IN THE UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

_____

Case No. 08-1378, 08-1384 and 08-1385
_____

UNITED STATES OF AMERICA,

Plaintiff - Appellee,
v.
DALE GILES, CHARMAR BROWN AND
EVEREADA KOURIS

Defendants - Appellants.

_____

BRIEF OF APPELLEE
_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

HONORABLE LAURIE SMITH CAMP, UNITED STATES DISTRICT JUDGE
_____

UNITED STATES OF AMERICA

JOE E. STECHER
United States Attorney
District of Nebraska

and

MARIA R. MORAN
Assistant U.S. Attorney
1620 Dodge, Suite 1400
Omaha, NE 68102-1506
(402) 661-3700

## <u>SUGGESTION OF NO ORAL ARGUMENT</u>

This case comes before this Court pursuant to Giles', Brown's and Kouris' appeal of their convictions following a jury trial and of their sentences.

The facts and legal arguments necessary to resolve the issues raised by the parties have been adequately presented in the briefs and the record. However, should the Court believe oral argument is necessary, it is suggested that 15 minutes per side will be adequate to address all issues raised.

Appellate Case: 08-1385    Page: 2    Date Filed: 11/04/2008 Entry ID: 3487201

# TABLE OF CONTENTS

SUGGESTION OF NO ORAL ARGUMENT .. . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF CONTENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

TABLE OF AUTHORITIES CITED. . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

JURISDICTIONAL STATEMENT.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xii

STATEMENT OF THE ISSUES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xiii

STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

     A.    NATURE OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

     B.    STATEMENT OF THE FACTS.. . . . . . . . . . . . . . . . . . . . . . . . 2

SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

ARGUMENT.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

I.    WHETHER THE EVIDENCE WAS SUFFICIENT TO SUPPORT THE
JURY'S VERDICT OF GUILTY AS TO EACH DEFENDANT... . . . . . 40

II.    WHETHER THE DISTRICT COURT COMMITTED CLEAR ERROR IN
DENYING THE DEFENDANT'S <u>BATSON</u> CHALLENGE TO THE
STRIKING OF TWO AFRICAN-AMERICAN VENIRE MEMBERS.. . 47

III.    WHETHER THE DISTRICT COURT ABUSED IT'S DISCRETION BY
DENYING A MISTRIAL AND ADMITTING NON-HEARSAY
TESTIMONY.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

IV.    WHETHER THE DISTRICT COURT ABUSED ITS DISCRETION BY
ADMITTED STATEMENTS OF COCONSPIRATORS PURSUANT TO
FED. RULE OF EVIDENCE 801(d)(2)(E).. . . . . . . . . . . . . . . . . . . . . 57

Appellate Case: 08-1385    Page: 3    Date Filed: 11/04/2008   Entry ID: 3487201

V.      WHETHER GILES  RECEIVED EFFECTIVE ASSISTANCE OF
        COUNSEL.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

VI.     WHETHER A VARIANCE EXISTED BETWEEN COUNT II OF THE
        INDICTMENT AND THE EVIDENCE PRESENTED.. . . . . . . . . . . . . . 68

VII.    WHETHER THE JURY INSTRUCTIONS FOR COUNTS II, IV AND VII
        CORRECTLY DESCRIBED THE ELEMENTS OF THE OFFENSE.. . . 75

VIII.   WHETHER THE DISTRICT COURT PLAINLY ERRED WHEN IT DID
        NOT SUA SPONTE SEVER BROWN'S CASE FROM HIS CO-
        DEFENDANTS.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

IX.     WHETHER PROBABLE CAUSE EXISTED TO ISSUE THE SEARCH
        WARRANTS.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

X.      WHETHER THE DISTRICT COURT ERRED IN INSTRUCTING THE
        JURY REGARDING DRUG QUANTITY.. . . . . . . . . . . . . . . . . . . . . . 99

XI.     WHETHER THE OBSTRUCTION OF JUSTICE ENHANCEMENT WAS
        PROPERLY APPLIED TO KOURIS' SENTENCE.. . . . . . . . . . . . . . . 104

XII.    WHETHER THE TRIAL COURT PROPERLY SENTENCED THE
        DEFENDANT, GILES, BASED ON A FINDING THAT HE
        COMMITTED FIRST DEGREE MURDER.. . . . . . . . . . . . . . . . . . . . . 110

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 121

CERTIFICATE OF DISKETTE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 122

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 122

CERTIFICATE OF COMPLIANCE.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 123

ADDENDUM

Appellate Case: 08-1385     Page: 4     Date Filed: 11/04/2008 Entry ID: 3487201

# TABLE OF AUTHORITIES

## CASES

Apprendi v. New Jersey, 530 U.S. 466 (2000). . . . . . . . . . . . . . . . . . 100, 101, 118

Bailey v. United States, 516 U.S. 137 (1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

Batson v. Kentucky, 476 U.S. 79 (1986). . . . . . . . . . . . . . . . . . . 38, 48, 49, 51, 52

Bruton v. United States, 391 U.S.123 (1968). . . . . . . . . . . . . . . . . . . . . . . . 58, 67

Crawford v. Washington, 541 U.S. 36 (2004). . . . . . . . . . . . . 55, 56, 57, 58, 61

Franks v. Delaware, 438 S. Ct. 154 (1978). . . . . . . . . . . . . . . . . . . . . . . 96, 97, 98

Henderson v. United States, 815 F.2d 1189 (8th Cir. 1987). . . . . . . . . . . . . . . . 41

Hernandez v. New York, 500 U.S. 352 (1991). . . . . . . . . . . . . . . . . . . . . . . . . . . 49

Illinois v. Gates, 462 U.S. 213 (1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86, 93

McMillan v. Pennsylvania, 477 U.S. 79 (1986). . . . . . . . . . . . . . . . . . . . 117, 119

Milburn v. United States, 474 U.S. 994 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . 72

Muscarello v. United States, 524 U.S. 125 (1998). . . . . . . . . . . . . . . . . . . . . . . 79

Pinkerton v. United States, 328 U.S. 640 (1946). . . . . . . . . . . . . . . . . . . . . . . 102

Rahn v. Hawkins, 464 F.3d 813 (8th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . 55

Rita v. United States, 127 S. Ct. 2456 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . 113

Stone v. Powell, 428 U.S. 465 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

Strickland v. Washington, 466 U.S. 668 (1984). . . . . . . . . . . . . . . . . . . . . . 64, 68

Appellate Case: 08-1385    Page: 5    Date Filed: 11/04/2008 Entry ID: 3487201

Tennessee v. Street, 471 U.S. 409 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

United States v. Adkins, 842 F.2d 210 (8th Cir. 1988). . . . . . . . . . . . . . . . . . . . . 82

United States v. Aguayo-Delgado, 220 F.3d 926 (8th Cir. 2000). . . . . . . . 100, 101

United States v. Allmon, 500 F.3d 800 (8th Cir. 2007). . . . . . . . . . . . . . . . . . . 108

United States v. Alvarez, 478 F.3d 864 (8th Cir. 2007). . . . . . . . . . . . . . . . . . . 113

United States v. Atkins, 25 F.3d 1401 (8th Cir. 1994),
cert. denied, 513 U.S. 953 (1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

United States v. Bascope-Zurita, 68 F.3d 1057 (8th Cir. 1995),
cert. denied, 516 U.S. 1062 (1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

United States v. Begnaud, 783 F.2d 144 (8th Cir. 1986). . . . . . . . . . . . . 68, 72, 73

United States v. Bell, 573 F.2d 1040 (8th Cir. 1978). . . . . . . . . . . . . . . . . . . . . . 63

United States v. Brown, 183 F.3d 740 (8th Cir. 1999). . . . . . . . . . . . . . . . . . . . . 64

United States v. Brown, 584 F.2d 252 (8th Cir. 1978),
cert. denied, 440 U.S. 910 (1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

United States v. Ceballos-Torres, 218 F.3d 409 (5th Cir. 2000). . . . . . . . . . . . . 79

United States v. Cordova, 157 F.3d 587 (8th Cir. 1998). . . . . . . . . . . . . . . . . . . 47

United States v. Crawford, 413 F.3d 873 (8th Cir. 2005). . . . . . . . . . . . . . . . . . 47

United States v. Crook, 936 F.2d 1012 (8th Cir. 1991). . . . . . . . . . . . . . . . . . . . 97

United States v. Dawn, 129 F.3d 878 (7th Cir. 1997). . . . . . . . . . . . . . . . 116, 117

United States v. Edmiston, 46 F.3d 786 (8th Cir. 1995). . . . . . . . . . . . . . . . 88, 89

Appellate Case: 08-1385     Page: 6     Date Filed: 11/04/2008 Entry ID: 3487201

United States v. Espino, 317 F.3d 788 (8th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . 42

United States v. Etheridge, 165 F.3d 655 (8th Cir. 1999). . . . . . . . . . . . . . . . . . 87

United States v. Evans, 970 F.2d 663 (10th Cir. 1992),
cert. denied, 507 U.S. 922 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

United States v. Falls, 34 F.3d 674 (8th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . 98

United States v. Farrington, 499 F.3d 854 (8th Cir. 2007). . . . . . . . . . . . . . . . . 104

United States v. Faul, 748 F.2d 1204 (8th Cir. 1984),
cert. denied, 472 U.S. 1027 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

United States v. Faulkner, 439 F.3d 1221 (10th Cir. 2006). . . . . . . . . . . . . . . . . 56

United States v. Frazier, 280 F.3d 835 (8th Cir. 2002). . . . . . . . . . . . . . . . . . . . . 57

United States v. Gamboa, 439 F.3d 796 (8th Cir. 2006). . . . . . . . . . . . . . . . . . . 78

United States v. Garcia, 893 F.2d 188 (8th Cir. 1990). . . . . . . . . . . . . . . . . . 60, 62

United States v. Garcia-Gonon, 433 F.3d 587 (8th Cir. 2006). . . . . . . . . . . . . . 113

United States v. Ghant, 339 F.3d 660 (8th Cir. 2003). . . . . . . . . . . . . . . . . . . . . 73

United States v. Gill, 513 F.3d 836 (8th Cir. 2008). . . . . . . . . . . . . . . . . . 79, 80, 81

United States v. Gjerde, 110 F.3d 595 (8th Cir. 1997). . . . . . . . . . . . . . . . . . . . . 60

United States v. Gladney, 48 F.3d 309 (8th Cir. 1995). . . . . . . . . . . . . . . . . . . . 98

United States v. Gooden, 892 F.2d 725 (8th Cir. 1989),
cert. denied, 496 U.S. (1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119

United States v. Graham, 323 F.3d 603 (8th Cir. 2003). . . . . . . . . . . . . . . . . . . 114

Appellate Case: 08-1385    Page: 7    Date Filed: 11/04/2008 Entry ID: 3487201

United States v. Greene, 41 F.3d 383 (8th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . 109

United States v. Handy, 668 F.2d 407 (8th Cir. 1982). . . . . . . . . . . . . . . . . . . . . . 61

United States v. Harris, 344 F.3d 803 (8th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . 74

United States v. Hernandez, 281 F.3d 746 (8th Cir. 2002).. . . . . . . . . . . . . . . . 64

United States v. Hernandez-Hernandez, 384 F.3d 562 (8th Cir. 2004). . . . . . . . . 86

United States v. Hester, 140 F.3d 753 (8th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . 41

United States v. Holt, 149 F.3d 760 (8th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . 107

United States v. Hughes, 911 F.2d 113 (8th Cir. 1990). . . . . . . . . . . . . . . . . . . . . 51

United States v. Jennings, 487 F.3d 564 (8th Cir. 2007). . . . . . . . . . . . . . . . . . . . 75

United States v. Jones, 990 F.2d 1047 (8th Cir. 1993). . . . . . . . . . . . . . . . . . . . . 44

United States v. Kent, 531 F.3d 642 (8th Cir. 2008). . . . . . . . . . . . . . 77, 78, 80, 81

United States v. LaGuardia, 774 F.2d 317 (8th Cir. 1985). . . . . . . . . . . . . . . 40, 45

United States v. Lange, 918 F.2d 707 (8th Cir. 1990). . . . . . . . . . . . . . . . . . . . . 108

United States v. Leon, 468 U.S. 897 (1984). . . . . . . . . . . . . . . . . . . . . . . . 94, 95, 98

United States v. Lombard, 72 F.3d 170 (1st Cir. 1995). . . . . . . . . . . . . . . . . . . . 117

United States v. Lucht, 18 F.3d 541 (8th Cir. 1994).. . . . . . . . . . . . . . . . . . . . . . . 97

United States v. Massa, 740 F.2d 629 (8th Cir. 1984),
cert. denied, 471 U.S. 1115 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

United States v. Masters, 978 F.2d 281 (7th Cir. 1992). . . . . . . . . . . . . . . . . . . . 117

Appellate Case: 08-1385    Page: 8    Date Filed: 11/04/2008 Entry ID: 3487201

United States v. Mathijssen, 406 F.3d 496 (8th Cir. 2005). . . . . . . . . . . . . . . . . 110

United States v. Maxwell, 473 F.3d 868 (8th Cir. 2007). . . . . . . . . . . . . . . . . . . . 51

United States v. May, 413 F.3d 841 (8th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . 109

United States v. McConnell, 903 F.2d 566 (8th Cir. 1990). . . . . . . . . . . . . . . . . 84

United States v. McMurray, 34 F.3d 1405 (8th Cir. 1994). . . . . . . . . . . . . . . . . . 41

United States v. Meyer, 157 F.3d 1067 (7th Cir. 1998). . . . . . . . . . . . . . . . . . . . 116

United States v. Michaels, 911 F.2d 131 (8th Cir. 1990),
cert. denied, 498 U.S. 1094 (1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

United States v. Mickelson, 378 F.3d 810 (8th Cir. 2004). . . . . . . . . . . . . . . . . . 104

United States v. Minnis, 489 F.3d 325 (8th Cir. 2007). . . . . . . . . . . . . . . . . . . . . 99

United States v. Morin, 437 F.3d 777 (8th Cir. 2006). . . . . . . . . . . . . . . . . . . . . 104

United States v. Murphy, 69 F.3d 237 (8th Cir. 1995). . . . . . . . . . . . . . . . . . 92, 93

United States v. Novak, 217 F.3d 566 (8th Cir. 2000). . . . . . . . . . . . . . . . . . . . . 70

United States v. Olano, 507 U.S. 725 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

United States v. Payne, 923 F.2d 595 (8th Cir. 1991). . . . . . . . . . . . . . . . . . . . . 84

United States v. Pecina, 956 F.2d 186 (8th Cir. 1992). . . . . . . . . . . . . . . . . . . . . 85

United States v. Phelps, 168 F.3d 1048. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

United States v. Ramos, 818 F.2d 1392 (8th Cir. 1987). . . . . . . . . . . . . . . . . 88, 89

United States v. Red Elk, 426 F.3d 948 (8th Cir. 2005). . . . . . . . . . . . . . . . . . . 114

Appellate Case: 08-1385    Page: 9    Date Filed: 11/04/2008 Entry ID: 3487201

United States v. Rodriguez, 484 F.3d 1006 (8th Cir. 2007). . . . . . . . . . . . . 56, 110

United States v. Scheetz, 293 F.3d 175 (4th Cir. 2002). . . . . . . . . . . . . . . . . . 115

United States v. Sdoulam, 398 F.3d 981 (8th Cir. 2005). . . . . . . . . . . . . . . . . 99

United States v. Sleet, 893 F.2d 947 (8th Cir. 1990). . . . . . . . . . . . . . . . . . . 119

United States v. Smith, 487 F.3d 1163 (8th Cir. 2007). . . . . . . . . . . . . . . . . . 52

United States v. Snider, 720 F.2d 985 (8th Cir. 1983). . . . . . . . . . . . . . . . . . . 60

United States v. Sparkman, 500 F.3d 678 (8th Cir. 2007). . . . . . . . . . . . . . . . 52

United States v. Stapleton, 268 F.3d 597 (8th Cir. 2001).. . . . . . . . . . . . . . . . 109

United States v. Stuckey, 220 F.3d 976 (8th Cir. 2000). . . . . . . . . . . . . . . . . . 70

United States v. Swinney, 970 F.2d 494 (8th Cir. 1992). . . . . . . . . . . . . . . . . 85

United States v. Thornberg, 844 F.2d 573 (8th Cir. 1988). . . . . . . . . . . . . . . . 81

United States v. Townley, 929 F.2d 365 (8th Cir. 1991). . . . . . . . . . . . . . . . . 119

United States v. Tyler, 235 F.3d 1036 (8th Cir. 2001). . . . . . . . . . . . . . . . . . . 90

United States v. Urick, 431 F.3d 300 (8th Cir. 2005).. . . . . . . . . . . . . . . . . . . 74

United States v. Vega-Rico, 417 F.3d 976 (8th Cir. 2005),
cert. denied, 547 U.S. 1073 (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

United States v. Watson, 480 F.3d 1175 (8th Cir. 2007). . . . . . . . . . . . . . . . . 104

United States v. Watts, 519 U.S. 148 (1997). . . . . . . . . . . . . . . . . . . . . . . . . 119

United States v. Westbrook, 896 F.2d 330 (8th Cir. 1990). . . . . . . . . . . . . . . . 81

Appellate Case: 08-1385    Page: 10    Date Filed: 11/04/2008 Entry ID: 3487201

United States v. Whiting, 522 F.3d 845 (8th Cir. 2008). . . . . . . . . . . . . . . . . . . . . 67

United States v. Wiggins, 104 F.3d 174 (8th Cir. 1997). . . . . . . . . . . . . . . . . . 104

United States v. Williams, 431 F.3d 1115 (8th Cir. 2005). . . . . . . . . . . . . . . . . 86

United States v. Williams, 936 F.2d 1243 (11th Cir. 1991),
cert. denied, 112 S. Ct. 1279 (1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

United States v. Williams, 982 F.2d 1209 (8th Cir. 1992). . . . . . . . . . . . . . . . . 45

United States v. Young, 702 F.2d 133 (8th Cir. 1983). . . . . . . . . . . . . . . . . . 75, 81

United States v. Young-Bey, 893 F.2d 178 (8th Cir. 1990). . . . . . . . . . . . 40, 44, 45

Zafiro v. United States, 506 U.S. 534 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

## STATUTES, CODES AND RULES

Fed. Rule of Crim. Procedure 14.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81, 82, 85

Fed. Rule Evid. 801(c).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

Fed. Rule Evid. 801(d)(2)(E). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38, 59, 62, 84

Title 18 U.S.C. § 13 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 115

Title 18 U.S.C. §922(g). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3

Title 18 U.S.C. §924(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 45, 77, 78, 117

Title 18 U.S.C. § 1111.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 115, 116

Title 21 U.S.C. §841 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 100, 117

Title 21 U.S.C. §846 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2

Appellate Case: 08-1385     Page: 11     Date Filed: 11/04/2008 Entry ID: 3487201

Title 21 U.S.C. §853 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3

U.S.S.G. § 2A1.1. . . . . . . . . . . . . . . . . . . . . . . . . .   67, 105, 108, 110, 111, 115, 116

U.S.S.G. § 2D1.1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 111, 114, 116

U.S.S.G. § 3C1.1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67, 105, 108

U.S.S.G. § 3D1.2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110

Appellate Case: 08-1385    Page: 12    Date Filed: 11/04/2008 Entry ID: 3487201

## JURISDICTIONAL STATEMENT

The District Court's jurisdiction in this case is pursuant to Title 21, United States Code, Sections 841 and 846, and Title 18, United States Code, Sections 922 and 924. This Court's jurisdiction is invoked pursuant to Title 18, United States Code, Section 3742 and Title 28, United Code, Section 1291.

Appellate Case: 08-1385    Page: 13    Date Filed: 11/04/2008 Entry ID: 3487201

## <u>STATEMENT OF THE ISSUES</u>

I.    **WHETHER THE EVIDENCE WAS SUFFICIENT TO SUPPORT THE JURY'S VERDICT OF GUILTY AS TO EACH DEFENDANT.**

United States v. Jones, 990 F.2d 1047 (8th Cir. 1993)

United States v. Cordova, 157 F.3d 587 (8th Cir. 1998)

United States v. McMurray, 34 F.3d 1405 (8th Cir. 1994)

II.   **WHETHER THE DISTRICT COURT COMMITTED CLEAR ERROR IN DENYING THE DEFENDANT'S <u>BATSON</u> CHALLENGE TO THE STRIKING OF TWO AFRICAN-AMERICAN VENIRE MEMBERS.**

Batson v. Kentucky, 476 U.S. 79 (1986)

Hernandez v. New York, 500 U.S. 352 (1991)

United States v. Williams, 982 F.2d 1209 (8th Cir. 1992)

III.  **WHETHER THE DISTRICT COURT ABUSED IT'S DISCRETION BY DENYING A MISTRIAL AND ADMITTING NON-HEARSAY TESTIMONY.**

United States v. Crawford, 413 F.3d 873 (8th Cir. 2005)

Rahn v. Hawkins, 464 F.3d 813 (8th Cir. 2006)

United States v. Rodriguez, 484 F.3d 1006 (8th Cir. 2007)

Appellate Case: 08-1385    Page: 14    Date Filed: 11/04/2008 Entry ID: 3487201

**IV. WHETHER THE DISTRICT COURT ABUSED ITS DISCRETION BY ADMITTED STATEMENTS OF COCONSPIRATORS PURSUANT TO FED. RULE OF EVIDENCE 801(d)(2)(E).**

United States v. Gjerde, 110 F.3d 595 (8th Cir. 1997)

United States v. Bell, 573 F.2d 1040 (8th Cir. 1978)

United States v. Garcia, 893 F.2d 188 (8th Cir. 1990)

**V. WHETHER GILES  RECEIVED EFFECTIVE ASSISTANCE OF COUNSEL.**

United States v. Hernandez, 281 F.3d 746 (8th Cir. 2002)

Strickland v. Washington, 466 U.S. 668 (1984)

United States v. Whiting, 522 F.3d 845 (8th Cir. 2008)

**VI. WHETHER A VARIANCE EXISTED BETWEEN COUNT II OF THE INDICTMENT AND THE EVIDENCE PRESENTED.**

United States v. Stuckey, 220 F.3d 976 (8th Cir. 2000)

Milburn v. United States, 474 U.S. 994 (1985)

United States v. Ghant, 339 F.3d 660 (8th Cir. 2003)

Appellate Case: 08-1385    Page: 15    Date Filed: 11/04/2008 Entry ID: 3487201

**VII.  WHETHER THE JURY INSTRUCTIONS FOR COUNTS II, IV AND VII CORRECTLY DESCRIBED THE ELEMENTS OF THE OFFENSE.**

United States v. Gill, 513 F.3d 836 (8th Cir. 2008)

United States v. Kent, 531 F.3d 642 (8th Cir. 2008)

United States v. Young, 702 F.2d 133 (8th Cir. 1983)

**VIII.  WHETHER THE DISTRICT COURT PLAINLY ERRED WHEN IT DID NOT SUA SPONTE SEVER BROWN'S CASE FROM HIS CO-DEFENDANTS.**

Zafiro v. United States, 506 U.S. 534 (1993)

United States v. Payne, 923 F.2d 595 (8th Cir. 1991)

United States v. McConnell, 903 F.2d 566 (8th Cir. 1990)

**IX.  WHETHER PROBABLE CAUSE EXISTED TO ISSUE THE SEARCH WARRANTS.**

Illinois v. Gates, 462 U.S. 213 (1983)

United States v. Murphy, 69 F.3d 237 (8th Cir. 1995)

United States v. Leon, 468 U.S. 897 (1984)

Appellate Case: 08-1385     Page: 16     Date Filed: 11/04/2008 Entry ID: 3487201

**X.     WHETHER THE DISTRICT COURT ERRED IN INSTRUCTING THE JURY REGARDING DRUG QUANTITY.**

United States v. Aguayo-Delgado, 220 F.3d 926 (8th Cir. 2000)

Pinkerton v. United States, 328 U.S. 640 (1946)

United States v. Morin, 437 F.3d 777 (8th Cir. 2006)


**XI.     WHETHER THE OBSTRUCTION OF JUSTICE ENHANCEMENT WAS PROPERLY APPLIED TO KOURIS' SENTENCE.**

United States v. Allmon, 500 F.3d 800 (8th Cir. 2007)

United States v. Holt, 149 F.3d 760 (8th Cir. 1998)

United States v. May, 413 F.3d 841 (8th Cir. 2005)


**XII.     WHETHER THE TRIAL COURT PROPERLY SENTENCED THE DEFENDANT, GILES, BASED ON A FINDING THAT HE COMMITTED FIRST DEGREE MURDER.**

United States v. Graham, 323 F.3d 603 (8th Cir. 2003)

United States v. Scheetz, 293 F.3d 175 (4th Cir. 2002)

United States v. Meyer, 157 F.3d 1067 (7th Cir. 1998)

Appellate Case: 08-1385     Page: 17     Date Filed: 11/04/2008 Entry ID: 3487201

# STATEMENT OF THE CASE

## A.  NATURE OF THE CASE

On April 20, 2006,  a federal grand jury returned an indictment against Dale Giles and Charmar Brown charging them with a conspiracy to distribute more than 1,000 kilograms of marijuana in violation of  21 U.S.C. §846; with firearms charges in connection with drug trafficking offenses in violation of 18 U.S.C. § 924(c); with possession with intent to distribute marijuana in violation of 21 U.S.C. §841; and with the forfeiture of various amounts of  United States currency, real properties, vehicles and other miscellaneous property in violation of 21 U.S.C. §853.  Giles alone was charged with being a felon in possession of several firearms in violation of 18 U.S.C. §922(g).  (Filing No. 1).

Prior to trial several superseding indictments were returned including others in the conspiracy to distribute marijuana charge with Giles and Brown.  Those individuals included Evereada Kouris, George Dotson, George Moore, Lavelle Giles, Richard McGinnis, Terrance Howard and Johnny Newell. Dotson, Moore, Lavelle Giles, McGinnis, Howard and Newell all pled guilty to the conspiracy charge prior to trial.  By the time of the fifth superseding indictment, only Giles, Brown and Kouris remained.  (Filing Nos. 18, 30, 112, 189, 298).  They pled not guilty to the charges.  (Filing Nos. 309-311).

Appellate Case: 08-1385     Page: 18     Date Filed: 11/04/2008 Entry ID: 3487201

Several motions were filed by the defendants prior to trial including motions by Giles, Brown and Kouris to suppress evidence (Filings No. 89, 93, 95). After a hearing on these motions (Filing Nos. 163, 167), the court issued a Report and Recommendation (hereinafter referred to as "R&R") denying the motions to suppress. (Filing No. 215). This R&R was adopted by Judge Smith Camp. (Filing No. 297).

Trial against the defendants commenced on September 25, 2007, and ended on October 25, 2007. The jury returned guilty verdicts against all defendants of all counts on October 25, 2007. (Filing Nos. 572-577). Presentence reports were prepared. Each defendant filed objections to the presentence reports which were addressed and ruled on by Judge Smith Camp. All were sentenced on January 28, 2008. All three filed timely notices of appeal. (Filing Nos. 638, 644, 647).

## B. STATEMENT OF THE FACTS

On April 20, 2006, an indictment was returned charging Giles and Brown with a conspiracy to distribute more than 1,000 kilograms of marijuana in violation of 21 U.S.C. §846; with firearms charges in connection with and in furtherance of the drug trafficking offenses in violation of 18 U.S.C. § 924(c); with possession with intent to distribute marijuana in violation of 21 U.S.C. §841; and with the forfeiture of various amounts of United States currency, real

2

properties, vehicles and other miscellaneous property in violation of 21 U.S.C. §853. Giles alone was charged with being a felon in possession of several firearms in violation of 18 U.S.C. §922(g). (Filing No. 1).

Other individuals were joined with Giles and Brown in the conspiracy to distribute marijuana charge in several superseding indictments that were returned prior to trial. Those individuals added were Evereada Kouris, George Dotson, George Moore, Richard McGinnis, Lavelle Giles, Terrance Howard and Johnny Newell. Dotson, Moore, McGinnis, Lavelle Giles, Howard and Newell all pled guilty.

Giles, Brown and Kouris filed motions to suppress evidence gathered during the execution of numerous search warrants for various properties, storage facilities and vehicles affiliated with the defendants. (Filings No. 89, 93, 95). Law enforcement began execution of these warrants on April 3, 2006. Evidence collected from these searches resulted in the seizure of over 1000 pounds of marijuana, over $629,000 in currency, 14 vehicles, two guns, jewelry, recording equipment, ownership documents to properties, vehicles and financial accounts, and items associated with the distribution of marijuana such as scales, money counters and packaging equipment.

After a hearing on these motions (Filing Nos. 163, 167), the court issued a

3

Report and Recommendation denying the motions to suppress.  (Filing No. 215).
This R&R was adopted by Judge Smith Camp.  (Filing No. 297).

The fifth superseding indictment was returned against Giles, Brown and
Kouris on January 18, 2007.  Giles, Brown and Kouris pled not guilty to the
charges.  (Filing Nos. 298, 310, 311, 321).

The jury trial of the defendants commenced on September 25, 2007, before
the Honorable Laurie Smith Camp.  At the month-long trial, the evidence
presented, in part, consisted of testimony from cooperating witnesses and
coconspirators, evidence recovered from various searches of locations and
vehicles associated with the defendants, evidence of contacts the defendants had
with law enforcement, phone toll records, airline records, hotel records, and other
storage records, and documents evidencing the defendants' interests in real and
personal property.

The conspiracy between Giles, Brown, Kouris and others began in the Fall
of 2004 and continued for almost two years.  During this time the defendants
arranged for tons of marijuana to be transported to Omaha, for it to be sold in
Omaha, and for millions of dollars to be collected for the sale of this marijuana
which they used to purchase  houses, vehicles, jewelry, clothes, and a host of other
assets.  In furthering the aim of the conspiracy to distribute marijuana, Giles and

4

Brown shot and killed three persons to avoid paying for the load of marijuana these individuals had arranged to be transported to Omaha for them. Giles also shot Monte Williams after Williams had stolen marijuana from a marijuana stash house used by Giles and Brown. Giles and Brown also attempted to shoot Clarence Dennis, William's accomplice in the marijuana theft. Even after Giles and Brown were arrested on April 4, 2006, the conspiracy continued on as there was still marijuana not confiscated by law enforcement that was distributed and money that was collected on behalf of the defendants.

The events leading to the discovery of the conspiracy began on May 4, 2005, when the bodies of Benigno Dominguez, Frank Wilkinson, and Faustino Garcia were discovered in a wooded area near 60th and State Streets lying dead after their bodies had been dumped, doused with gasoline and set on fire. (Tr. 152:13-17; 153:5-23; 205:20-206:7; 210:5-15: 232:14-233:2)[1]. Through the investigation done at the scene, Omaha Police Officers learned that their bodies had been transported to that location as they were able to follow trails of blood that had spilled along the highway leading to the dump site. At the time it was unknown where the murders had actually occurred. (Tr. 168:10-13; 184:20-185:4; 186:18-187:22; 196:13-197:18).

---

[1]Tr. = Transcript of the trial commencing on 9-25-07.

Appellate Case: 08-1385   Page: 22   Date Filed: 11/04/2008 Entry ID: 3487201

The jury heard through the testimony of Dr. Jerry Jones, a forensic pathologist who performed the autopsies, that all three victims died as a result of gunshot wounds to the head. Dominguez died as a result of a shot to the right side of his head. He also suffered a gunshot wound to the left side of his neck, the bullet being still lodged in his neck at the time of the autopsy. This bullet had passed through his arm and into his neck as Dominguez attempted to block this shot. Both shots to Dominguez were fired from a distance of at least two feet. Dominguez was the heaviest victim of the three killed. (Tr. 417:11-19; 425:14-20; 421:22-24; 422:7-17; 423:17-424:7; 450:3-5; 454:5-15).

Frank Wilkinson, a half-brother of Dominguez, and the youngest of the three killed was shot three times: once in the right side of his head, once just about in his right ear, and once on the left side of his neck. He also tried to block the head shots with his right hand. Dr. Jones testified that the shots to the head were fired from a distance of under two feet. (Tr. 431:3-23; 433:12-15; 439:13-20; 450:3-5). Faustino Garcia, the oldest of the three, also died from a gunshot wound to his head. He was shot from a distance of less than two feet. (Tr. 440:10-20; 441:7-13; 443:2-8).

The five bullets removed from the victims were analyzed by crime laboratory technician, Daniel Bredow, to identify the type of weapon used and the

6

type of ammunition used in the killings.  (Tr. 596:23-597:15).  He testified that all the bullets were .44 caliber ammunition consistent with being Speer Gold Dot ammunition.  (Tr. 601:2-24).  Bredow also assembled a list of four weapons that could have fired the bullets.  All four possible weapons were .44 caliber revolvers.  (Tr. 605:3-607:10).  Because of the condition of the bullets recovered, Bredow could not determine whether all the bullets were fired from the same gun.  (Tr. 611:2-19).

After the bodies were discovered, law enforcement's first duties centered on attempting to determine the identity of the victims.  (Tr. 231:24-232:2).  The victims had no identification on them.  However, a Carlisle Hotel receipt was found in the pocket of Wilkinson.  Tracing this receipt, officers verified with personnel at the Days Inn Carlisle Hotel that Wilkinson had checked into that hotel on May 2, 2005.  Officers also learned that  Dominguez checked into that same hotel earlier on April 29, 2005.  He rented another room for one other person under his name on May 2, 2005.  This third person was never identified during the trial.  All three persons checked out on the morning of May 3, 2005.  On these hotel records, Tempe and Mesa, Arizona addresses were listed.  (Tr. 260:7-262:13; Ex. 493).  Officers used that information to contact law enforcement authorities in Arizona and ultimately to identify relatives, who made the identifications of

Appellate Case: 08-1385     Page: 24     Date Filed: 11/04/2008 Entry ID: 3487201

Dominguez and Wilkinson. Nothing was found on the third person to identify him. However, after hearing about the homicides on television and knowing that Garcia was coming to Nebraska, family members of Garcia from Colorado contacted the Omaha Police Department and ultimately made the identification of him.

Law enforcement was then able to obtain airline records confirming that Dominguez flew into Omaha from Atlanta on April 28, 2005, (Ex. 716) where he rented a 2005 gray Pontiac from Enterprise Rental at Epply Airport upon his arrival. (Ex. 104). This vehicle was later found abandoned near Plattsmouth, Nebraska on the morning the bodies were discovered. (Tr. 336:9-337:7). Wilkinson flew into Omaha on May 1, 2005. (Ex. 719).

After the identification of the three bodies, officers traveled to Arizona attempting to discover why the three persons were in Omaha and why they were murdered. Conversations with Hector Wilkinson, the half brother of Benigno Dominguez and the twin brother of Frank Wilkinson, revealed that Dominguez was associated with "Clean" from Omaha. (Tr. 387:2-10; 290:21-393:22). "Clean" remained unidentified until officers retrieved reports of a shooting that happened on October 3, 2005. These reports recited that on October 3rd, "Clean" had shot Monte Williams outside William's sister's residence located at 2868

8

Camden Avenue. The individual with "Clean" at this shooting was "Charmar". (Tr. 393:10-394:10).

Researching the name of "Charmar" through police reports, uncovered a shooting that occurred on February 6, 2005, in which a person identified as Charmar Brown had been shot and treated at a local hospital. One of the individuals associated with Brown at the hospital was Dale Giles, who had a nickname of "Clean". (Tr. 369:3-10).

Based on the descriptions given of Brown and Giles from the Charmar Brown shooting on Feb. 6, 2005, Omaha Police Officer Brian Bogdanoff now believed that the "Clean" named by Hector Wilkinson was Dale Giles. Off. Bogdanoff returned to Arizona where he interviewed other individuals. (Tr. 390:21-392:22). Eventually, he interviewed Kenrell Boyston, a prisoner at the Maricopa County Jail in Phoenix, Arizona, who identified both Giles and Brown from photo lineups. Boyston identified Giles as "Clean" and Brown as "Cousin". (Tr. 467:21-469:19; 473:5-12; 555:3-556:12; Ex. 102 & 103).

At trial Boyston testified that he met Giles and Brown in 2004 in Phoenix and began supplying them with marijuana. (Tr. 533:1-6). Their deals usually occurred in the following way: Boyston would meet with Giles and Brown, show them a photo of the marijuana he would sell them, they agreed on a quantity and

Appellate Case: 08-1385    Page: 26    Date Filed: 11/04/2008 Entry ID: 3487201

price, and arrangements were then made for Giles and Brown to pick up the marijuana. (Tr. 535:8-536:8; 539:1-14). The marijuana was usually picked up at the home of Ulysses Sanchez aka " Bully", Boyston's supplier. Boyston identified Benigno Dominguez also known as "Jimmy" as the supplier to Bully. (Tr. 531:19-532:4; 540:18-25; 545:23-546:9). The first delivery to Giles and Brown that Boyston arranged was 80-150 pounds. (Tr. 536:22-23). He set up a total of 5-6 marijuana deals with Brown and Giles with the amount of the loads escalating to 500-600 pounds a load. (Tr. 538:9-12). Boyston testified that Brown and Giles were always together when they received the loads. (Tr. 539:15-22). He also identified photographs of Thelexus Marshall and James Giles as additional persons who sometimes accompanied Giles and Brown when they obtained the marijuana. (Tr. 541:1-542:22).

Boyston also testified about a trip that he took with Ulysses Sanchez (Bully) and Benigno Dominguez in March of 2005 to Atlanta regarding a 1000 pound load of marijuana that needed to be sold. (Tr. 546:10-14). Giles and Brown traveled to Atlanta to meet up with Boyston. (Tr. 547:8-23). All the parties met up at an Atlanta strip club. Boyston was not privy to the entire conversation between Sanchez, Dominguez, Giles and Brown as he got ill and was in the restroom during some of their meeting. (Tr. 546:15-21). Boyston testified he did not know

Appellate Case: 08-1385   Page: 27   Date Filed: 11/04/2008 Entry ID: 3487201

if Giles and Brown ever got this 1000 pound load. (Tr. 549:7-9). However, Boyston and Sanchez did attempt to arrange for Dominguez to have 2,000 pounds of marijuana delivered to Nebraska. Giles was to buy the first 1,000 pounds and the second 1,000 pounds would be paid for when it was sold. (Tr. 548:23-549:21). After this meeting between the Phoenix and Omaha people, Boyston never again had any further marijuana dealings with Dominguez, Giles or Brown as Giles and Brown were now directly connected to a major supplier, Dominguez. (Tr. 551:4-25).

Airline and bank records were later obtained verifying that all these parties were, in fact, together in Atlanta at the same time. Flight records from Delta and US Airlines were received confirming the presence of Kouris, Dominguez, Ulysses Sanchez (Bully), and Boyston in Atlanta by March 5, 2005. (Ex. 716 & 719). U.S. Bank records of Brown were received showing charges he incurred at the Hawthorne Suites in Atlanta during this same time. (Ex. 689).

Officers also uncovered another incident related to Giles, Brown and the distribution of marijuana. Timothy Moreno was arrested on October 16, 2005, at an immigration checkpoint in Texas driving a rental truck loaded with over 3,500 pounds of marijuana. (Tr. 1232:23-1233:25). Off. Bogdanoff's interviewed Moreno. Moreno admitted that he transported a total of over 25,000 pounds of

11

marijuana from Texas to various locations within the United States commencing around April 15, 2005. (Tr. 1234:9-12). He received $10 a pound for these deliveries. (Tr. 1248:9-10). At the trial, Moreno testified that it was on his eighth trip that he was stopped and arrested. (Tr. 1242:13-19). He admitted transporting an earlier large load of marijuana to Omaha. (Tr. 1258:16-1259:3).

On each of Moreno's trips prior to his arrest he would follow Mason Hill, a/k/a "Beau", the person in contact with the supplier, in a truck Moreno rented either through Budget or Penske. (Tr. 1257:5-17; 1258:1-18). Records of the rental of these trucks were received at trial documenting each trip Moreno took. (Ex. 453 & 454). His first trip began on April 15, 2005, where he transported approximately 3000 pounds of marijuana from El Paso to Tennessee. (Tr. 1244:20-25; 1252:1-2). He dropped off some of the load in Tennessee and then drove to Chicago, where he delivered the rest. (Tr. 1254:3-1255:8).

The second trip commenced on April 30, 2005. (Tr. 1255:23-1256:13). On this trip he also dropped off half of the marijuana in Tennessee, and then continued on to Omaha. (Tr. 1258:16-1259:3). Upon arrival in Omaha, Mason Hill made contact with the Omaha individuals. (Tr. 1259:12-16). Moreno was instructed that he was to follow a vehicle from the hotel where he and Hill were staying to the delivery site. A vehicle came to Moreno's hotel and Moreno

12

followed it to a house located at 4511 N. 65th Street. (Tr. 1261:8-1262:21; 1345:20-1346:11). At that location several black males assisted him in unloading approximately 3,000 pounds of marijuana from the truck into the laundry and living rooms of the house. (Tr. 1263:1-1264:3; 1281:5-16; 1283:5-12). Whether this was the load of marijuana that was negotiated between Giles, Brown and Dominguez while in Atlanta is unknown. Moreno and Mason Hill waited in Omaha to be paid for this load. However, they were notified shortly after the delivery to leave and not try to collect any money. (Tr. 1283:20-1285:15). While Moreno was unable to positively identify Giles and Brown as the persons he delivered marijuana to, he did positively identify the North 65th Street house as the location where he delivered the marijuana. (Tr. 1290:14-1291:17; Ex. 521 & 522).

The 3,000 pound estimate of the marijuana delivered by Moreno was corroborated by Faustino Garcia, one of the individuals killed. At the time the bodies were discovered (three days after Moreno commenced his trip from Texas to Tennessee to Omaha), officers located a blood stained piece of paper with numbers totaling up to approximately 3,000 in Garcia's pocket. (Tr. 213:11-18; Ex. 608). At the time of the murders, marijuana was being sold for approximately $1000 a pound. Off. Bogdanoff testified that this load delivered by Moreno was worth approximately $2,900,000. (Tr. 389:19-390:20).

13

Appellate Case: 08-1385    Page: 30    Date Filed: 11/04/2008 Entry ID: 3487201

Believing that Giles and Brown were connected to Dominguez and the distribution of marijuana, officers began compiling information about Giles and Brown, including information about vehicles they owned, real property they owned or used, financial accounts owned, and conducting surveillance of their activities. (Tr. 761:4-17). The information compiled demonstrated that large amounts of assets were accumulated and monies expended during the time set forth in Count I of the Indictment.

U.S. Bank records of Giles, Brown, and various entities they were affiliated with showed deposits of almost $500,000 being made in a one-year time period. During that time they wrote over $200,000 in checks and spent over $93,000 in credit card purchases, much of that spent on airline flights. (Exs. 105 & 686-698). Within two weeks after the deaths of the three individuals, Giles purchased a house located at 3811 N. 88th Avenue for $26,400 in cash. (Tr. 764:25-765:13; Ex. 8). Within one month after the murders Giles and Brown, in the name of K-Nown, bought a house located at 2118 Ames for $18,000 in cash. (Tr. 767:22-768:2; 1645:10-25; Ex. 7). They also purchased a house located at 4816 S. 60th St. in the name of K-Nown on August 17, 2005, by putting down a cash deposit of $50,000. (Tr. 772:20-773:14; Ex. 6). Giles also owned a home in Avondale, Arizona having purchased it for $340,000 putting down $103,000 as a deposit in

14

January of 2006. He had actually been utilizing this house prior to this date, however. (Tr. 819:9-820:5; 1587:3-7; Ex. 818).

Officers also learned that Giles, Brown, Kouris and other individuals affiliated with them rented a number of storage facilities in the Omaha area. Specifically, at Milt's Mini Storage located at 3349 Keystone Drive, Daramus Brown (a relative of Charmar Brown) rented unit 427, and Giles rented units 245 and 246. (Tr. 821:7-13). At Crown Point Storage located at 7603 Crown Point Avenue, Giles rented units 135, 292 and 350. (Ex. 669). Unit 189 was rented by Latasha Willis (girlfriend of Charmar Brown). (Ex. 670). Kouris rented unit 478. (Tr. 821:14-19; 889:17-24; Ex. 671). Law enforcement also learned that Giles and Brown were the owners of many vehicles, most of which were acquired during the time of the conspiracy and were seized during this investigation. (Exs. 29, 49, 86, 148, 174, 176-177 230-233, 307, 400, 413, 451, 459, 469, 472m, 492, 518).

Based on the financial information gathered, the property and vehicle information gathered, the storage records obtained, interviews with many individuals, and all the other research of Giles and Brown's activities that had been accumulated, law enforcement executed search warrants of many of the properties utilized by the defendants commencing on April 3, 2006. Among the items found during the search of the storage units at Milt's Mini Storage executed

15

on April 3, 2006, officers located: from #427 (rented to Daramus Brown) thirteen bags of marijuana (Tr. 1355:18-22; Ex. 13); and from #246 (Giles) a beige Cadillac with two safes in the trunk containing $358,030. (Tr. 1370:24-1371:3; Ex. 39 & 48).

Among the items found during the search of the units at Crown Point Storage executed on April 4, 2006, officers located: from #135 (Giles) - $164,880 (Ex. 83); from #350 (Giles) - a tan van purchased by Charmar Brown which contained 715 pounds of marijuana from 33 bundles (Ex. 111-143); from #427 (Kouris) - 35 pounds of marijuana (from 2 bundles), and an EA Co. .223 semi-automatic rifle with ten live .223 rounds and two AR magazines, two 20-round boxes of .223 ammunition and a ballistic vest, all lying next to the marijuana. (Ex. 160-165).

Among the items found during the search on April 4, 2006, of 7006 ½ Maple, a warehouse facility leased by Giles and Brown (Ex. 178), officers located: seven vehicles (all owned by Giles and/or Brown), 260 pounds of marijuana, two money counters, and $81,970. (Tr. 944:3-7; 976:17-18; 982:12-17; Ex. 179-196, 200 & 208). A later search (on April 14, 2006) of the 2004 Chevrolet Suburban, which was owned by Brown and found inside 7006 ½ Maple, revealed a scale, $16,000, a small amount of marijuana, and a .38 Taurus revolver and ammunition.

Appellate Case: 08-1385     Page: 33     Date Filed: 11/04/2008 Entry ID: 3487201

(Tr. 922:17-20; 1639:2-1642:11; Ex. 208, 430 & 431).

Among the items found during the search of Brown's residence located at 2629 N. 130th Street on April 4, 2006, officers located two bags of marijuana and $22,290. (Tr. 1198:1-7; 1200:2-11; 1208:2-3; Ex. 320). Among the items found during the search on April 4, 2006, of 4618 S. 60th Street, a house used by Brown and Giles, officers located a scale, marijuana and sound and recording equipment. (Tr. 1571:21-1573:5).

Among the items found during the first search on April 4, 2006, of 3547 N. 40th Avenue, the residence of Giles and Kouris, officers located six ounces of marijuana and a scale. (Tr. 1466:15-17; 1470:4-19; Ex. 386 &390-392). During a second search of the same residence, conducted on June 26, 2006, officers located a number of expensive jewelry items and more marijuana. (Tr. 1817:19-1819:23; Ex. 424, 436 & 437).

Among the items found during the first search of Kouris' apartment located at 1214 Applewood, #G208 on April 4, 2006, officers located marijuana, a bullet proof vest, video cameras and expensive jewelry items. (Ex. 398, 405, 406, 422 & 418). One of the video segments on the Sony camera seized was played to the jury. In this video Brown is seen sitting at a table at the 7006 ½ Maple warehouse counting out thousands of dollars. He and Giles, who is narrating the segment,

17

brag about how much money they are making and that they do not owe anyone any money. Marijuana is clearly visible in the video. (Ex. 405). During a second search of that apartment on June 26, 2006, officers observed several mink coats but they were not seized.

On April 7, 2006, the Phoenix Police Department searched Giles' home at 11733 W. Hadley Street in Avondale, Arizona. Officers located a 9 MM gun, ammunition, marijuana, a large scale, a $4,000 gift certificate from Brown to Giles, and hundreds of apparel items including 33 team jerseys, 90 team hats and 112 pairs of athletic shoes. (Tr. 1583:13-24; 1590:16-1591:8; 1595:19-1596:2; 1597:7-17; 1598:5-6; 1603:10-17; 1611:5-16; 1613:15-1616:4; Ex. 470-472).

Brown was arrested on April 4, 2006, while officers were searching his residence at 2629 N. 130th Street in Omaha. (Tr. 1208:18-22). Giles was also arrested on April 4th. At the time of Giles' arrest he was in possession of $2,421 in currency. (Tr. 1560:12-1561:8). Prior to his arrest, he was in the vicinity of 7006 ½ Maple as the officers were searching that location. When he saw the activity going on, he sped off eventually dumping the car he was driving, his 2005 Cadillac Escalade, in a driveway on Ellison Street. After Giles and Brown were arrested, they were detained pending trial. Giles was first detained for several weeks at the Douglas County Jail. Later he was moved to the Pottawattamie

18

County Jail in Council Bluffs, Iowa. Both of those facilities have the capability to record outgoing calls by inmates. (Tr. 1631:3-1633:1). During the trial 25 telephone calls initiated by Giles were played to the jury. (Tr. 1693:20-1694:4; 1735:15-23).

Law enforcement listened to the calls Giles was making and through those calls were able to learn of other individuals involved in this conspiracy to distribute marijuana, specifically Kouris, Richard McGinnis, Lavelle Giles, George Moore, Terrance Howard and George Dotson. Prior to McGinnis' indictment, Off. Bogdanoff confronted McGinnis about the content of his calls with Giles.

McGinnis related to Off. Bogdanoff his involvement with Giles and Brown in the conspiracy. At trial McGinnis testified that he initially became involved with them in 2004 when he and George Dotson, who was already acquainted with Giles and Brown, made two trips to Phoenix to obtain marijuana and transport it back to Nebraska. On the first trip they brought back three pounds. On the second trip approximately one week later they brought back 5 ¾ pounds. (Tr. 1899:14-1901:22; 1913:19-25). On McGinnis' first two trips, he did not know Giles or Brown or who Dotson was giving the marijuana to after they brought it back to Nebraska.

19

After their second trip Dotson introduced McGinnis to Giles at a casino in Council Bluffs, Iowa. McGinnis and Dotson agreed to and subsequently did drive to Phoenix, met up with Giles there, and transported 120 pounds of marijuana back to Nebraska for him. Once in Omaha the marijuana was unloaded at 4115 S. 37th Street, a house rented by Brown. After this trip, Dotson was cut out of the marijuana transportation as he wanted too much of a cut for his actions. (Tr. 779:1-17; 1902:8-1905:25).

Thereafter, McGinnis testified that he continued to make runs to Phoenix. Typically, Giles would ask McGinnis if he wanted to make a run, McGinnis would then get traveling money from Giles, drive to Phoenix, receive the load in Phoenix from Giles, who was with Brown about 1/3 of the occasions, load up the marijuana into McGinnis' vehicle, and then call Giles and/or Brown as he approached Omaha for directions on where to deliver the marijuana. The loads of marijuana McGinnis transported got progressively larger on each trip, averaging 400-600 pounds a load. (Tr. 1914:15-23). Early on the loads were unloaded at the South 37th Street house. Later on the loads were delivered to the warehouse at 7006 ½ Maple. (Tr. 1944:1-1949:8; 1953:7-21; 1954:4-24; 1955:18-1956:18).

The usual practice was for McGinnis to meet Giles and Brown outside a motel while obtaining the marijuana from them in Phoenix. However, after Giles

20

purchased his Avondale, AZ house in November of 2005, McGinnis would meet Giles (and Brown once) there to load up the marijuana. Giles would separate out some of this marijuana for himself that he did not want to share with Brown. These bales of marijuana were kept separate from the other marijuana that Brown and Giles shared and McGinnis would unload Giles' bales at McGinnis' house, and then take the other bales to the warehouse. (Tr. 1949:9-1950:9). As Giles needed this marijuana, he called McGinnis who would bring over the bales. McGinnis and Giles would break the bales down into smaller bags, and McGinnis would take those bags back to his house until Giles called for them. (Tr. 1908:9-19; 1909:23-1910:11; 1956:19-1959:6; 1960:3-1962:10; 1964:25-1967:10).

McGinnis testified that the largest load he transported was 800 pounds and this load occurred just before the 3,000 pound load was delivered by Moreno in early May of 2005. (Tr. 1953:12-21). After Moreno delivered the 3,000 pound load, McGinnis' trips to Phoenix were less frequent as Giles and Brown were flush with marijuana and did not need to be resupplied as often. (Tr. 1975:12-21).

Each one of McGinnis' trips to Phoenix was verified through documents produced at trial. These included hotel receipts showing his stays in Phoenix while he waited for the marijuana (Ex. 310 & 311), his oil records showing his oil changes after each Phoenix trip in 2004 and early 2005 (Tr. 1910: 16-1911:19; Ex.

21

155), and his cell phone records showing his travel towards Phoenix and back to Omaha wherein he had contact with Giles and Brown (Ex. 712 & 713). The airline records of Giles and Brown's flights were also received demonstrating that they were traveling to and from Phoenix during the same dates that McGinnis' hotel, oil and cell phone records show he was in Phoenix picking up the marijuana. (Ex. 719S).

McGinnis made at least 14 trips to Phoenix loading up marijuana for Giles and Brown and returning with it back to Omaha. Five trips occurred in 2004 beginning in September. (Tr. 1913:19-1914:9). Six trips occurred in 2005, and three trips in 2006 with the last load arriving into Omaha on March 31, 2006, just days before Giles and Brown's arrests. (Tr. 1977:12-24).

When McGinnis arrived back into Omaha on this last trip, he stored the portion of the marijuana at his house that Giles had separated out for himself and delivered the remainder of the marijuana to the Maple Street warehouse. Later on that evening, April 3, 2006, law enforcement began raiding the storage units at Milt's Mini Storage. On the morning of April 4th, Giles called McGinnis to bring his separate stash of marijuana to him. However, Giles learned that the police were raiding several of his properties when he drove by the Maple Street warehouse. Giles fled from that area, dumping his Escalade near 60th & Ellison

22

Streets and then contacted Lavelle Giles, George Moore, and McGinnis. (Tr. 1633:6-18). Giles told McGinnis to bring his cutting torches with him as they were heading to the Crown Point Storage units (where $164,880, 175 pounds of marijuana and the semi-automatic rifle were recovered). Giles along with Moore and Lavelle Giles proceeded to the Crown Point storage location. McGinnis followed in a separate vehicle. However, as they arrived, the police were there executing the warrants. Giles fled and was arrested. McGinnis, who was following Giles, never got stopped. (Tr. 2014:7-2017:15).

McGinnis testified that he still had 75-125 pounds of Giles' marijuana at his house after Giles' arrest. Giles called McGinnis from the jail and instructed him to give this marijuana, calling it "petitions" to his brother, Lavelle. McGinnis later delivered this marijuana to Lavelle, who was with Moore. (Tr. 2017:16-2020:14). The jury heard Giles' telephone conversations with McGinnis, Lavelle Giles, and Kouris regarding these "petitions". Several calls detailed Ms. Kouris' attempts to collect for this marijuana from Lavelle and from other persons that still owed Giles money for marijuana previously delivered. (Ex. 650-664).

George Moore and Johnny Newell were two of the individuals identified by McGinnis as assisting Brown and Giles in their marijuana distribution. They were added to the indictment and both provided information to law enforcement upon

23

their arrests in August of 2006. Through the information they provided, law enforcement was able to identify where the murders of Dominguez, Wilkinson and Garcia took place and the motive behind the murders.

Moore and Newell both identified the residence at 4511 N. 65 Street as the site of the murders. This house had actually been rented to Roosevelt Jackson, Giles' cousin, by the time of the murder. However, Jackson testified that he moved out of this house at the end of 2004 or January of 2005 with his wife, who had moved to an Izard Street address. Jackson left many of his things at this N. 65 St. address and gave his key to Giles asking him to keep an eye on this property. (Tr. 2182:9-2184:13). Jackson also admitted buying guns for Giles and Brown, specifically a gun found in Giles' car at Creighton Hospital on February 6, 2005, the night Brown was admitted for the gunshot wound. (Ex. 707). These gun purchases started on July 13, 2004, and ended on February 24, 2005. He testified that Giles paid him for the 5-6 guns he bought but he bought and delivered the guns to both Giles and Brown. (Tr. 2174:10-19; 2176:14-19; 2177:5-18; 2179:7-2180:21).

George Moore, a 21 year old man, was befriended by Giles. Throughout their association which continued up until the time of Giles and Brown's arrest, Moore estimated that Giles provided him a total of 5-6 pounds of marijuana. (Tr.

24

2213:15-2214:25; 2219:1-5).   Moore testified that he assisted Giles and Brown break down marijuana into smaller packages approximately ten times at the S. 37th Street house, the N. 40th St. house and at the Barbershop.  The Barbershop was located directly to the west of 4511 N. 65th St.  (Tr. 2219:21-2220:21; 2222:3-2225:8).

Moore testified that on the night of the murders, May 3, 2005, Giles called him to come to the Barbershop.  (Tr. 2225:21-2226:10).   Moore arrived and met Giles outside the shop where they then walked next door to 4511.  (Tr. 2227:7-24). When Moore walked in,  he recounted that he saw a houseful of marijuana and saw Brown with three Hispanic males inside.  He'd seen Dominguez, who he described as the heaviest one, and Garcia, who he described as the oldest one, a couple days before over at the S. 37th Street stash house.  They all began then to count and weigh the marijuana bales.  The oldest one was writing down the weights on a piece of paper.  This paper was later found on Garcia's dead body. (Tr. 2228:10-2231:25; Ex. 608). After they finished weighing the marijuana, they all loaded  it into a U-Haul truck rented by Brown that was outside in the driveway. (Tr. 2232:1-5; Ex. 479).

After the U-Haul was loaded, Brown and Giles took off with it and they left Moore with the three Hispanics at the house.  (Tr. 2232:6-17).  Less than 45

25

minutes later, Brown and Giles returned, now in Brown's black Silverado truck. Brown proceeded towards the kitchen doorway and Giles continued on towards the hall area. Moore was then told to go outside and get Giles' cell phone from the Silverado. When he left the house, Dominguez, Wilkinson and Garcia were sitting on the couch against the wall in the living room between the kitchen and hall area. According to Moore, the heaviest man (Dominguez) was closest to the outside door, the youngest (Wilkinson) was sitting in the middle and the oldest (Garcia) was sitting closest to the hall by the bathroom. When Moore went outside to get Giles' phone, he heard gunshots. (Tr. 2236:1-2237:16). Not knowing who was shooting at who, he started running away. Giles called to him from the front door and told him to come back. He did. Brown also came to the door with a gun and Giles told Brown to go back and "do yours". Moore saw Brown go back inside and heard another gunshot. (Tr. 2238:14-2239:18). Giles told Moore to go in and take the identification off the men. Moore refused so Giles later performed the task. (Tr. 2240:10-21).

Moore then left with Giles and Brown as they drove to the South 37th Street house where Giles' two guns and Brown's one gun were hidden behind a bookcase. They then drove to a gas station where Giles filled gasoline into a gas can. (Tr. 2241:2-2243:14). They all then traveled back to the North 65th St. house

26

where they backed the truck into a carport area next to the house and Moore watched as Giles and Brown hauled the youngest (Wilkinson) and oldest (Garcia) victims out of the house dumping them into the back of Brown's black Silverado. Moore had to help on the last victim, Dominguez, because he was so heavy. They then drove to the State Street location where Moore acted as a lookout while Giles and Brown hauled the bodies out of the truck, dumped them and set them on fire. (Tr. 2243:17-2246:5; 2250:8-2252:18).

After dumping the bodies, they all proceeded back to the S. 37th Street house where they retrieved Dominguez' rental car that was left there. During the early morning hours of what was now May 5, 2005, they drove this rental car to an area near Plattsmouth, Nebraska and abandoned it beside a highway. Moore, Giles and Brown then proceeded to Giles' house at 3547 N. 40th Avenue where they all changed clothes and Moore was sent across the street to Johnny Newell's house to obtain his assistance in cleaning up the murder scene. (Tr. 2253:21-2259:1). Newell, not knowing what assistance he was going to provide, accompanied Giles and Moore to the North 65th Street address. (Tr. 2479:7-10; 2480:8-2481:6).

Upon arrival Newell was instructed to go inside and clean up the house. Newell observed blood in the living room, on the kitchen floor, in the utility room, and down into the basement. He started to clean up but soon realized it was too

Appellate Case: 08-1385    Page: 44    Date Filed: 11/04/2008 Entry ID: 3487201

gruesome to continue. (Tr. 2481:7-2487:8). He then exited the house, sat on a stoop at the next-door Barbershop and watched as Giles and Brown carried out the couch and carpet from the house. These items were hauled away in Brown's black Silverado truck. Brown paid Newell $500 and a bag of marijuana for his efforts. (Tr. 2487:9-2491:8).

Newell was upset over being brought into this situation. He testified that two days later Giles and Brown were checking on him and Newell told them not to involve him "with something like that." (Tr. 4292:12-2492:23). Giles told him "don't worry about it, don't nobody know them people to come see him. And they was part of the Mexican mafia, ain't nobody gonna be looking for them, just stay quiet." (Tr. 2493:9-12).

Newell also testified that Brown sought his advice about the black Silverado. They discussed how blood could be traced. Newell advised Brown he needed to take the lining out of the back of the Silverado, have it sandblasted down and repainted. (Tr. 2493:17-2494:9). Brown followed his advice. Scott Stevenson, owner of PS Auto Body Shop, testified that Brown brought in his black Silverado at the end of May or early June, 2005. At that time Stevenson repainted the truck blue. He also removed the existing bed liner and replaced it by spraying in a new Rhino box liner. (Tr. 2098:18-2099:4; 2103:15-2104:15; 2109:24-

28

2111:15).

McGinnis testified that after the murders he saw Giles with three pistols, a rifle and a shotgun. Giles had him melt down two of the handguns at the 70th and Maple warehouse. McGinnis later took another of Giles' guns to Phoenix for Giles. Giles had also given McGinnis ammunition to hide for him. McGinnis hid the ammunition at his house but later turned over a magazine clip, .40 caliber ammunition, .357 ammunition and .44 caliber ammunition to Off. Bogdanoff. (Tr. 2008:5-2013:14). Dan Bredow, crime lab technician, testified that he analyzed these .44 caliber rounds (Exhibits 737 and 738) and that this ammunition was consistent with the type of bullets recovered from the victims. (Tr. 617:2-618:23).

On May 9, 2006, Giles and McGinnis went to the 40th Street Carpet Mart and picked out new carpeting for the 4511 N. 65th Street house. Brown later paid for this carpet. McGinnis picked it up and laid it a few days later after he had placed fans toward the floor to attempt to get it dry. (Tr. 1999:11-21; 2000:4-2004:23).

The marijuana that Giles and Brown hauled away in the U-Haul from the North 65th Street house on the night of the murders was unloaded at McGinnis' cousin's garage. The morning after the murders McGinnis met Giles and Brown

29

and they picked up a white panel truck from Nancy's Furniture, located at Sorenson Parkway and 56th Street (Exhibit 156 shows that ownership of this truck was transferred on the very day the bodies were discovered). McGinnis was driven to a housing development near 72nd and Ames, where the U-Haul truck was parked in the driveway of one of the homes under construction. McGinnis then drove the U-Haul to his cousin's automotive shop in Carter Lake, Iowa, where he was met by Brown driving the white panel truck and Giles who arrived with Moore in one of Giles' vehicles. At the Carter Lake shop, they all unloaded the marijuana from the U-Haul into this white truck and Brown then returned the U-Haul. (Tr. 2261:20-2263:14; Ex. 479). McGinnis parked the white truck outside his house until Giles came over later and they stored it in one of the storage units. Eventually, McGinnis drove the truck from the storage unit to the 70th and Maple warehouse where he had to let air out of the tires to get it into the garage. (Tr. 1980:6-1986:8; 1988:2-1992:14; 1993:9-1995:17).

The jury was also provided with forensic proof that the murders occurred at the North 65th St house. On September 3, and 4, 2006, law enforcement came into the house, photographed it, tore up linoleum, tore up carpet, used various methods to search for blood evidence, and took samples of blood evidence found. On the woodwork leading from the kitchen to the laundry room and in an area leading

Appellate Case: 08-1385     Page: 47     Date Filed: 11/04/2008 Entry ID: 3487201

into the basement, technicians discovered blood. (Tr. 2375:15-2381:1; Ex. 12, 539-542 & 548). Samples of these areas were submitted to the University of Nebraska Medical Center for DNA analysis. (Tr. 2394:3-2396:13). Technicians Shephard and Helligso analyzed the items removed from the house and generated DNA profiles of those items and generated profiles from the blood of the three victims. (Tr. 2608:17-2609:1; Ex. 562 & 563). They testified that Frank Wilkinson and Benigno Dominguez were excluded as possible sources of blood on the items from North 65th St. However, Faustino Garcia could not be excluded as the source of blood on each of the items. (Tr. 2617:3-2618:12). They further testified that the odds that Garcia was not the source of the blood on those items was at least 1 in a 900 quintillion chance, higher than the entire population of the planet. (Tr. 2620:13-2621:15).

Telephone records received at the trial verified that Dominguez had contact with the phones of Giles and Brown. The phone number provided by Dominguez at the Omaha hotel, on his flight reservation into Omaha, and on the paperwork for the car he rented upon arrival in Omaha was compared to known telephones used by Giles and Brown. A phone seized from Giles on May 22, 2005, phone numbers used by Giles and Brown when they purchased their matching BMW's, and a phone number just one digit off the number used when the BMW's were

31

purchased (but subscribed to by the same person and contacted numerous times by coconspirator McGinnis) were compared to the number for Dominguez. (Exs. 69, 176, 177). There were over 30 contacts between Dominguez and the phones of Giles and Brown during the time shortly before the murders of the three individuals.

During the time this conspiracy was in existence the jury heard about other numerous instances involving Giles and Brown's marijuana possession, distribution, and efforts to further their conspiracy. On February 6, 2005, Brown was admitted to Creighton Medical Center. Brown, who arrived at the hospital in his black Silverado, had been shot in the leg. (Tr. 1089:2-20; 1092:7-14). Several of his coconspirators also arrived at the hospital: Dale Giles, James Giles (cousin of Dale Giles), Terrance Howard and Daramus Brown. (Tr. 1094:2-23; 1117:24-1118:23). A loaded .357 Magnum firearm and $2,076 in cash were recovered in Giles' Cadillac in the parking lot of the hospital. (Tr. 1002:11-1005:19; Ex. 707 & 708). Brown was in possession of $2,562. (Tr. 1105:8-15).

Just over one month later, on March 20, 2005, Giles and Brown were stopped at Epply Airport on their way to Phoenix. Nebraska State Patrol Investigators Rich Lutter and Jason Scott testified that they went to Epply Airfield that day because they had been alerted by airline personnel that Brown and Giles

32

had purchased tickets to fly to Phoenix but had missed their flight.  Brown and Giles had been making frequent flights to Phoenix in a manner that was consistent with individuals involved in the distribution of drugs; for example, short turn-around times on round trips, last minute purchases of tickets, travel to a source city.  Believing that Brown and Giles might try to catch a second flight, the investigators arrived at the terminal just as Brown and Giles were entering.  (Tr. 1124:8-1126:2; 1147:12-13).  The investigators approached Giles and Brown, who agreed to speak to the investigators  and granted them permission to search both them and their bags.  (Tr. 1128:24-1129:7; 1133:2-10; 1148:9-1150:9).  A total of $47,430 in currency was located on Giles and Brown.  After the money was confiscated, both Giles and Brown left the terminal.  Neither was arrested.  (Tr. 1136:21-1142:4;1151:9-19).

On April 11, 2005, Brown was stopped on the interstate for speeding in a truck rented by Giles.  Over 13 ounces of marijuana was recovered from the vehicle along with $2,588 in currency.  (Ex. 61).

On May 22, 2005, (two weeks after the murders), Giles was arrested after law enforcement found him passed out at the wheel of his Dodge Magnum.  An ounce of marijuana along with $12,647 in currency was confiscated.  (Tr. 1532:9-1533:13; 1534:5-22; Ex. 68).

Appellate Case: 08-1385     Page: 50     Date Filed: 11/04/2008 Entry ID: 3487201

On October 3, 2005, Monte Williams was shot in the leg while outside his sister's residence at 2868 Camden Avenue. (Tr. 353:3-22). Williams recovered from this gunshot wound but was killed in June of 2007, while this case was pending trial. (Ex. 762). At trial, Cyrinthia Williams, his sister, testified that she was visiting relatives at the Camden Street house the day when "Clean" (Giles) came to the door looking for her brother. (Tr. 645:11-22). When she told him that Monte was not at home, "Clean" left the porch area and waited across the street with another male by the car he arrived in, a maroon Monte Carlo. (Tr. 646:3-19). When Monte Williams arrived at the house, Ms. Williams saw " Clean" and Monte Williams arguing. (Tr. 647:2-7). She saw "Clean" shoot her brother in the leg. Ms. Williams identified the shooter, "Clean", in the courtroom as Dale Giles. She also identified the maroon Monte Carlo, Charmar Brown's girlfriend's car, as the vehicle Giles arrived in and left from the shooting. (Tr. 647:8-649:1; Ex. 455 & 679).

Approximately one week later, Giles and Brown were involved in a shootout with Clarence Dennis. Mr. Dennis testified that approximately one week prior to the Williams' shooting, he and Williams had broken into a house used by Giles and Brown to store and break up their marijuana. While inside the house located at 4115 S. 37th Street, Williams and Dennis stole 25 pounds of marijuana,

Appellate Case: 08-1385    Page: 51    Date Filed: 11/04/2008 Entry ID: 3487201

some clothes and jewelry. (Tr. 657:14-658:24; 666:4-13). Giles and Brown knew Williams and Dennis had stolen their marijuana and came looking for each of them separately. (Tr. 668:11-12; 669:16-17). The Williams shooting occurred on October 3, 2005. On October 11, 2005, Giles and Brown, along with two other parties, drove to the area of Dennis' house located at 4921 N. 28th Avenue armed with weapons. Dennis, who knew they were coming for him, left his residence with an AK47 rifle and opened fire on them as they got near his home. Dennis fired at them and they shot back. Giles, Brown and the other two men with them fled with no one being hit by gunfire. (Tr. 670:3-21: 671:8-673:10). OPD Off. Craig Wiley testified that he recovered AK47 shell casings in the area on the day of the shootout. (Tr. 518:20-519:6; Ex. 444).

As referenced earlier, the jury also heard 25 telephone calls placed by Giles to Kouris and others while he was incarcerated awaiting trial. Several of these telephone calls concerned Giles' attempts to collect money for deliveries of marijuana made prior to his arrest but also for the marijuana that was not confiscated by law enforcement when Giles was arrested. These calls involved threats to George Dotson to pay for marijuana previously delivered to him and instructions to Kouris about how much money she should be receiving for marijuana delivered. Other telephone calls referenced the gun found at Kouris'

Appellate Case: 08-1385   Page: 52   Date Filed: 11/04/2008 Entry ID: 3487201

storage facility on April 4, 2006, setting up alibis for the night of the murders, the marijuana found, and attempts to conceal property. (Ex. 650-664).

The trial concluded on October 25, 2007. That same day, the jury returned guilty verdicts against all defendants of all counts. Presentence reports were prepared. Each defendant filed objections to the presentence reports which were addressed and ruled on by Judge Smith Camp. All were sentenced on January 28, 2008. Brown was sentenced to life imprisonment on Count I, 120 months of imprisonment on Count II to be served consecutively to the sentence imposed in Count I, 300 months of imprisonment on Count IV to be served consecutively to the sentences on all of the other counts, 480 months of imprisonment on Count VI, 300 months of imprisonment on Count VII to be served consecutively to the sentences on all of the other counts, and the forfeiture of all the items listed in Count IX (except for a 2003 Buick Rendezvous). (SHB 24:10-25:24)[2]. Giles was sentenced to life imprisonment on Counts I and VI, 120 months of imprisonment on Counts III, V, and VIII, 120 months of imprisonment on Count II to be served consecutively to the sentences on all of the other counts, 300 months on Count IV to be served consecutively to the sentences on all of the other counts, 300 months on Count VII to be served consecutively to the sentences on all of the other

---

[2]SHB = Sentencing hearing transcript of Brown.

Appellate Case: 08-1385    Page: 53    Date Filed: 11/04/2008 Entry ID: 3487201

counts, and the forfeiture of all the items listed in Count IX (except for a 2003 Buick Rendezvous). (SHG 21:23-23:15)[3]. Kouris was sentenced to 135 months of imprisonment (Count I), and the forfeiture of all the items listed in Count IX (except for the 2003 Buick Rendezvous). (SHK 13:6-21)[4]. All three filed timely notices of appeal. (Filing Nos. 638, 644, 647).

## SUMMARY OF THE ARGUMENT

The evidence presented at trial clearly established that the defendants were guilty of conspiring to distribute marijuana. Both Giles and Brown arranged for marijuana to be transported into Omaha where it was distributed. During the time of the conspiracy they murdered three persons to avoid paying for a 3,000 pound load that was delivered to them. Giles shot Monte Williams and Giles and Brown attempted to shoot Clarence Dennis. Those individuals had stolen marijuana from a stash house utilized by Giles and Brown. Giles and Brown were arrested on April 4, 2006, after a series of search warrants were executed on their properties resulting in the recovery of over 1,000 pounds of marijuana, over $629,000 in currency, 14 vehicles and other assorted personal property. The conspiracy continued on after their arrests as there was still marijuana to be delivered that had

---

[3]SHG = Sentencing hearing transcript of Giles.

[4]SHK = Sentencing hearing transcript of Kouris.

37

Appellate Case: 08-1385    Page: 54    Date Filed: 11/04/2008 Entry ID: 3487201

not been confiscated by law enforcement. Kouris assisted in both the delivery of this marijuana and the collection of money for its distribution. In addition, she assisted Giles in hiding assets of the conspiracy and attempting to influence the testimony of witnesses.

The striking of two African-American women from the venire panel during voir dire by the government did not violate <u>Batson</u>. The prosecutor enunciated race-neutral reasons for this strike.

A statement made to Off. Perna by Monte Williams identifying "Clean" as his shooter and being in the company of "Charmar" were properly admitted. These statements were not hearsay as they were not offered to prove that "Clean" shot Williams but were offered only to show how law enforcement was later able to assemble a photo lineup which included photos of Giles and Brown.

Two other statements made by Giles were also properly admitted as coconspirator statements under Fed. Rule of Evid. 801(d)(2)(E). One statement was made to McGinnis, a coconspirator, to keep him involved in the conspiracy. The other was a statement made to a law enforcement officer in which Giles provided false information to protect the ongoing conspiracy.

Giles directed one of his former attorneys to contact witnesses and attempt to influence their testimony. He instigated this conduct by his attorney and cannot

38

now complain that his representation was deficient because of his attorney's actions.

No variance existed between the evidence presented at trial concerning the shooting of Monte Williams and the evidence that was presented about that shooting during grand jury testimony. Williams was shot by Giles because Williams stole marijuana from Giles and Brown's stash house. Giles and Brown also attempted to shoot Williams accomplice, Clarence Dennis, a week later. The grand jury was presented with all this evidence resulting in the charge contained in Count II of the fifth superseding indictment.

The jury instructions regarding the use and discharge of weapons (Counts II, IV and VII) were correct. The jury instructions were the Model Eighth Circuit instructions on use of a weapon. Furthermore, the jury was specifically directed to find and did find that Giles and Brown discharged a weapon in connection with Counts II and IV.

Probable cause existed to issue the numerous search warrants executed in this case. In the event that probable cause was lacking, the officers had a good faith belief that the warrants were valid.

All three defendants were properly sentenced. Ample evidence existed for the judge to determine that Giles and Brown murdered three persons deliberately

39

and with premeditation to avoid paying for a delivery of marijuana. The amount of marijuana attributable to each defendant was submitted to the jury. The judge agreed with the jury determination and sentenced accordingly. Based on Kouris activities in attempting to hide assets of the conspiracy and cover up evidence of Giles' involvement in the conspiracy, the judge correctly found that she obstructed justice.

## **ARGUMENT**

## I. **THE EVIDENCE WAS SUFFICIENT TO SUPPORT THE JURY'S VERDICT OF GUILTY AS TO EACH DEFENDANT.**

### A. **STANDARD OF REVIEW.**

In reviewing the sufficiency of the evidence to support a guilty verdict, this Court looks at the evidence in the light most favorable to the verdict, accepting as established all reasonable inferences tending to support the verdict. United States v. Bascope-Zurita, 68 F.3d 1057, 1060 (8th Cir. 1995), cert. denied, 516 U.S. 1062 (1996). All reasonable inferences must be resolved in favor of the jury's verdict. United States v. LaGuardia, 774 F.2d 317, 319 (8th Cir. 1985). An appellate court can reverse only if no reasonable jury could have found the defendant guilty beyond a reasonable doubt. United States v. Young-Bey, 893 F.2d 178, 181 (8th Cir. 1990).

Appellate Case: 08-1385     Page: 57     Date Filed: 11/04/2008 Entry ID: 3487201

### B.    ARGUMENT.

The defendants Brown and Kouris contend that the government produced insufficient evidence to support the jury's verdict that they participated in a criminal conspiracy.    They also attack the veracity and credibility of the cooperating witnesses in this case.  Because the defendants' allegations ignore both the law and the evidence produced at trial, their arguments must fail.

To establish a drug conspiracy, the government must prove the existence of an agreement between two or more persons to violate federal narcotics law, the defendants' knowledge of the agreement, and the defendants' voluntary participation in the agreement.  United States v. Hester, 140 F.3d 753, 760 (8th Cir. 1998).  These elements may be established by reasonable inferences from the evidence.  Henderson v. United States, 815 F.2d 1189, 1191 (8th Cir. 1987).

"Once the existence of a conspiracy is established, slight evidence connecting a defendant to the conspiracy is sufficient to support a conviction." United States v. McMurray, 34 F.3d 1405, 1412 (8th Cir. 1994), cert. denied, 513 U.S. 1179 (1995).  More than slight evidence existed to connect Brown and Kouris with the conspiracy.

The defendants shared a common goal with the coconspirators of acquiring and selling large amounts of marijuana.  Even after Giles and Brown were

Appellate Case: 08-1385    Page: 58    Date Filed: 11/04/2008 Entry ID: 3487201

arrested, Giles continued to have marijuana distributed for him using Kouris, McGinnis and Lavelle Giles. While Brown attempts to downplay his role in this conspiracy, much of the evidence collected from the execution of numerous search warrants commencing on April 3, 2006, demonstrates his direct involvement in the conspiracy. (SOF 14-18 where marijuana and money seized from Brown's truck, house and person are discussed)[5]. Furthermore, Boyston and McGinnis testified about Giles and Brown obtaining multiple loads of marijuana in Arizona and having it transported to Nebraska. (SOF 9-11, 19-23).

This Court has repeatedly held that the jury "is always the ultimate arbiter of a witness's credibility, and this Court will not disturb the jury's findings in this regard." United States v. Espino, 317 F.3d 788, 794 (8th Cir. 2003). The jury's reliance on the testimony of Boyston and McGinnis was justified given that their testimony was corroborated by airline, telephone and hotel records. (Exs. 155, 310-311, 712-713, 719).

Brown makes specific arguments that the evidence was insufficient to convict him of the weapons violations set forth in Counts II, IV and VII of the superseding indictment. Those counts dealt respectively, with the discharge of the weapon on October 3, 2005, (the shooting of Williams), on May 3-4, 2005, (the

---

[5]SOF = Statement of Facts section of this brief.

Appellate Case: 08-1385     Page: 59     Date Filed: 11/04/2008 Entry ID: 3487201

murders of Dominguez, Wilkinson, and Garcia), and April 3-4, 2006, (the guns found during the warrant executions). The evidence of Brown's involvement with respect to the October 3, 2005, shooting is discussed later in this brief at page 72 and will not be addressed here. Suffice it to say that ample evidence existed linking Brown to that shooting as well as to the other two firearm counts.

With respect to the weapons violation set forth in Count IV, Moore and Newell testified about Brown's involvement in the murders and the steps he took to cover up the murder scene. (SOF 23-29). The gun or guns that killed the three individuals were never recovered. However, the evidence overwhelmingly established that it was Giles and/or Brown who shot them. Regardless of whether Brown, Giles, or both of them killed the three individuals, the jury's verdict against Brown as to the discharge of a weapon on this occasion is well supported by the evidence. The weapon or weapons used to kill the three individuals were clearly used in connection with a drug conspiracy and were used to further the aims of the drug conspiracy. With these three individuals out of the way, Giles and Brown did not need to pay for the 3,000 pounds of marijuana that had been weighed out and counted out by them on the evening of the murders. Not having to pay for this marijuana improved the profit of their marijuana business. Furthermore, it was certainly foreseeable to Brown that weapons would be used.

Appellate Case: 08-1385    Page: 60    Date Filed: 11/04/2008 Entry ID: 3487201

Both Giles and Brown had guns that evening.  (SOF 25-27).

With respect to the .38 Taurus revolver, the gun as well as ammunition and $16,000 in currency were found in Brown's truck on April 4, 2006.  Certainly, this gun was located in the immediate vicinity of the marijuana and was used in connection with the conspiracy.

In United States v. Jones, 990 F.2d 1047, 1049-1050 (8th Cir. 1993), the defendant kept a gun in the same room as and in close proximity to the drugs: the gun hung on the back of the bedroom door and the cash and drugs were stored in the adjacent bedroom closet.  The court found that the jury's verdict that Jones used a weapon was supported by the evidence as a reasonable jury might infer that the paraphernalia found in the apartment was used to prepare the drugs for sale and that the gun was important for the protection and success of Jones' enterprise as a whole.  See United States v. Michaels, 911 F.2d 131, 132 (8th Cir. 1990). ("[I]f a gun is available to the defendant, and if the gun was an integral part of the crime and increased the likelihood of its success, then it was used during and in relation to the crime.") (citation omitted), cert. denied, 498 U.S. 1094 (1991)). This Court recognizes, "[i]t has become common knowledge that drug traffickers typically keep firearms available to protect themselves and their drugs and drug money." United States v. Young-Bey, 893 F.2d 178, 181 (8th Cir. 1990). If the

44

presence of the firearm helps protect the supply of drugs and further the illegal activity, a § 924(c) conviction may be warranted. <u>United States v. LaGuardia</u>, 774 F.2d 317, 321 (8th Cir. 1985); <u>Young-Bey</u>, 893 F.2d at 181.  See also <u>United States v. Williams</u>, 982 F.2d 1209 (8th Cir. 1992) (loaded handgun found in defendant's automobile, readily accessible, and in close proximity to a large quantity of cocaine base sufficient to support a § 924(c) conviction).

The jury had before it sufficient evidence to conclude that Brown kept the gun to protect his marijuana supply in the back end of his truck.  The presence of the weapon increased the likelihood that Brown would be able to protect his marijuana, may assist him in the sale of marijuana, and further the aims of the drug conspiracy.  Therefore, the jury's verdict with respect to Count VII should not be overturned.

Kouris' argument that her involvement was insufficient for the jury to find she was guilty of the conspiracy also ignores the trial evidence.  All throughout the time of the conspiracy, Kouris resided with, traveled with, and assisted Giles in his activities.  As far back as the trip Giles and Brown took to Atlanta in March of 2005, Kouris was along with Giles.  This is the trip where Giles and Brown first met Dominguez.   She and Giles both rented storage lockers at Crown Point Storage Units where marijuana, money and a gun were found.   The two

45

residences that she resided in with Giles also revealed evidence of marijuana distribution. (SOF 15-18).

After Giles was arrested Kouris assisted Giles in orchestrating the delivery of marijuana to his cousin, Lavelle Giles, that had not been confiscated. (SOF 23). Moore confirmed at trial that he did assist Lavelle in receiving this marijuana from McGinnis. (Tr. 2269:7-2270:18). Lavelle Giles was directed to sell this marijuana and to provide the money to Kouris.

Through a series of jail calls made by Giles, the jury heard about Kouris' efforts to further the aims of the conspiracy. In calls 22, 57, and 77-79 Kouris admitted distributing marijuana to others and collecting money for that marijuana. (Exs. 642, 646-648, 657). In calls 183, 210 and 238 Kouris concocted an alibi for the gun found in her storage locker and tried to retrieve assets from the Arizona property. (Exs. 654, 656, 659). In calls 2, 199, 225 and 232 Giles and Kouris discussed the money they were making from his marijuana dealings and the assets they accumulated. (Exs. 640, 655, 6570658). In calls 44, 64, 79, 94 and 116 Giles and Kouris plotted to collect money owed for the marijuana and Kouris placed three-way calls for Giles to threaten Dotson for payment. (Exs. 43, 664, 648-650). In calls 123-124, 127 and 265 Giles and Kouris discussed alibis for the night of the murder and the personal contact she will make with others placing the blame

Appellate Case: 08-1385    Page: 63    Date Filed: 11/04/2008 Entry ID: 3487201

for the murders on Brown.  (Exs. 651-653, 660).  Lastly, calls were made attempting to conceal assets and a gun from the Arizona property.  (Exs. 661-663).

In <u>United States v. Cordova</u>, 157 F.3d 587 (8th Cir. 1998), the defendant was convicted of conspiracy to distribute marijuana.  On appeal he argued that even if a conspiracy to distribute marijuana existed, there was insufficient evidence presented to link the defendant to the conspiracy.  "An agreement to join a conspiracy 'need not be explicit but may be inferred from the facts and circumstances of the case.'" <u>United States v. Evans</u>, 970 F.2d 663, 669 (10th Cir. 1992), <u>cert. denied</u>, 507 U.S. 922 (1993).

Certainly, the testimony of these witnesses along with the exhibits presented and the telephone calls played convinced the jury that demonstrated an agreement between Brown, Giles and Kouris to obtain and sell marijuana. Their verdict should not be set aside.

## II. WHETHER THE DISTRICT COURT COMMITTED CLEAR ERROR IN DENYING THE DEFENDANT'S <u>BATSON</u> CHALLENGE TO THE STRIKING OF TWO AFRICAN-AMERICAN VENIRE MEMBERS.

### A. STANDARD OF REVIEW.

The district court's determination that peremptory challenges are race neutral is reviewed for clear error.  <u>United States v. Crawford</u>, 413 F.3d 873 (8th

Appellate Case: 08-1385     Page: 64     Date Filed: 11/04/2008 Entry ID: 3487201

Cir. 2005).

**B.    ARGUMENT.**

The defendants claim that their rights to equal protection were violated
when the government struck two African-Americans during the voir dire
examination.  Because the government presented race-neutral reasons for these
strikes, the defendants arguments are without merit.

In <u>Batson v. Kentucky</u>, 476 U.S. 79, 96-98 (1986), the Supreme Court
articulated a three-part test for determining whether a prosecutor racially
discriminated in exercising peremptory challenges against prospective jurors in
violation of the Equal Protection Clause.  First, a defendant must establish that he
is a member of a cognizable racial group and that the relevant facts and
circumstances of the case support an inference that the prosecution used its
peremptory challenges to exclude a member of the venire from the jury panel on
account of race. <u>Id.</u> at 96.  Second, the defendant then has the initial burden of
making a prima facie showing of purposeful racial discrimination in the selection
of the jury.  If this prima facie case is made, the prosecutor must then offer a
racially neutral explanation for the challenge.  This explanation need not rise to
the level of justifying the exercise of a challenge for cause, but the prosecutor
must not merely claim that he thought the challenged venire men would be partial

Appellate Case: 08-1385     Page: 65     Date Filed: 11/04/2008 Entry ID: 3487201

to the defendant because of their shared race or by denying that he had any discriminatory motive. Id. at 97-98. At this stage, unless a discriminatory intent is inherent in the explanation, the reasons offered will be deemed race neutral. Hernandez v. New York, 500 U.S. 352, 360 (1991). Lastly, the trial court must determine whether the defendant carried the burden of proving purposeful racial discrimination. Batson at 98.

It is uncontested that the defendants, as African Americans, are members of a cognizable racial group and that the prosecution struck two African Americans on the panel. However, the record establishes that Juror Dryver and Alternate Juror Dean were struck for race neutral reasons.

Given that many law enforcement personnel testified at this trial, during jury selection the government inquired of the prospective jurors whether anyone had previously had a bad encounter with law enforcement to the extent that they believed they had been treated unfairly. (Tr. 46:3-4). Prospective jurors Kush, Loontjer and prospective alternate juror Dean all responded affirmatively. (Tr. 46:5-48:23; 49:25-50:20). Ms. Dean described an incident with her son concerning police brutality charges involving police officers in Omaha about two years prior. The charges against her son were eventually dropped. (Tr. 48:23-49:14). The government exercised two of its peremptory strikes to strike Kush

49

and Loontjer, individuals who believed law enforcement had acted unfairly. The government also used one of its peremptory strikes for the alternate, Ms. Dean, for the same reason.

Prospective juror Debra Dryver provided the address of an apartment complex that was funded through Omaha Housing Authority Section 8 as her residence. The residents in this complex received public assistance. The government exercised an additional peremptory challenge to strike Ms. Dryver for this reason.

The defendants challenged the government peremptory strikes of Dean and Dryver. At sidebar, the government explained the reasons for its strikes. The prosecutor explained that it struck Alternate Juror Dean because she had stated that her son had been brutalized by law enforcement. (Tr. 81:8-12).

The government struck Juror Dryver who lived at an apartment complex whose residents were receiving public assistance through Section 8 housing. During a portion of the time the conspiracy was in existence, Ms. Kouris resided at an apartment located 1214 Applewood Drive, Papillion, Nebraska (a suburb of Omaha). At trial the government introduced Exhibit 398, a certification from the property manager of this apartment complex. Exhibit 398 detailed that Ms. Kouris' rent was $625 per month. However, she was receiving public assistance

Appellate Case: 08-1385     Page: 67     Date Filed: 11/04/2008 Entry ID: 3487201

through the Omaha Housing Authority Section 8 program that reduced her rent to just $6 per month.  (Tr. 796:14-797:13; 799:16-800:2).  For that reason the government believed that Juror Dryver would be unfair to the government but would be sympathetic with Kouris, who was also receiving public assistance. (Tr. 79:5-11).  The prosecutor went on to explain that none of the other residences of the potential jurors were residing in publicly assisted housing.  (Tr. 80:12-19).

After hearing the explanations for the strikes, the District Court denied the defense's <u>Batson</u> challenge and found that the government articulated legitimate, non-discriminatory reasons for the strikes and found these reasons were racially neutral.   (Tr. 13-17).  See <u>United States v. Hughes</u>, 911 F.2d 113, 114-15 (8th Cir. 1990) (challenges based on jurors' education, background, and responses to questions were racially neutral);   <u>United States v. Williams</u>, 936 F.2d 1243 (11th Cir. 1991) (juror's place of residence considered race-neutral reason for strike), <u>cert. denied</u>, 112 S. Ct. 1279 (1992); <u>United States v. Atkins</u>, 25 F.3d 1401, 1406 (8th Cir. 1994) (recognizing that party may strike a venire member who "lacks an attachment or commitment to the community"), <u>cert. denied</u>, 513 U.S. 953 (1994); <u>United States v. Maxwell</u>, 473 F.3d 868, 872 -873 (8th Cir. 2007) (recognized that lack of community ties is race-neutral reason for striking a juror).

Defendant Kouris specifically contends that the court erred by "requiring [the

51

defendants to show] a 'pattern' of striking African American jurors." ( Kouris brief p. 48). The court was fully aware of the procedural steps set forth in <u>Batson</u>. When the court ruled that the defense failed to demonstrate a pattern, it did so as it was aware that demonstrating a pattern of strikes is but an alternate way to establish the inference of discrimination. <u>Batson</u> at 97. The court, however, found that the prosecution did not engage in any discriminatory reason or pattern for their strikes. The ruling is supported by the record and is not clearly erroneous.

## III. THE DISTRICT COURT DID NOT ABUSE IT'S DISCRETION BY DENYING A MISTRIAL AND ADMITTING NON-HEARSAY TESTIMONY.

### A. STANDARD OF REVIEW.

The Court reviews a district court's evidentiary rulings for abuse of discretion. <u>United States v. Sparkman</u>, 500 F.3d 678 (8th Cir. 2007). The Court reviews the denial of a motion for mistrial for abuse of discretion. <u>United States v. Smith</u>, 487 F.3d 1163 (8th Cir. 2007).

### B. ARGUMENT.

Brown argues that the district court abused it's discretion when it failed to grant a mistrial after erroneously admitting the testimony of Officer Perna concerning statements made to him by Monte Williams. Because the statements were not hearsay, the defendant's allegation is unfounded.

52

Omaha Police Department Officer Perna testified that on October 3, 2005, he was assigned to go to Creighton University Medical Center to interview Monte Williams, who had been transported to that location for treatment of a gunshot wound. (Tr. 363:1-9). Perna interviewed Williams on that date as well as four subsequent times and testified that he did develop a suspect or suspects based on those conversations. (Tr. 364:6-16). When asked how a suspect or suspects were developed, Perna testified over objection that Williams told him that he was approached by two individuals. One he knew was Charmar that was spelled like "Charmer" and that the person who shot him was a person he knew as "Clean". (Tr. 364:2-366:16).

Perna then went on to testify that he did not know anyone named "Clean" or "Charmar". (Tr. 367:6-8). Eventually he located an incident report from a police data base in which a "Charmar Brown" was admitted to Creighton University Hospital on February 6, 2005, suffering from a gunshot wound. Dale Giles and James Giles were also present at Creighton that day. (Tr. 367:6-369:10; 1117:24-1118:23). Other witnesses testified about this Creighton incident with Brown. A gun purchased by Roosevelt Jackson for Dale Giles was recovered from Giles' vehicle during this encounter.

When Off. Bogdanoff traveled to Arizona after the murders, Hector

53

Wilkinson, the twin brother of Frank Wilkinson and the half-brother of Benigno Dominguez, told him that Dominguez was involved with "Clean" in Omaha. Sometime after the Williams shooting, Perna told Off. Bogdanoff that "Clean" was Dale Giles. (Tr. 387:2-10; 390:21-392:22; 393:10-394:10). Off. Bogdanoff used that information along with the fact that a "Charmar Brown" had been at Creighton Hospital with Giles to prepare photo lineups of them that he presented to Kenrell Boyston, who positively identified both Giles and Brown as the individuals he had distributed marijuana to while they were in Phoenix. (SOF 9).

The trial court gave a cautionary instruction both prior to and after Perna's testimony that Williams told him that "Charmar" was with "Clean" when "Clean" shot him. On both occasions the jury was instructed that this testimony was not offered for the truth of the matter asserted but only for the limited purpose of explaining why this witness took the actions he took. The court also informed the parties at a sidebar that if the testimony had been offered for the truth of the matter asserted it would have been hearsay. (Tr. 365:12-18; 366:23-367:2; 408:7-16).

The trial court was correct in finding that the statement involved was not hearsay. Rule 801(c) of the Fed. Rules of Evidence defines hearsay as "a statement...offered in evidence to prove the truth of the matter asserted." Perna's statement regarding Williams identification of his shooter as "Clean" and the

54

person with him as "Chamar" was not offered to prove the truth of the matter asserted, i.e., that "Clean" shot Williams and "Charmar" was with him. See, <u>Rahn v. Hawkins</u>, 464 F.3d 813, 820 (8th Cir. 2006) ("A statement is hearsay only if the movant's goal in seeking to introduce the statement is to prove the statement is true."). Rather, it was offered to establish the link as to how Perna knew to inform Off. Bogdanoff that the "Clean" that Bogdanoff was looking to identify was, in fact, Dale Giles. This knowledge allowed Off. Bogdanoff to assemble photo lineups of Giles and Brown that were presented to others.

While the defense alleges that "the prosecution's purported non-hearsay reason for offering the statements was just a subterfuge to get Williams statement" in (Brown's brief at p. 50), it was not necessary for the government to establish that Williams was shot by Giles through Perna's testimony. The government would establish the identity of Williams' shooter through Williams' sister, Cyrinthia Williams. In her testimony she positively identified Giles as the shooter of her brother and identified that another man in the maroon Monte Carlo (registered to Charmar Brown's girlfriend) was with Giles. (SOF 34).

The defendant argues that <u>Crawford v. Washington</u>, 541 U.S. 36 (2004), bars admission of this evidence. In <u>Crawford</u>, the Supreme Court found admission of the defendant's wife's recorded statement at trial violated the

55

defendant's Sixth Amendment right to confront witnesses. Id. at 37-41. "Where 'testimonial' statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation." Id. at 68.

The Crawford Court did not articulate a comprehensive definition of the term "testimonial hearsay", however, at least one case decided since Crawford has helped to define "testimonial hearsay". In United States v. Rodriguez, 484 F.3d 1006 (8th Cir. 2007), a police officer summarized a cooperating witnesses statements to the defendant at trial. This Court held that regardless of whether the informant's statements to the officer were "testimonial," they did not implicate Rodriguez's right to confrontation as the testimony was admitted to show Rodriguez's state of mind and to place Rodriguez's statement into context, and the testimony was not offered or admitted to prove the truth of the matter asserted. The testimony did not violate Rodriguez's rights under the Confrontation Clause. See Crawford at 59 n. 9, 124 S. Ct. 1354 ("The [Confrontation] Clause ... does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." (citing Tennessee v. Street, 471 U.S. 409, 414 (1985) (holding "[t]he nonhearsay aspect of [the testimony] ... raises no Confrontation Clause concerns.")); see, e.g., United States v. Faulkner, 439 F.3d 1221, 1225-26

56

(10th Cir. 2006) (noting the Supreme Court's decision in <u>Crawford</u> makes clear "the [Confrontation] Clause has no role unless the challenged out-of-court statement is offered for the truth of the matter asserted in the statement").

A reading of <u>Crawford</u> and cases since decided make clear that <u>Crawford</u> does not apply to the statement made by Perna. It was not testimonial in nature as it was not offered to prove that Charmar was with "Clean". It was offered to show how Off. Bogdanoff was later able to assemble a photo lineup containing photos of Giles and Brown to present to individuals later identifying Giles and Brown as marijuana conspirators. Furthermore, direct evidence of who shot Williams was presented through the eye witness testimony of Cyrinthia Williams. The district court properly admitted the statement of Perna and properly denied the motion for mistrial after admission of the statement.

## IV.   THE DISTRICT COURT ABUSED ITS DISCRETION BY ADMITTED STATEMENTS OF COCONSPIRATORS PURSUANT TO FED. RULE OF EVIDENCE 801(d)(2)(E).

### A.   STANDARD OF REVIEW.

"We review a district court's decision to admit a coconspirator's statement for abuse of discretion and reverse if the error substantially prejudiced the outcome." <u>United States v. Frazier</u>, 280 F.3d 835, 848 (8th Cir. 2002).

Appellate Case: 08-1385    Page: 74    Date Filed: 11/04/2008 Entry ID: 3487201

**B.    ARGUMENT.**

Brown complains that statements made by Moreno, McGinnis, Moore and Newell were erroneously admitted as coconspirator statements.  However, in his brief Brown cites only two examples he claims as errors: 1) the admission of a statement made by Giles to Brown in a conversation Giles had with McGinnis over the telephone; and 2) that Giles' statements to law enforcement made on March 20, 2005, while Giles and Brown were at Epply Airport should have been excluded under <u>Bruton v. United States</u>, 391 U.S.123 (1968), and <u>Crawford v. Washington</u>, 541 U.S. 36 (2004).  Because the statements admitted were made during the course of and in furtherance of the conspiracy, these statements were properly admitted.

**1.  Giles telephone contact with McGinnis**.

This conversation complained of occurred on the day the bodies of the three victims were discovered, May 4, 2005.   McGinnis testified that earlier that day he had assisted Giles and Brown in unloading the marijuana from the U-Haul and storing it later at his residence.  (SOF 29-30).

McGinnis testified that he later learned of the deaths of the three individuals from news reports after returning home that day with the marijuana in the white van that he had helped Giles, Brown and Moore unload.   During a phone

Appellate Case: 08-1385     Page: 75     Date Filed: 11/04/2008 Entry ID: 3487201

conversation with Giles, McGinnis asked if he had anything to do with the murder. Giles never answered the question. In the presence of Brown he stated "Do you believe what this man's asking me?" (Tr. 1998:4-1999:7).

Rule 801(d)(2)(E) of the Federal Rules of Evidence provides that: a statement is not hearsay if the statement is offered against a party and is a statement by a coconspirator during the course of and in furtherance of the conspiracy. Because the statements complained of by Brown were made during the course of the conspiracy and in furtherance of the conspiracy, the statements were admissible.

It is clear that the conspiracy existed between Brown, Giles, McGinnis and other conspirators beginning as early as the fall of 2004, and that the conspiracy continued in existence for well over a year after this conversation occurred. Activities that occurred after this conversation included McGinnis continuing to transport marijuana from Phoenix to Omaha for Giles and Brown; McGinnis continuing to help Giles and Brown break up marijuana once it reached Omaha; laying carpet at the North 65th Street house after the murders; distributing the marijuana not confiscated by law enforcement after Giles and Brown's arrests; and misleading the police about his own involvement and the involvement of others in the conspiracy.

59

It is also clear that Giles' statement to Brown was also made in furtherance of the conspiracy. A statement is not hearsay and is admissible as a statement made to a coconspirator if it advances the objectives of the conspiracy and does not merely inform the listener of the declarant's activities. United States v. Snider, 720 F.2d 985, 992 (8th Cir. 1983). Giles' statement to Brown in response to McGinnis' question was uttered so that McGinnis would hear Giles tell Brown in essence how absurd it was that McGinnis would think such a thing. Giles needed to assure McGinnis that he and Brown did not commit the murders because they needed McGinnis to stay involved with them in the conspiracy.

This Court interprets the phrase "in furtherance of" broadly. See United States v. Gjerde, 110 F.3d 595, 603 (8th Cir. 1997). The "in furtherance of" standard has been satisfied in the context of statements urging a third person not to reveal the conspiracy (United States v. Garcia, 893 F.2d 188 (8th Cir. 1990)); or simply to keep coconspirators abreast of current developments and problems facing the group (United States v. Massa, 740 F.2d 629, 638 (8th Cir. 1984)) (holding that statements made to "explain events important to the conspiracy or give directions to facilitate it" were in furtherance of conspiracy), cert. denied, 471 U.S. 1115 (1985).

In considering whether the statement was in furtherance, the Court may

60

consider the nature of the statement, as well as take into account the time and circumstances under which the statement was made in determining whether it was intended to further the scheme's ultimate objective. United States v. Handy, 668 F.2d 407 (8th Cir. 1982). Certainly, keeping McGinnis involved in transporting marijuana for them furthered Giles and Brown's aims of distributing marijuana. Under these circumstances the trial court properly admitted Giles' statement and Brown suffered no prejudice as a result of the admission.

**2. Giles statements at Epply Airport**.

On March 20, 2005, Giles and Brown were stopped at Epply Airport on their way to Phoenix and a total of $47,430 was recovered from them. (SOF 32-33). Upon being asked about the money recovered, Giles stated he got the money from working at his barbershop and from a U.S. Bank account and he was going to use the money to purchase a vehicle. He said he had between $17,000-$20,000. (Tr. 1136:21-1142:4). Brown told Inv. Scott that he was in possession of approximately $16,000. He was actually in possession of $23,410. (Tr. 1151:9-19).

Brown claims that Giles' statements were testimonial because they were made while Giles was being detained and therefore violated Crawford v. Washington, 541 U.S. 36 (2004). Because Giles' statements were statements

61

made by a coconspirator during the course of and in furtherance of the conspiracy, they were not hearsay and thus were properly admitted.

Having just discussed above Rule 801(d)(2)(E) and the broad interpretation this Court has applied in determining the "in furtherance of" language, it is unnecessary to reiterate it here. It is clear, however, that the statements both Brown and Giles made to the investigators were untruthful, proffered to avoid detection as drug dealers, and provided to prevent their arrest.

The "in furtherance of" requirement includes: statements designed to reveal the existence and scope of conspiracy, identify fellow conspirators or designed to delay or prevent arrest, United States v. Garcia, 893 F.2d 188 (8th Cir. 1990). The trial evidence demonstrated that Giles and Brown frequently flew to Phoenix where they met up with McGinnis. In Phoenix Giles and Brown arranged for the purchase of marijuana that they loaded into McGinnis' truck for transportation back to Omaha. They were flying to Phoenix on March 20, 2005, to meet McGinnis and arrange for another load of marijuana. U.S. Airline records introduced at trial, Exhibit 719, verified that Brown flew to Phoenix later on that same day of the encounter with law enforcement. Giles flew to Phoenix the following day. McGinnis was in Phoenix to meet them on this trip. Both hotel records, Exhibit 310, and cell phone records, Exhibit 719S, of McGinnis

62

corroborate he left for Phoenix from Omaha on March 20 and returned back to Omaha on March 22, 2005.

The court followed the procedures set forth in <u>United States v. Bell</u>, 573 F.2d 1040 (8th Cir. 1978), in admitting the statements at issue. The court conditionally received the statements and instructed the government of its burden outside the presence of the jury. (Tr. 1130:2-1132:20; 1998:21-25). The court also complied with the second requirement of <u>Bell</u>, instructing the jury about reasonable doubt and witness credibility. (Instructions 31 and 34). Lastly, the court concluded at the close of the evidence that the statements were made during the course of and in furtherance of the conspiracy proven. (Tr. 2814:2-18; 2819:20-25).

In this brief, the Appellee has previously responded to the issue of whether a conspiracy existed. Suffice it to say, that sufficient evidence was presented for the jury to conclude that all defendants conspired to distribute marijuana. Should this Court find that any of the coconspirator statements were admitted in error, the government submits that any such error would be harmless as the government submitted overwhelming evidence of Brown's guilt.

Appellate Case: 08-1385     Page: 80     Date Filed: 11/04/2008 Entry ID: 3487201

## V.    GILES RECEIVED EFFECTIVE ASSISTANCE OF COUNSEL.

### A.    STANDARD OF REVIEW.

An ineffective assistance of counsel claim presents a mixed question of law and fact.  The Appellate Court reviews the district court's factual findings for clear error, and its legal conclusions de novo. <u>Strickland v. Washington</u>, 466 U.S. 668, 694 (1984).

### B.    ARGUMENT.

Giles did not raise an ineffectiveness claim in the district court; however, he now contends that one of his lawyers, Terri Crawford,  who represented him early on in his case was involved in attempting to obtain false testimony from witnesses who later testified at trial.  Trial evidence demonstrated that Giles, however, instigated this conduct by his attorney.

In general, an ineffective assistance of counsel claim is not cognizable on direct appeal.  <u>United States v. Hernandez</u>, 281 F.3d 746, 749 (8th Cir. 2002). This Court will consider such a claim on direct appeal "only in exceptional cases where the district court has developed a record on the ineffectiveness issue or where the result would otherwise be a plain miscarriage of justice."  <u>Id.</u>, citing <u>United States v. Brown</u>, 183 F.3d 740, 743 (8th Cir. 1999).

Crawford's first appearance as Giles' attorney took place at his arraignment

64

on the superseding indictment on May 25, 2006. At that time she appeared as retained co-counsel for Giles with Steven Lefler. (Filing No. 25). Her formal representation of Giles ended on March 20, 2007, when Mr. Lefler was allowed to withdraw as Giles' counsel. (Tr. 2195:10-2197:21). While she did appear at a few of Giles' various court appearances (Filing Nos. 103, 161), Mr. Lefler clearly was lead attorney in Giles' defense.

Moore, Newell and Roosevelt Jackson all testified that Crawford contacted them shortly after Giles' arrest and attempted to influence what they should tell the authorities if questioned by law enforcement. This contact was in an attempt to shift the blame from Giles to Brown in connection with the murders of the three individuals.

Jackson, a cousin to Giles, testified he had personal contact with Crawford after Giles' arrest. According to Jackson "[S]he asked me to say that I was outside–asked me to say that I was outside the residence and heard a couple shots. And I told her, no, I wouldn't because I wasn't outside the residence." (Tr. 2194:20-23). Jackson understood that this was some kind of attempt to exonerate Giles. (Tr. 2188:19-2189:2; 2195:2195:2-4).

Moore testified that he was untruthful in his first interviews with law enforcement because he was trying to protect Giles. He stated that prior to being

65

interviewed by law enforcement he was visited by Crawford at Giles' house at 3547 N. 40th Ave. Kouris had called Moore and told him to come to the house to talk to someone. At that location Crawford gave him a note that said "put everything on Charmar." The note also stated that he was to say he heard three "pops" while he was standing outside 4511 N. 65th Street and that Charmar came out of the house and asked him to move the bodies. Moore testified that Crawford had a second note also, presumably for Johnny Newell. (Tr. 2274:16-2276:23; 2728:1-2730:6).

Newell testified that he was visited by Crawford after the arrests of Giles and Brown. Crawford wanted Newell to say that if law enforcement contacted him, he was to tell them that Big Head (Charmar Brown) picked him up the night of the murders and wanted Newell to clean up the place. (Tr. 2498:7-18; 2508:15-20).

Obviously, Crawford's conduct in attempting to influence witness testimony is reprehensible and criminal. However, trial testimony demonstrated that Giles was fully aware of Crawford's activities and instigated this conduct. For Giles to allege in his brief that the record "does not suggest that Mr. Giles actively participated in the suborning of perjury or that he condoned such actions by his trial counsel" is ludicrous. (Giles brief at p. 20). Telephone calls 78, 123, 127

Appellate Case: 08-1385     Page: 83     Date Filed: 11/04/2008 Entry ID: 3487201

and 265 played to the jury between Giles and Kouris, demonstrated that Giles and/or Kouris contacted these individuals in an effort to manipulate their testimony. (Exs. 647, 651-652).

Several other recorded calls between Giles and Crawford were turned over to the defense in the discovery process. However, these calls were not played at trial because the government was mindful that only calls in furtherance of the conspiracy and calls that did not violate Bruton v. United States, 391 U.S. 123 (1968), with respect to Brown could be played. Even though the record does not contain each contact between Giles and Crawford, the record is sufficient to show Giles' knowledge of and complicity in Crawford's actions.

To allow him relief on the basis of ineffective assistance would be to allow him to profit by his own criminal misconduct. In fact, the sentencing guidelines provide for enhancement of a sentence based on the very conduct with which Giles was engaged. U.S.S.G. § 3C1.1 provides for a two level enhancement for obstruction of justice if the defendant has committed perjury or suborned perjury by another witness. United States v. Whiting, 522 F.3d 845, 849 (8th Cir. 2008).

At Giles sentencing on January 28, 2008, Judge Smith Camp specifically found that Giles was subject to an obstruction of justice enhancement pursuant to U.S.S.G. §3C1.1 for conduct referred to in paragraphs 37 and 38 of the RSPR.

Appellate Case: 08-1385     Page: 84     Date Filed: 11/04/2008 Entry ID: 3487201

(SHG 12:11-15).  Paragraph 37 detailed that Giles made telephone calls to Kouris while he was incarcerated making arrangements to influence what Moore and Newell were to tell law enforcement if questioned.  Application Note 4(a) explains that threatening, intimidating or unlawfully influencing a co-defendant or witness are examples of obstructive behavior.  Paragraph 38 references the call Giles made to Kouris to retrieve the video camera containing Brown counting money.

The government asserts that Giles' claims are insufficient to entitle him to the relief he requests.  Strickland v. Washington, 466 U.S. 668, 687-89 (1984), requires Giles to prove counsel's performance was so deficient it failed to fulfill the requirements of the Sixth Amendment and that Giles was prejudiced by the actions of his counsel.  While Giles may be able to show that Crawford's performance was unprofessional, her conduct was at his instigation.  He certainly has not and cannot prove that he was prejudiced by counsel's actions as he instigated them.   As such Giles' should not benefit by his own criminal conduct.

## VI.  NO VARIANCE EXISTED BETWEEN COUNT II OF THE INDICTMENT AND THE EVIDENCE PRESENTED.

### A.    STANDARD OF REVIEW.

A variance that does not result in actual prejudice to the defendant is harmless error, and does not require reversal of the conviction.  United States v.

68

Begnaud, 783 F.2d 144, 148 (8th Cir. 1986).

**B.     ARGUMENT.**

Giles and Brown argue that the district court erred when it denied their motions to dismiss Count II of the Fifth Superseding Indictment as the trial evidence presented varied from the act charged and that the evidence presented constructively amended the indictment.   Count II charged that on or about October 3, 2005, Giles and Brown used, carried, possessed and discharged a firearm in connection with the conspiracy to distribute marijuana charged in Count I.  Giles also argues that Count III, felon in possession on that same date, should also have been dismissed on variance grounds.  Because the trial evidence presented did not vary from the indictment nor was the indictment constructively amended, their arguments are without merit.

At trial several witnesses testified regarding the shooting of Monte Williams by Giles that occurred on October 3, 2005.  Giles was in the company of Brown during this shooting.   (SOF 34).   The jury also heard testimony about the motive for the Williams shooting through the testimony of Clarence Dennis.  Dennis testified that approximately one week prior to the Williams' shooting, he and Williams had broken into a house used by Giles and Brown to store and break up their marijuana.  (SOF 34-35).

69

The defendants in their briefs interchange the term "variance" and "constructive amendment". The title of their arguments allege that a "fatal variance" occurred (Giles' brief p. 41 and Brown's brief p. 44 ), but then argue that such a variance resulted in constructive amending the indictment. As set forth in <u>United States v. Stuckey</u>, 220 F.3d 976 (8th Cir. 2000), there is a very real difference between the two and a difference in the standard of review for both. "The basic difference between a constructive amendment and a variance is this: a constructive amendment changes the charge, while the evidence remains the same; a variance changes the evidence, while the charge remains the same." <u>United States v. Novak</u>, 217 F.3d 566, 574-75 (8th Cir. 2000). A constructive amendment is reversible error per se, while a variance is subject to the harmless error rule. <u>Stuckey</u> at 981.

No constructive amendment of the indictment could have occurred in this case as Count II of the indictment alleged the discharge of a weapon by Giles and Brown on October 3, 2005. The jury was instructed on the elements of this offense for events occurring on or about October 3, 2005.

What the defendants, therefore, must be arguing is that the charge remained the same but the evidence presented to the grand jury changed, i.e., a "variance" occurred. However, because the grand jury did, in fact, hear evidence of the same

Appellate Case: 08-1385     Page: 87     Date Filed: 11/04/2008 Entry ID: 3487201

evidence presented at trial on this count, the defendants allegations of "variance" are without merit.

On January 18, 2007, the grand jury returned the fifth superseding indictment. Evidence of the Monte Williams shooting was again presented in this indictment (just as in the original indictment). However, the grand jury was also presented specific evidence from Off. Bogdanoff of the shootout with Clarence Dennis in connection with the Williams shooting. See Grand Jury transcript of 1/18/07 p. 30:6-32:9 attached in the Addendum.

The government takes exception to the defendants allegations that the Dennis shootout was unrelated to the Williams shooting. This argument ignores the very motive behind the Williams shooting. Brown and Giles went after each individual involved in their marijuana theft and did so in the space of one week. These shooting incidents were related both in purpose and timing.

Clearly, the evidence presented proved beyond a reasonable doubt that Williams was shot on October 3, 2005, in connection with Giles and Brown's drug activities. The shooting was in retaliation for stealing their marijuana. While it is true that there was not a positive identification of Brown at the scene of the Williams shooting, the maroon Monte Carlo registered to his girlfriend (Ex. 459) transported Giles to and from the shooting. It was certainly logical for the jury to

Appellate Case: 08-1385     Page: 88     Date Filed: 11/04/2008 Entry ID: 3487201

infer that Brown was present at the scene. The prosecution never asserted that Brown himself shot Williams. The prosecution asserted that Giles shot Williams and that the shooting was foreseeable to Brown and committed in furtherance of his drug trafficking activities. (Jury instruction No. 18).

The defense cites United States v. Begnaud, 783 F.2d 144 (8th Cir. 1986), in support of its contention that the indictment was amended after the grand jury had issued the indictment. In Begnaud, the defendant, after being convicted of nine counts of wire fraud, alleged that the jury instructions on the elements of the offense constructively amended the indictment as the court's instructions allowed the jury to convict Begnaud on the basis of any false representations verses the two elements set forth in the indictment. This Court found his allegations to be unfounded as the indictment fairly apprised the defendant of the charges he must meet at trial. Id. at 147-148.

The Begnaud Court cited Milburn v. United States, 474 U.S. 994 (1985), in finding that no variance occurred. In Milburn, the Court found that where the indictment fairly specifies the offense charged and notifies the defendant of the particulars, the defendant has knowledge that other overt acts underlying the conspiracy might be pleaded at trial. Likewise, in the instant case, the defendants knew that the government would present evidence of the motive behind the

72

Williams shooting and were not surprised by the introduction of this testimony at trial. The defendants were provided the information regarding the Dennis shootout over a year before trial began. On August 17, 2006, documents relating to the shooting were disclosed to the defense in the discovery materials provided to them (bate stamped numbers 5823-5827 as set forth in Government's response to the defendant's motion to dismiss Filing No. 498). Furthermore, the non-prosecution agreement of Dennis was provided to the defense on September 12, 2007.

Even had the defendants been able to demonstrate that a variance occurred at trial after a grand jury had issued an indictment, the defendants cannot prevail absent a showing that any variance infringed their substantial rights. See Begnaud at 148. In United States v. Ghant, 339 F.3d 660, 662 (8th Cir. 2003), (a drug conspiracy case) the Court noted the following three situations where a variance might infringe on a defendant's substantial rights: 1) if the defendant could not reasonably have anticipated from the indictment the evidence presented against him; 2) if the indictment was so vague that he could be subsequently prosecuted for the same offense; and 3) the defendant was prejudiced by a spillover from one conspiracy to another. The defendants only assertion that fit any of the Ghant factors is the allegation that they did not know of the Dennis information in a

Appellate Case: 08-1385    Page: 90    Date Filed: 11/04/2008 Entry ID: 3487201

timely manner.  This allegation is insufficient to demonstrate an infringement on their substantial rights as they received reports of the Dennis incident over a year prior to trial.

While proof of the discharging of the weapon to Williams was sufficient to convict the defendants of Count II, the government submits that the jury could also have considered the shootout occurring a week later also as evidence of proof of Count II.   Proof of one or both incidents are sufficient to sustain the  defendants' convictions.  Again, evidence of both incidents was presented to the grand jury when it returned the fifth superseding indictment. (See Addendum).

The law is clear that the use of the term "on or about" in an indictment relieves the government of proving the crime charged occurred on a specific date, so long as it occurred within a reasonable time of the date specified.  United States v. Urick, 431 F.3d 300, 303-04 (8th Cir. 2005)(quotations and citation omitted). The eight-day difference between October 11, 2005, and October 3, 2005, is reasonable. See United States v. Harris, 344 F.3d 803, 804-05 (8th Cir. 2003) (finding no prejudicial variance where offense occurred one week before the date alleged in the indictment).  In accordance with the foregoing, the defendants' claims of a variance are without merit.

## VII. THE JURY INSTRUCTIONS FOR COUNTS II, IV AND VII CORRECTLY DESCRIBED THE ELEMENTS OF THE OFFENSE.

### A. STANDARD OF REVIEW.

The district court has wide discretion in crafting jury instructions. The Court will affirm if the instructions, taken as a whole, fairly and adequately instruct the jurors on the law applicable to the case. United States v. Jennings, 487 F.3d 564, 580 (8th Cir. 2007). This Court reviews jury instructions that were not objected to for plain error. United States v. Young, 702 F.2d 133, 136 (8th Cir. 1983).

### B. ARGUMENT.

Brown alleges that the district court's erroneous instructions on the elements of the crimes set forth in Counts II, IV and VII resulted in prejudice to him. The defendant made no objections to the instructions at the time they were given. Count II of the Fifth superseding Indictment charged that on or about October 3, 2005, Brown and Giles "used, carried, possessed and discharged a firearm during and in relation to a drug trafficking crime...to wit: the activity set forth in Count I of this Indictment" (conspiracy to distribute marijuana). This count related to the shooting of Monte Williams. Count IV charged that on or about May 3, 2005, through May 4, 2005, Brown and Giles "used, carried,

75

possessed and discharged a firearm during and in relation to a drug trafficking crime......to wit: the activity set forth in Count I of this Indictment" (conspiracy to distribute marijuana). This count related to the shooting of the three homicide victims. Count VII charged that on or about April 3, 2006, through April 4, 2006, Brown and Giles "used, carried and possessed a firearm, to wit: a Taurus .38 revolver... and a KR SPR Rifle..., during and in relation to a drug trafficking crime......to wit: the activity set forth in Count VI of this Indictment" (possession with intent to distribute marijuana). This count related to the weapons found in Brown's truck and the Crown Point Storage Units on the date of Brown and Giles arrests.

The district court instructed on the elements of the offense for the use of a firearm counts pursuant to the Eighth Circuit Model Jury Instruction on "possess in furtherance of" (jury instructions 18 (Count II), 21(Count IV) and 26 (Count VII)):

> COUNT II: POSSESSION IN FURTHERANCE OF A DRUG TRAFFICKING OFFENSE
> The crime of using or carrying a firearm during and in relation to, or possessing a firearm in furtherance of, a drug trafficking crime, as charged against the Defendant, Charmar Brown, has two essential elements, which are:
> ONE, ...Brown committed the crime of conspiracy to distribute or possess with intent to distribute marijuana, as charged in Count I; and

TWO: on or about October 3, 2005 (the date changes of each of these three counts)...Brown knowingly used or carried a firearm during and in relation to or possessed a firearm in furtherance of, that crime.

The elements of Instructions 18 (Count II), 21 (Count IV) and 26 were identical with directing the jury that if these elements were proven, they were to place on the verdict form whether the firearm was discharged. The jury voted on both Counts II and IV that the weapon was discharged. The jury was also instructed that Brown could be found guilty of the crime if the elements of the crime were committed by a coconspirator and foreseeable to Brown. In support of his argument that the second element of the jury instruction given is erroneous as it sets forth both crimes proscribed by 18 U.S.C. §924(c) and it gives the jury the option to convict on either of the two crimes (the "during and in relation to" and the "in furtherance of"), the defendant cites <u>United States v. Kent</u>, 531 F.3d 642 (8th Cir. 2008).

In <u>Kent</u>, the defendant was charged with two counts of possessing a gun in furtherance of drug trafficking. The evidence supporting his conviction on those crimes in Count II included Kent's possession of crack in one pocket and a loaded gun in the other and in Count IV with crack, cash and a loaded firearm found in a bedroom where he was staying. The jury was instructed pursuant to the Model

77

Eighth Circuit Instruction on "possess in furtherance":

> The phrase 'possess in furtherance of' means the firearm must have some purpose or effect with respect to possession with intent to distribute crack cocaine; its presence or involvement cannot be the result of accident or coincidence. The firearm must facilitate or have the potential to facilitate the offense of possession with intent to distribute crack cocaine.

Because 18 U.S.C. § 924(c) proscribes two separate crimes: 1) carrying or using a firearm during and in relation to a drug trafficking crime; and (2) possessing a firearm in furtherance of a drug trafficking crime, the Court found the instruction would allow the jury to convict on the lesser finding of "in relation to". Therefore, the jury instruction was erroneous. Id. at 850. However under the plain error standard of review, the court ruled that Kent was not prejudiced .

While is appears that the jury was instructed on the elements of the offense in Brown's case similar to that in Kent, they are distinguishable. In Brown, "in relation to" was not defined in the supplemental instructions. "In furtherance of" was defined identical to the "possess in furtherance of" language of Kent. "The 'in furtherance of' is a slightly higher level of participation than 'during and in relation to'". United States v. Gamboa, 439 F.3d 796, 810 (8th Cir. 2006). Therefore, the only definition the jury received regarding the degree of participation necessary to convict on the charge was the higher standard—the "in

78

furtherance of". This analysis would apply for Counts II, IV and VII.

In United States v. Gill, 513 F.3d 836, 850-852 (8th Cir. 2008), the defendant was charged with carrying a gun during and in relation to a drug trafficking crime. The jury instruction did not track the appropriate statutory language. It incorrectly labeled in the instruction the offense as "carrying a firearm in furtherance of drug trafficking". The instruction further misstated an essential element of the offense as the "knowing possession of a firearm in furtherance of drug trafficking as an element of the offense. During deliberations the jury sent a note to the court asking for additional instruction on the definition of "in furtherance of". The court sent the jury the Model Eighth Circuit instruction on "possessed in furtherance of", an instruction superfluous to the charge.

In spite of these errors, the Gill Court found that reversal was not required. Gill was charged with carrying a firearm, not using it. Using a firearm requires active employment of the weapon, Bailey v. United States, 516 U.S. 137, 144 (1995), while an individual can carry a firearm merely by knowingly transporting it in a vehicle, Muscarello v. United States, 524 U.S. 125, 136-139 (1998). Put another way, one can possess a firearm without using it, but one cannot carry a firearm without possessing it. United States v. Ceballos-Torres, 218 F.3d 409, 413

Appellate Case: 08-1385    Page: 96    Date Filed: 11/04/2008 Entry ID: 3487201

(5th Cir. 2000). Because Gill was charged with "carrying" a firearm, not "using it, and because the evidence presented unequivocally demonstrated that Gill was knowingly transporting the handgun in the truck, the term "possess" in the jury instructions did not create a substantial likelihood that the jury could have convicted Gill of an offense other than the one with which he was charged. The Court found that the "in furtherance of" instruction–rather than "during and in relation to" - did not affect Gills substantial rights because "the instructions required the jury to find a higher level of participation than the charged offense.

The government concedes that in light of the decision in <u>Kent</u>, the district court may have instructed in error. However, the error did not affect Brown's substantial rights. Brown was charged in Counts II and VI with using, carrying, possessing and discharging a gun. The jury was instructed and made a specific finding that Brown and/or Giles discharged the weapon on each of these occasions. Under the <u>Gill</u> analysis, discharging a weapon requires the highest degree of participation by the possessor of the weapon. In order to discharge a weapon, one must possess, use, and carry the weapon. Therefore, because the evidence presented at trial with respect to Counts II and IV, demonstrated that Giles and/or Brown (with knowledge and foreseeability of the actions of the other) shot Williams and shot the three homicide victims, there existed no substantial

80

likelihood that the jury could have convicted Brown of an offense or a lesser

offense other than with what he was charged.

Brown did not object to the instructions given. Therefore, this court may

reverse only if the error constitutes plain error. See United States v. Young, 702

F.2d 133, 136 (8th Cir. 1983). Reversal under plain error review requires the

defendant to show (1) there was error, (2) that was plain, and (3) affected

substantial rights. United States v. Olano, 507 U.S. 725, 736 (1993). Under this

Court's holdings in Kent and Gill, Brown has made no such showing.

## VIII. THE DISTRICT COURT DID NOT PLAINLY ERR WHEN IT DID NOT SUA SPONTE SEVER BROWN'S CASE FROM HIS CO-DEFENDANTS.

### A. STANDARD OF REVIEW.

Where the issue of severance has not been preserved, the Court can only

review for plain error. United States v. Westbrook, 896 F.2d 330, 337 (8th Cir.

1990). This requires appellants to show not only that there was a Rule 14

violation affecting their substantial rights, but also that there is some extraordinary

reason for the Court to reverse for such error despite their failure to raise the issue

in the trial court. United States v. Thornberg, 844 F.2d 573, 575 (8th Cir. 1988).

### B. ARGUMENT.

Brown argues that even though no motion for severance was made, the court

Appellate Case: 08-1385   Page: 98   Date Filed: 11/04/2008 Entry ID: 3487201

should have severed his trial from Giles as the trial progressed.

> Fed. Rule of Crim. Procedure 14 provides:
> If the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires.

"To make a showing of prejudice, an appellant must establish something more than the mere fact that he would have had a better chance for acquittal had he been tried separately." United States v. Adkins, 842 F.2d 210, 212 (8th Cir. 1988). "The appellant must demonstrate that the jury was unable to compartmentalize the evidence as it related to the separate defendants." Id.

Brown alleges that much of the trial evidence had nothing to do with him and would have been inadmissible if he had been tried alone. A review of the trial evidence disproves his assertions. Boyston and McGinnis both testified regarding Brown's involvement with Giles in setting up and transporting loads of marijuana to Omaha. (SOF 9-11, 19-22). Moore and Newell testified about Brown's complicity with Giles in the murders of the three Hispanic individuals and their attempts to cover up evidence of the murders. (SOF 23-29).

Commencing on April 3, 2006, search warrants executed on vehicles and properties utilized and/or owned by Brown and Giles revealed evidence significant

to the severance issue. Officers located large amounts of currency, hundreds of pounds of marijuana, a gun and other indicia of selling marijuana at Brown's residence, locations used by him and in his vehicles. (SOF 15-17).

Other instances were testified to at trial in which Brown was arrested or had contact with law enforcement during the conspiracy: February 6, 2005, incident (SOF 32); March 20, 2005, stop at Epply Airport (SOF 32-33); and April 11, 2005, incident (SOF 33).

On October 11, 2005, approximately one week after the shooting of Monte Williams, Giles and Brown were involved in a shootout with Clarence Dennis because Dennis and Williams had stolen marijuana from 4115 S. 37th Street. This residence used as a marijuana stash house by Giles and Brown was rented by Brown. (SOF 34-35).

After the arrest of Giles and Brown on April 4, 2006, the conspiracy continued. Marijuana was still left to be distributed that had not been confiscated by law enforcement. (SOF 23-24). While it is true that telephone calls were made by Giles to other conspirators regarding the distribution of this marijuana and the attempts to collect money for the distribution, there is no evidence to suggest that Brown had withdrawn from the conspiracy at this time. Therefore, any telephone calls played to the jury would have been admissible even in a separate trial as

Appellate Case: 08-1385    Page: 100    Date Filed: 11/04/2008 Entry ID: 3487201

coconspirator statements under Fed. R. Evid. 801(d)(2)(E).

The Eighth Circuit "prefers conspiracy defendants to be tried together, particularly where the government's case is based on the same evidence." United States v. Payne, 923 F.2d 595, 597 (8th Cir. 1991). "Persons charged with a conspiracy will generally be tried together, especially where proof of the charges against each of the defendants is based on the same evidence and acts." United States v. McConnell, 903 F.2d 566, 571 (8th Cir. 1990).

In the instant case, almost without exception, the very same evidence that was admitted at this trial would have been admitted in a severed trial. For example, the evidence of Giles' arrest on May 22, 2005, in which he was found passed out at the wheel of his Dodge Magnum in possession of an ounce of marijuana and $12,647 in currency would have been admitted. (SOF 33). The marijuana and money confiscated just two weeks following the murders were admissible as evidence of the conspiracy between Brown and Giles even in a separate trial of Brown. Likewise, the $358,030 found in #246 of Giles storage locker at Milt's Mini Storage would have been admitted in a separate trial of Brown as this money was proceeds from the conspiracy. (SOF 16).

Assuming arguendo, that the case against Giles was stronger than against Brown, this still provides him no grounds for relief. "Severance is not required

84

merely because the evidence against one defendant is more damaging than the evidence against another. 'Severance becomes necessary where the proof is such that a jury could not be expected to compartmentalize the evidence as it relates to separate defendants.'" United States v. Faul, 748 F.2d 1204, 1217 (8th Cir. 1984), cert. denied, 472 U.S. 1027 (1985). "Neither does limited involvement in a conspiracy warrant severance." United States v. Pecina, 956 F.2d 186, 188 (8th Cir. 1992)(citations omitted). See also, United States v. Swinney, 970 F.2d 494, 501 (8th Cir. 1992)(separate trials not required just because quantum of proof against each defendant is unequal or because each defendant did not act in each and every act constituting the joined offenses).

In Zafiro v. United States, 506 U.S. 534 (1993) the Supreme Court held:

> . . . a district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence. . . . . [I]t is well settled that defendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials.

Brown has failed to identify a specific prejudice from having his trial consolidated with Giles. His assertions are mere generalizations. Furthermore, the jury was capable of compartmentalizing the evidence against each defendant and the court specifically instructed the jury to treat each defendant separately.

85

Therefore, Brown was not entitled to severance.

## IX. PROBABLE CAUSE EXISTED TO ISSUE THE SEARCH WARRANTS.

### A. STANDARD OF REVIEW.

The Court reviews a district court's factual findings for clear error and its legal conclusions de novo. United States v. Williams, 431 F.3d 1115, 1117 (8th Cir. 2005). We will affirm the denial of a motion to suppress "unless the decision is unsupported by substantial evidence, is based on an erroneous view of the applicable law, or in light of the entire record, we are left with a firm and definite conviction that a mistake has been made." United States v. Vega-Rico, 417 F.3d 976, 979 (8th Cir. 2005) (quoting United States v. Hernandez-Hernandez, 384 F.3d 562, 564-65 (8th Cir. 2004)), cert. denied, 547 U.S. 1073 (2006).

### B. ARGUMENT.

### 1. The Search Warrants Were Supported by Probable Cause.

Brown argues the affidavits in support of the search warrants lacked probable cause because of informant unreliability and insufficient corroboration of their information. Because the affidavits set forth probable cause, his argument is without merit.

In Illinois v. Gates, 462 U.S. 213, 238 (1983), the Supreme Court found that

86

"the task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." Thus, when viewing a search warrant, the court must look at the totality of the circumstances set forth in the affidavit. United States v. Etheridge, 165 F.3d 655, 656 (8th Cir. 1999). "Deference is accorded an issuing magistrate's probable cause determination." United States v. Brown, 584 F.2d 252, 256 (8th Cir. 1978), cert. denied, 440 U.S. 910 (1979).

A review of the affidavits demonstrate that probable cause existed for the issuance of the warrants. It is clear that those affidavits chronicled an exhaustive and lengthy investigation into the defendants that began approximately one year prior to the execution of the warrants.

These affidavits detail the identification of witnesses providing information against Giles and Brown. The affiants' investigation of these individuals commenced upon the homicides of Dominguez, Wilkinson and Garcia on May 4, 2005. In summary, Kenrell Boyston and Ulysses Sanchez detailed their personal involvement with the deceased Dominguez, and Giles and Brown in the distribution of marijuana. Boyston admitted arranging for Dominguez to supply

Appellate Case: 08-1385    Page: 104    Date Filed: 11/04/2008 Entry ID: 3487201

Brown and Giles with several loads of marijuana. Sanchez confirmed Boyston's role in arranging these sales.

In addition, both Sanchez and Boyston relayed information about a specific meeting occurring in Atlanta, Georgia during the spring of 2005, where Dominguez, Giles and Brown negotiated for a large shipment of marijuana to be delivered to Omaha. The affidavits specifically detailed that after receipt of the Sanchez and Boyston information, airline records were obtained by the affiants from America West and Delta Airlines confirming that Dominguez flew from Phoenix, AZ to Atlanta on March 5, 2005, and that Boyston arrived in Atlanta the following day. Bank records obtained on Brown's bank account detailed a $1,218.49 charge he made on March 14, 2005, to Hawthorne Suites, Atlanta, Georgia. Michael Edwards, manager of that establishment, verified that this billing amount was consistent with a 8-10 day stay at their establishment.

Even the "corroboration of minor innocent details can suffice to establish probable cause". United States v. Ramos, 818 F.2d 1392, 1397 n.7 (8th Cir. 1987). If some information from a source is shown to be reliable because of independent corroboration, it is a permissible inference that the source is reliable and, therefore, other information the source provides, though uncorroborated, is also reliable. United States v. Edmiston, 46 F.3d 786, 789 (8th Cir. 1995).

Appellate Case: 08-1385    Page: 105    Date Filed: 11/04/2008 Entry ID: 3487201

Certainly, the independent information gained from Boyston and Sanchez provided the corroboration necessary to satisfy the standards the courts set in Ramos and Edmiston.

Sanchez also informed the affiants that the Mexican supplier of the approximate 4,000 pound delivery of marijuana contacted him by telephone after the murder of Dominguez. This supplier, who was out millions of dollars, wanted Sanchez to go to Omaha and identify the individuals who received the marijuana. Fearing for his safety, Sanchez did not come to Omaha. Hector Wilkinson independently confirmed also being contacted by this Mexican supplier and admitted giving this supplier Sanchez' phone number. Affiants confirmed the information supplied by Boyston and Sanchez that the large marijuana load was delivered to Omaha shortly before the Dominguez homicide, by Timothy Moreno's admission of delivering a load of at least 3,500 pounds of marijuana to black males in Omaha.

The information provided by Boyston, Sanchez and Moreno was very specific information provided independent of one another. In addition, they all provided statements against their penal interest. Boyston admitted brokering marijuana deals between Dominguez and Giles and Brown. Both Boyston and Sanchez admitted to traveling to Atlanta and participating in conversations

89

regarding the transfer of a large amount of marijuana from Dominguez to Giles and Brown. Moreno admitted delivering at least a 3,500 pound load of marijuana to Omaha. When an informant makes disclosures against his penal interest, those disclosures are presumptively credible. United States v. Tyler, 235 F.3d 1036, 1039 (8th Cir. 2001).

Affiant officers conducted extensive searches into Giles and Brown's finances. They checked bank records, credit card records and, vehicle purchases. These searches disclosed that after the murder of Dominguez, Wilkinson and Garcia, Giles and Brown deposited and expended very large amounts of monies. Officers also identified various storage facilities rented by the defendants and/or persons associated with them.

After service of the warrants on April 3, and 4, 2006, on the various storage units at Crown Point and Milt's Mini Storage, affiants expounded on the information provided in the first set of affidavits by requesting warrants for various other addresses. This information included the recoveries of 13 pounds of marijuana, over $337,500, and the venue items of Giles and Brown taken from the storage units. These affidavits also set forth how each new address to be searched was connected to the defendants.

By way of example, with respect to the affidavit for 7006 ½ Maple, the

90

officers detailed the results of their surveillance on that property since March 24, 2006. During this surveillance, vehicles associated with Giles and Brown were identified regularly at that address. Based on the actions they observed during surveillances, the officers concluded that Giles and Brown were trying to prevent law enforcement from maintaining constant surveillance on them. They would enter the structure in one vehicle but exit shortly in another vehicle. The rental agreement obtained for this property revealed that Giles and Brown had been renting the property since May 18, 2005, for $1,500 a month. This agreement listed the business as K-Nown Investments, LLC and 40 Deuce Music Corporation and referred to this location as being used for the storage of lawn care and a towing service. However, surveillance conducted on the business failed to show the presence of any lawn care or towing equipment associated with this address. (Exhibit 10 affidavit).

The affidavit for the South 60th Street address informed the issuing judge that officers learned during the investigation that both Brown and Giles were utilizing this address. Travis Wilcoxson, Brown's supervising federal pretrial officer, informed the officers that Brown and Giles began a music recording business named "40 Deuce Music Corporation" at this address. During the numerous surveillances officers had of this address, vehicles associated with

91

Brown and Giles were observed several times. In addition, Brown had listed himself as the vice-president of this music corporation on the rental application for the Maple Street address. (Exhibit 11 affidavit).

The affidavit for the 2629 N. 130th Street (Brown's home) informed the judge that this was one of the addresses associated with Brown. On a rental agreement obtained for the 7006 ½ Maple Street location, Brown provided his home address as 2629 N. 130th Street. In addition, officers identified Latasha Willis, black female, born 12/25/84, as residing at this same address. During affiant's discussion with Wilcoxson, officers learned that Brown listed his home address as 2629 N. 130th Street and that he stated he resided there with his girlfriend, Latasha Willis, the mother of their two children. (Exhibit 12 affidavit).

In United States v. Murphy, 69 F.3d 237 (8th Cir. 1995), cert. denied, 516 U.S. 1153 (1996), this Court found that the affidavit, combined with corroborated facts, was sufficient to support the warrant for a search for weapons. The affidavit merely recited that an anonymous informant knew Murphy was recently released from prison for murder and had certain items in his possession. The only corroboration of the informant's information was the affiant's verification that Murphy lived at the house requested to be searched and that Murphy was released on parole for murder in 1992. While this Court found that the affidavit was "bare

92

bones at best", the court was satisfied that the independent corroboration provided assurances of the informant's reliability and that the affidavit under the totality of the circumstances set forth probable cause.

The affidavits in this case are much more detailed than what the Court found adequate in Murphy. The named witnesses are not anonymous, but persons who, from the face of the affidavit, made statements against their own penal interest and had personal knowledge of the defendants' involvement in marijuana trafficking. The affiants then set forth corroborating facts demonstrating to the issuing judge that the witnesses were giving reliable information.

Taking these affidavits as a whole, under the rule set forth in Gates, 462 U.S. at 238, the information received from the named witnesses and law enforcement's subsequent corroboration and independent investigation, sufficient probable cause was presented for Nebraska Court Judges Lowe and Schatz to reasonably believe that proceeds, records, and equipment from an illegal narcotics distribution organization would be found at the storage shed facilities, residences and vehicles searched.

In his Report and Recommendation ("R&R") following the motions to suppress Magistrate Judge Gossett iterated that he had reviewed each search warrant application in detail, giving deference to the issuing judges'

93

determinations of probable cause and found adequate corroboration of the factual information contained therein. (Filing No. 215 p. 52-53). The R&R was adopted in its entirety by District Judge Smith Camp. (Filing No. 297, p. 6-7). The court did not err in finding probable cause existed for the issuance of the search warrants.

## 2. The good faith exception in <u>United States v. Leon</u>, is applicable.

Brown also alleges that the good faith exception set forth in <u>United States v. Leon</u>, was inapplicable in this case. This assertion is also in error.

Even assuming, arguendo, that the search warrants lacked probable cause, the <u>Leon</u> good faith exception would allow the admissibility of the evidence. Under <u>United States v. Leon</u>, 468 U.S. 897 (1984), the Fourth Amendment exclusionary rule should not be applied to exclude the use of evidence obtained by officers acting in reasonable reliance on a neutral and detached magistrate judge's determination of probable cause in the issuance of a search warrant that is ultimately found to be invalid. <u>Id.</u> at 919-23.

"[S]earches pursuant to a warrant will rarely require any deep inquiry into reasonableness, (citation omitted) for a warrant issued by a magistrate normally suffices to establish that a law enforcement officer has acted in good faith in conducting the search." <u>Id.</u> at 922. In the absence of an allegation that the

94

magistrate abandoned his detached and neutral role, suppression is appropriate only if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause. Id. at 926.

> It is the magistrate's responsibility to determine whether the officer's allegations establish probable cause and, if so, to issue a warrant comporting in form with the requirements of the Fourth Amendment. In the ordinary case, an officer cannot be expected to question the magistrate's probable cause determination or his judgment that the form of the warrant is technically sufficient. [O]nce the warrant issues, there is literally nothing more the policeman can do in seeking to comply with the law.

Stone v. Powell, 428 U.S. 465, 498 (1976).

The government concedes that Leon will not operate to save the fruits of a search in all situations. The good faith exception of Leon does not apply where: 1) the magistrate judge issuing the warrant was misled by statements made by the affiant that were false or made in reckless disregard for the truth; 2) the issuing judge wholly abandoned his judicial role; 3) the affidavit is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; or 4) the warrant is so facially deficient that the officers cannot reasonably presume it to be valid. Leon, 468 U.S. at 923.

These affidavits were not so facially deficient that an objective and

95

reasonable police officer could not rely on the warrants issued by neutral and detached judges. There is no evidence to suggest nor does Brown argue that Judges Lowe and Schatz wholly abandoned their judicial roles and were not acting as a neutral and detached judges.

Brown argues that he was entitled to a <u>Franks</u> hearing alleging that County Court Judge Lowe was mislead by the affiants in two instances: that Daramus Brown is the cousin, not the brother of Charmar Brown, and that at the time the warrant was served at Milt's Mini Storage Brown was no longer renting a unit there.

Off. Bogdanoff conceded at the motion to suppress that Daramus Brown may be the cousin of Brown, not his brother. Certainly, even if Daramus was misidentified in the affidavit as a brother vs. a cousin, this does nothing to negate the close degree of kinship existing between he and Charmar. The affiants informed Judge Lowe that individuals often rent storage sheds to hide or store proceeds or controlled substances and often use others associated with them to rent such units. Even had Daramus Brown only been a friend of the defendants, this would have sufficed to establish probable cause to search #427.

Charmar Brown was identified in the affidavits as renting unit 410 at the Crown Point Storage Units. It is true that on the date the warrants were executed,

Appellate Case: 08-1385     Page: 113     Date Filed: 11/04/2008 Entry ID: 3487201

he was no longer renting a unit at the facility.  However, the officers had

previously had repeated contacts with Tracy Nusser, the resident manager of the

Crown Point facility, about Brown's rental on that unit.  They learned that Brown

was renting the unit off and on until mid-March, 2006.  However, during this time

he had been receiving notices that his rent was unpaid and was being evicted

followed by Brown's payment of rent and then reinstatement of the premises.

While affiants should have informed Judge Lowe that Brown had discontinued the

rental of Unit 410 in mid-March, 2006, the mistake was inadvertent.  Affiants had

obviously spent considerable time preparing these affidavits and warrants prior to

March 30, 2006.  Given the fact that they actually got a warrant to search Unit

410, it is apparent that the officers merely overlooked the fact that Borwn was now

evicted from the unit.  They were not intending to mislead the Judge or acting with

reckless disregard for the truth.

Courts have long held that there is a presumption of validity with respect to

the affidavit supporting a search warrant.  United States v. Crook, 936 F.2d 1012,

1014 (8th Cir. 1991) (citing Franks v. Delaware,438 U.S. 154, 171 (1978)).

> A defendant may challenge a facially sufficient affidavit by showing
> that the facts included in the affidavit are false or were made in
> reckless disregard of the truth, or that facts were omitted with the
> intent to mislead or in reckless disregard of whether it was
> misleading.  Franks, at 155-156; United States v. Lucht, 18 F.3d 541,

546 (8th Cir. 1994). The reviewing court must then determine
whether, either absent the false material or supplemented with the
omitted material, the remaining contents of the affidavit are sufficient
to establish probable cause.

United States v. Falls, 34 F.3d 674, 681 (8th Cir. 1994). See also United States v.

Gladney, 48 F.3d 309, 313 (8th Cir. 1995). If there remains sufficient content in

the warrant affidavit with the supplemented information included to support a

finding of probable cause, then a Franks hearing would not be required. Franks, at

171-172. The defendant has the burden of demonstrating that relevant information

was recklessly omitted and "the omitted material would be 'clearly critical' to the

finding of probable cause." Gladney, 48 F.3d at 799.

Brown has not made a threshold showing of "deliberate falsehood" or

"reckless disregard for the truth" as required in Franks. Even though the affidavits

contained the misidentification of Daramus Brown and the identification of

Charmar Brown as the renter of unit 410, a Franks hearing was not required.

Absent these statements, the remaining contents of the affidavits were sufficient to

establish probable cause.

Judge Smith Camp found that the affidavits included sufficient probable

cause and that the defendants presented no evidence to support their arguments

that the Leon good faith exception did not apply. (Filing No. 297, p. 15). The

government submits that the district court properly considered the evidence presented at the motion to suppress and the affidavits in determining that the affidavits were sufficient to set forth probable cause.  In the event this Court finds that probable cause was lacking, the government submits that the officers had a good faith belief in the validity of the warrants.

## X.  THE DISTRICT COURT DID NOT ERROR IN INSTRUCTING THE JURY REGARDING DRUG QUANTITY.

### A.  STANDARD OF REVIEW.

"In reviewing challenges to jury instructions, this Court recognizes that 'the district court has wide discretion in formulating the instructions,' and we will 'affirm if the entire charge to the jury, when read as a whole, fairly and adequately contains the law applicable to the case."  United States v. Sdoulam, 398 F.3d 981 (8th Cir. 2005) (quoting United States v. Phelps, 168 F.3d 1048. 1057 (8th Cir. 1999)).  We review the district court's factual finding of drug quantity for clear error  and "will reverse a determination of drug quantity only if the entire record definitely and firmly convinces us that a mistake has been made."  United States v. Minnis, 489 F.3d 325, 329 (8th Cir. 2007).

### B.  ARGUMENT.

Kouris was charged in Count I of the fifth superseding indictment with

99

conspiracy to distribute more than 1,000 kilograms of marijuana.  The penalty for such an offense was a mandatory minimum term of imprisonment of 10 years up to a maximum term of life imprisonment.  21 U.S.C. §841(B)(1)(A)(vii).  The jury found Kouris was guilty of Count I and specifically found that the amount of marijuana was over 1,000 kilograms.  (Filing Nos. 298 & 576).  Kouris argues that she was sentenced in violation of Apprendi v. New Jersey, 530 U.S. 466 (2000).

Apprendi held that "other than the fact of a prior conviction, any fact that increases the penalty for a crime **beyond the prescribed statutory maximum** must be submitted to a jury, and proved beyond a reasonable doubt."  (Emphasis added).   In this case the law as set forth in Apprendi was not violated as Kouris' sentence of 135 months did not exceed the statutory maximum (life imprisonment) that was pled in the indictment (over 1,000 kilograms).  Furthermore, the issue of drug quantity determination **was** specifically submitted to the jury for their determination.

In United States v. Aguayo-Delgado, 220 F.3d 926 (8th Cir. 2000), this Court held that   "[I]f the government wishes to seek penalties in excess of those applicable by virtue of the elements of the offense alone, then the government must charge the facts giving rise to the increased sentence in the indictment, and

100

must prove those facts to the jury beyond a reasonable doubt." Id. at 933. However, in the same case, this Court also determined that the quantity of drugs need not be charged in the indictment or proven beyond a reasonable doubt so long as the sentence does not exceed the statutory maximum authorized by the jury's verdict.

Kouris had the best of all scenarios. The amount of marijuana was specifically pled in the indictment and the jury also made a determination of quantity that did not exceed the statutory maximum. The final sentence imposed did not exceed the statutory maximum. Therefore, Kouris' argument that Apprendi was violated in inapplicable and without merit.

Kouris further contends that Instruction 16 conflicted with Instruction 10 in how the jury was to determine drug quantity and prevented them from reaching a proper determination of drug quantity. This assertion is also in error.

Instruction 16 titled "Conspiracy: CoConspirator Acts and Statements" directs the jury as to how the acts of other conspirators may be attributed to the defendant:

> You may consider acts knowingly done and statements knowingly made by a Defendant's coconspirators during the existence of the conspiracy and in furtherance of it as evidence pertaining to the Defendant even though they were done or made in the absence of and without the knowledge of the Defendant.....

101

This instruction says nothing at all about the determination of the quantity of drugs the jury is directed to find. It is merely a statement about coconspirator liability given pursuant to <u>Pinkerton v. United States</u>, 328 U.S. 640 (1946). The Court in <u>Pinkerton</u> held that direct participation in the commission of the substantive offense need not be proved so long as the substantive offense was in furtherance of the conspiracy and a necessary or natural consequence of the unlawful agreement. <u>Id.</u> at 646.

Instruction 10 titled "Quantity" explained how the jury was to determine the quantity of marijuana attributable to Kouris. This quantity includes:

> the controlled substances the Defendant possessed for personal use or distributed or agreed to distribute. The quantity also includes the controlled substances fellow conspirators distributed or agreed to distribute, if you find that those distributions or agreements to distribute were a necessary or natural consequence of the agreement or understanding and were reasonably foreseeable by the Defendant.

As the very titles or headings of these two instructions make clear, one instructs on coconspirator liability and the other on how to determine drug quantity. They are not inconsistent.

If there was any ambiguity with regard to how the jury was to determine drug quantity, it was resolved prior to the jury verdict. During deliberations the jury sent the following question to the judge: "[I]f two or more defendants are

102

found guilty of Count I, can the amounts for each defendant be different (amount of marijuana)?" (Tr. 2982:1-3). In response to the question, the judge instructed the jury to reread Instruction 10 (the instruction on quantity). (Tr. 2986:14-16). So despite any alleged confusion Kouris perceives between Instructions 10 and 16, the jury was specifically directed to Instruction 10 in making it's quantity determination.

Ample evidence to support the jury's finding of quantity as to Kouris was produced during the trial. She was involved with Giles and Brown in the importation of thousands of pounds of marijuana into Omaha, over 1,000 pounds of which were recovered on April 3, and 4, 2006, (search of storage sheds and 7006 ½ Maple Streets). She assisted Giles in collecting money for marijuana previously delivered after Giles was arrested. She assisted in distributing marijuana after his arrest that was not confiscated by law enforcement. She traveled with him on numerous occasions when marijuana was procured and deals were arranged. She assisted Giles in hiding assets of the conspiracy and attempting to alibi his actions both in the murders and in the drug conspiracy.

The sentencing judge found that Kouris was responsible for over 1,000 kilograms of marijuana. (SHK 10:2-9). "In order to attribute a quantity of drugs to a defendant, the sentencing court is required to find by a preponderance of the

Appellate Case: 08-1385     Page: 120     Date Filed: 11/04/2008 Entry ID: 3487201

evidence that the activity involving those drugs was in furtherance of the conspiracy and either known to that defendant or reasonably foreseeable to him." United States v. Morin, 437 F.3d 777, 782 (8th Cir. 2006) (quoting United States v. Mickelson, 378 F.3d 810, 822 (8th Cir. 2004)). Judge Smith Camp was the trial and sentencing judge. As such, she had heard all of the evidence against Kouris. In United States v. Wiggins, 104 F.3d 174 (8th Cir. 1997) this Court held that the judge who presided over the trial was not required to hold an evidentiary hearing to resolve factual disputes and may base its finding of fact on the trial recall. Id. at 178. In light of the trial evidence presented, the sentencing court and the jury's determination of quantity with respect to Kouris were supported by the record.

## XI. THE OBSTRUCTION OF JUSTICE ENHANCEMENT WAS PROPERLY APPLIED TO KOURIS' SENTENCE.

### A. STANDARD OF REVIEW.

This Court reviews the district court's application of the guidelines de novo and its factual findings for clear error. United States v. Watson, 480 F.3d 1175 (8th Cir. 2007). "[S]entencing judges are only required to find sentence-enhancing facts by a preponderance of the evidence." United States v. Farrington, 499 F.3d 854, 859 (8th Cir. 2007).

104

**B.    ARGUMENT.**

Kouris was sentenced on January 28, 2008, to a term of 135 months of

imprisonment.  This sentence was at the low end of the advisory guidelines range

of 135-168 months.  The district court reached this calculation based on the jury

finding that Kouris was responsible for more than 1,000 kilograms of marijuana,

that she should receive a two level reduction for her role in the offense, that her

criminal history category was IV, and that she should receive a two level increase

for obstruction of justice under U.S.S.G. §3C1.1.   Kouris alleges that the finding

that she had obstructed justice was made in error.

The basis for this enhancement was recited in paragraph 36 of the

Presentence Report (hereinafter referred to as PSR) and based on additional

conduct proven at trial.  The PSR conduct referenced a video camera that was

seized by law enforcement on April 4, 2006.  On that day a search warrant was

executed at Kouris' apartment at 1214 Applewood Drive #G208.  (Tr. 1489:9-21;

1494:5-25).  Among the items seized was a Sony video camera.  In a telephone

call made by Giles to Kouris on May 10, 2006, Giles told Kouris that the video

camera seized from the apartment contained incriminating footage of he and

Brown counting money with marijuana being present.  (Ex. 405).  On June 21,

2006, Kouris contacted Off. Bogdanoff requesting that this video camera be

returned to her.  The camera was not returned to her.  Instead, Off. Bogdanoff arranged to have the contents of the camcorder downloaded, which revealed thirteen separate video segments, as well as some individual photographs.  One video segment was filmed at 7006 ½ Maple Street, the garage utilized by Giles and Brown.  In this segment narrated by Giles, Brown was seated at a table counting out thousands of dollars.  Giles and Brown were boasting about the money they were making.  At least one pound of marijuana is visible on the table. (Ex. 405 & 394).  Two photos from this same video camera were also introduced at trial.  Both photos depict marijuana.  (Ex. 395 & 396).

It was the opinion of the probation officer that this conduct qualified for the obstruction enhancement, citing Application Note 4(d), which provides that the enhancement applies where "destroying or concealing or directing or procuring another person to destroy or conceal evidence that is material to an official investigation...or attempting to do so".  Clearly, Ms. Kouris, at the urging of Giles, attempted to retrieve this video camera as it contained very incriminating evidence of Giles' and Brown's involvement in the marijuana conspiracy.  This conduct demonstrated that she did, in fact, attempt to obstruct an investigation by trying to retrieve this video in order to conceal evidence of Giles and Brown's involvement. Telephone calls on April 20, May 10, May 18 and May 21, 2008, between Giles

106

and Kouris confirmed that Kouris was successful in actually concealing a gun, money and other assets of the conspiracy. (Exs. 207, 661, 655, 659).

Other evidence of obstructive conduct by Kouris was brought forth during the trial. The government argued at sentencing that Application Note 4(a) also encompassed Kouris' conduct. That section provides that the obstruction enhancement should apply to (a) "threatening, intimidating, or otherwise unlawfully influencing a co-defendant, witness, or juror, directly or indirectly, or attempting to do so". The appellee has earlier discussed in this brief Ms. Kouris' conduct in which she directly and indirectly attempted to influence witness testimony. That conduct dealt with telephone calls with Giles in which he directed Kouris to contact Moore, Newell and Roosevelt Jackson to direct them what to say if they were contacted by law enforcement. (This brief at pp 65-67). Moore testified that it was Kouris who contacted him to come to the house at 3547 N. 40th Avenue where Crawford showed him the note detailing what he was to tell law enforcement.

The court's finding of obstruction is well supported by the trial testimony as well as case law. In United States v. Holt, 149 F.3d 760 (8th Cir. 1998), while awaiting trial, Holt attempted to deliver a note to his brother which was intercepted by a jailor. The note recited a version of the crime that varied

107

substantially from the brother's prior statements to the authorities. The district court applied a two-level enhancement under section 3C1.1 of the Guidelines on the ground that this correspondence constituted an attempt to obstruct the administration of justice as it was written in an attempt to get the brother to commit perjury and manufacture testimony. See also United States v. Lange, 918 F.2d 707, 709 (8th Cir. 1990) (The solicitation of false testimony generally may be viewed as an obstruction of justice).

In United States v. Allmon, 500 F.3d 800, 805 (8th Cir. 2007), this Court held that under U.S.S.G. § 3C1.1, a defendant is accountable for his own conduct and for conduct that he aided or abetted, counseled, commanded, induced, procured, or willfully caused. The testimony in that case established that a coconspirator stole documents from a motel front desk, which were prepared for a detective investigating Allmon. The coconspirator testified he delivered the documents to Allmon at the motel.

In the instant case Kouris was likewise held accountable for the conduct in which she attempted to obtain the video tape of incriminating evidence, by her actions of contacting witnesses and the concealment of Arizona property. Even should this Court find that Kouris did not do these actions entirely on her own, under the reasoning of the Allmon Court, she certainly qualified for the

108

enhancement as she aided and abetted Giles' obstructive behavior.

The defense further complains that the court was restricted to the contents of the PSR and could not consider conduct not contained in the PSR in deciding the obstruction enhancement. Such a contention is erroneous. Kouris cites no case law in support of this argument.

At the sentencing hearing, the district court took judicial notice of the trial testimony and heard argument from both counsel as to the enhancement. It then made a finding that Kouris did qualify for the enhancement based on the evidence presented at trial, a portion of which was set forth in the PSR. In doing so, the court followed proper procedure in deciding a contested sentencing issue. Where a defendant makes a specific objection to a statement in the presentence report, the district court is obliged to resolve the factual dispute. United States v. Stapleton, 268 F.3d 597, 598 (8th Cir. 2001). In that situation, the court is bound to make that finding on the basis of the evidence and cannot rely solely on the presentence report. United States v. May, 413 F.3d 841, 848 -849 (8th Cir. 2005) (quoting United States v. Greene, 41 F.3d 383, 386 (8th Cir. 1994).

In the alternative, the enhancement constituted harmless error, inasmuch as the sentence imposed was at the bottom of the guideline range. Had the total adjusted level been 28, rather than 30, the sentence imposed, 135 months, was

still within the applicable range, even with a Criminal History Category of IV (110 to 137 months). Based on the foregoing, the obstruction enhancement was properly applied.

## XII. THE TRIAL COURT PROPERLY SENTENCED THE DEFENDANT, GILES, BASED ON A FINDING THAT HE COMMITTED FIRST DEGREE MURDER.

### A. STANDARD OF REVIEW.

We review de novo the district court's application of the Sentencing Guidelines and review for clear error its factual findings. <u>United States v. Mathijssen</u>, 406 F.3d 496, 498 (8th Cir. 2005); <u>United States v. Rodriguez</u>, 484 F.3d 1006, 1014 (8th Cir. 2007).

### B. ARGUMENT.

The Revised Presentence Report (hereinafter referred to as RPSR) prepared for Giles' sentencing assessed Giles' offense level based on the convictions under Counts I, III, V, VI and VIII (which were grouped pursuant to U.S.S.G. §3D1.2(c)) as level 43. Counts II, IV and VII were not grouped requiring consecutive terms of imprisonment on each of these counts. Level 43 was determined based on a conclusion that Giles murdered Benigno Dominguez, Frank Wilkinson and Faustino Garcia in order to avoid paying for a load of marijuana.

At Giles' sentencing on January 28, 2008, Judge Smith Camp found that

110

U.S.S.G. §2D1.1(d)(1) with the cross-reference to §2A1.1 concerning the murders was proven beyond a reasonable doubt and sentenced Giles to life imprisonment on Counts I (conspiracy to distribute marijuana) and VI (possession with intent to distribute marijuana). (SHG 11:18-12:4). Giles alleges that the trial court erred in sentencing him because the issue of the murder enhancement was not submitted to the jury or proven beyond a reasonable doubt. He also argues that the jury's finding of discharge of a weapon was based on insufficient evidence and not found beyond a reasonable doubt. None of these arguments are meritorious.

**1. The trial court found that Giles committed first degree murder beyond a reasonable doubt and it was unnecessary to submit this determination to a jury.**

Title 18 U.S.C. §1111 defines murder as the unlawful killing of a human being with malice aforethought. First degree murder includes every murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious or premeditated killing. Any other murder is murder in the second degree.

Moore's testimony detailed Brown and Giles's complicity in receiving a 3,000 pound load of marijuana, shooting the three individuals in connection with that load, and then disposing of the bodies. Newell corroborated Moore's testimony regarding the murder scene at the North 65 Street house. (SOF 24-29).

111

Trial evidence was clear that all three victims died as a result of a gunshot wound or wounds to the head. (SOF 6). Dan Bredow testified that the ammunition used to kill the three individuals was fired from a .44 revolver. (Tr. 606:17-21). McGinnis testified that shortly after the murders he changed out the carpet in the living room of the North 65th Street house. He also testified that he melted down two guns for Giles. Later on he turned over part of the ammunition Giles brought over to him to law enforcement. This ammunition was tested and found to be consistent with the rounds recovered from the victims. (Tr. 2008:5-2013:14).

Trial evidence corroborated the testimony of Newell, McGinnis and Moore regarding the location of the actual murders. Four items that showed obvious traces of blood were removed from the North 65th Street house and submitted for DNA testing. The blood on all these four items was consistent with the blood of Faustino Garcia taken at his autopsy. (SOF 31).

Trial evidence conclusively established that Giles and Brown murdered the three victims in a willful, deliberate, malicious and in a premeditated manner. The defendants met the victims at a house utilized by Giles and Brown, obtained marijuana from the victims, hauled the marijuana away, and then returned to the house with the express purpose to execute them. They came into the house armed

112

with weapons and sent the only witness outside.  After Moore heard the shots, Giles told Brown to go back in and do the other.  Moore then heard another shot. After the shootings, Giles and Brown went over to the house on South 37th Street and hid their guns.

All three victims were executed by being shot in the head while sitting on a couch.  There is absolutely no evidence of a struggle.  There is absolutely no evidence that any of the victims were armed.  The motive for the murders was apparent —to avoid having to pay for the marijuana.  As Giles told Moore when Moore questioned him about the murders: "Any [thing] means necessary when you're getting money".  Giles and Brown were partners–they were in business together.  This was another business decision – to rob these three persons of this marijuana without paying.

Giles' argument that the issue of the murder enhancement should have been submitted to the jury is contrary to case law.  The Sixth Amendment does not forbid a sentencing court to "take account of factual matters not determined by a jury and to increase the sentence in consequence." Rita v. United States, 127 S. Ct. 2456, 2466-7 (2007).  In this Circuit, it is well settled that the district court is entitled to determine sentences based on judge-found facts.  United States v. Alvarez, 478 F.3d 864, 868 (8th Cir. 2007); United States v. Garcia-Gonon, 433

113

F.3d 587, 593 (8th Cir. 2006); United States v. Red Elk, 426 F.3d 948, 951 (8th Cir. 2005).

Even though the appropriate standard of proof articulated by the Circuit for imposition of sentencing enhancements is by a preponderance of the evidence, Judge Smith Camp found the murder enhancement applicable by the highest standard, beyond a reasonable doubt. (SHG 11-21:124).

The imposition of life sentences utilizing cross reference 2D1.1(d)(1) for drug-related homicides has been routinely upheld by the courts. This enhancement need not be pled or proved to a jury beyond a reasonable doubt. The sentencing court may enhance a defendant's sentence based on its findings by a preponderance of the evidence.

In United States v. Graham, 323 F.3d 603 (8th Cir. 2003), the Court held that application of the sentencing guideline for murder was appropriate. In that case Graham was charged in a federal indictment with drug-related activities related to a methamphetamine manufacturing operation. Trial evidence in the case demonstrated that David Alexander died as a result of injuries he sustained when a methamphetamine laboratory exploded. At sentencing the government argued Alexander's death fell within Section 1111's definition of murder in the second degree. The trial court and Circuit Court agreed finding that malice, one of the

114

elements of murder, was present as Graham was aware of the serious risk of death associated with the process of manufacturing methamphetamine.

In United States v. Scheetz, 293 F.3d 175 (4th Cir. 2002), one defendant pleaded guilty and, following a jury trial, two other defendants were convicted of various offenses related to a drug conspiracy and use of firearms. In sentencing Scheetz and Labuwi to terms of life imprisonment, the district court applied U.S.S.G. § 2A1.1, the first-degree murder sentencing guideline. Scheetz and Labuwi argued this was in error because the killing of Locklear was not a murder as defined in 18 U.S.C. § 1111.

In that case, Scheetz and Labuwi broke into a residence occupied by Locklear and Lester during the evening hours. The Court held that because 18 U.S.C. § 1111 covers crimes committed within the territorial jurisdiction of the United States and because there is no federal burglary statute, 18 U.S.C. § 13 assimilates the North Carolina state law of burglary defined as the breaking and entering into an occupied dwelling in the nighttime with the intent to commit a felony therein. Because Scheetz and Labuwi broke into the occupied residence at night with the intent to commit felonies therein, namely, the assault and robbery of Michael Hagins, their actions constituted a burglary under North Carolina state law. The sentencing court found that the killing of Locklear was committed

115

during the perpetration of a burglary and had the killing taken place within the territorial or maritime jurisdiction of the United States, it would have constituted a murder under 18 U.S.C. § 1111. Therefore, the Circuit Court held that the district court did not err in applying U.S.S.G. § 2D1.1(d)(1) because the killing of Locklear constituted a violation of 18 U.S.C. § 1111, which violation was committed during and in furtherance of the conspiracy charged in count one.

In United States v. Meyer, 157 F.3d 1067 (7th Cir. 1998), Hoff was sentenced to life imprisonment following his conviction for conspiring to distribute marijuana and cocaine. In determining the sentence the Court found by clear and convincing evidence that another person shot and killed Mr. Fenner at Hoff's direction and that Hoff killed Mr. Oestreich. Hoff argued that the sentencing guidelines cross-reference under Section 2D1.1(d)(1) to first degree murder violated his right to due process since he was charged with a drug conspiracy and was never charged or convicted by a jury for murder.

While the Court considered that murder is the most odious of crimes, it is clear that "sentencing judges may look to the conduct surrounding the offense of conviction in fashioning an appropriate sentence, regardless of whether the defendant was ever charged with or convicted of that conduct, and regardless of whether he could be." United States v. Dawn, 129 F.3d 878, 884 (7th Cir. 1997)

116

(collecting cases). Additionally, the Court noted that "taking into account conduct related to the offense of conviction in sentencing is not the same thing as holding the defendant criminally culpable for that conduct." <u>Id.</u> (citations omitted). At sentencing, a defendant does not have a right to have his sentence determination confined to facts proven beyond a reasonable doubt. <u>McMillan v. Pennsylvania</u>, 477 U.S. 79, 92 (1986).

The Court found that Hoff's reliance on <u>United States v. Lombard</u>, 72 F.3d 170 (1st Cir. 1995), to support his contention regarding the enhancement ignored <u>United States v. Masters</u>, 978 F.2d 281 (7th Cir. 1992). A key distinction between Hoff and Lombard is that the statute governing Lombard's sentencing, 18 U.S.C. § 924(e), set out a statutory minimum sentence, but did not have a stated statutory maximum. The sentencing in Hoff's case is governed by 21 U.S.C. § 841(b)(1)(A)(ii), which sets out an express statutory maximum sentence of life. As the Court noted in <u>Masters,</u> "[c]onviction at trial supplies all of the justification the Constitution requires for depriving the defendant of liberty for any term up to the maximum prescribed by statute. How much of that time to grant back in sentencing, and what procedures to use when doing so, are legislative rather than constitutional choices." <u>Id.</u> In Hoff's case, his life sentence fell within the expressly stated statutory maximum for his offense of conviction.

117

In upholding the sentencing enhancement, the Court considered that had it not enhanced Hoff's sentence for the murder, Hoff would have scored an offense level of 39. Therefore, an increase from level 39 to level 43 is not the type of drastic increase which would allow the sentencing enhancement to become the tail which wags the dog of the substantive offense.

Likewise, in Giles and Brown, the conspiracy statute under which they were convicted sets out an express statutory maximum sentence of life. Giles cites Apprendi v. New Jersey, 530 U.S. 466 (2000), in his brief in support of his argument that the issue of first degree murder was not submitted to the jury and was never found beyond a reasonable doubt. That case held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime **beyond the prescribed statutory maximum** must be submitted to a jury and proved beyond a reasonable doubt." (Id. at 490) (emphasis added). This case does not support Giles' argument that the jury had to find the murder enhancement. Giles' statutory range of imprisonment under Count I was 10 years to life imprisonment. Therefore, the statutory maximum term was life. The murder enhancement did not increase Giles' sentence above the statutory maximum.

Giles argues that should this Court disagree that the elements of first degree murder must be proven beyond a reasonable doubt, that in the alternative, he urges

118

this Court to find that any factors enhancing a sentence must be proven by clear and convincing evidence. He cites United States v. Townley, 929 F.2d 365 (8th Cir. 1991), in support of his contention. In Townley, the defendant was convicted of cocaine possession and use of a firearm. He appealed his sentence contending that including uncharged drug amounts in computing his sentence violated his due process right to make the Government prove these offenses beyond a reasonable doubt. Citing United States v. Sleet, 893 F.2d 947 (8th Cir. 1990); United States v. Gooden, 892 F.2d 725 (8th Cir. 1989), cert. denied, 496 U.S. (1990); and McMillan v. Pennsylvania, 477 U.S. 79 (1986), the Court concluded that a preponderance of the evidence suffices for determinations at sentencing.

In Townley, the inclusion of the additional drug amounts produced an 18-level increase in Townley's base offense level. This Court reasoned that under these circumstances due process could **conceivably** require more than a mere preponderance standard. However, even under these disparate sentencing ranges the Court refused to apply the clear and convincing standard.

The defendant's argument is further foreclosed by United States v. Watts, 519 U.S. 148 (1997). In Watts, the Court held that a jury's acquittal of a defendant on a murder count of an indictment does not prevent a sentencing court from considering conduct underlying the charged crime, so long as that conduct

119

has been proved by a preponderance of the evidence.

Judge Smith Camp, after hearing all the trial evidence, correctly calculated Giles' advisory guideline range. Based on the foregoing, the murcer enhancement was properly imposed.

**2. The jury's finding that Giles discharged a weapon was based on sufficient evidence.**

The jury was specifically instructed (Instruction No. 20 (Giles) and 21 (Brown)) that if the government proved the elements of the offense, i.e., using or carrying a firearm on May 3, through 4, 2005, that they must indicate on the verdict form whether a firearm was discharged. The jury did find that a weapon was discharged. Since the discharge of the weapon was alleged in Count IV of the indictment, the trial judge could have made this finding absent a jury finding. Nevertheless, the jury did make a discharge finding. For the reasons stated in the argument above, it was not necessary that this fact be proven beyond a reasonable doubt. Further, based on the testimony presented at trial, sufficient evidence existed of the discharge of the weapon into the bodies of the three victims.

The extent of Giles' and Brown's criminal enterprise was vast, spanning several states and involving millions of dollars and thousands of pounds of marijuana. During the time of their criminal conspiracy they possessed and used

Appellate Case: 08-1385     Page: 137     Date Filed: 11/04/2008 Entry ID: 3487201

weapons to protect their drug holdings and to secure additional quantities of marijuana. They shot one person and murdered three to accomplish their goals. A life sentence is within the statutory sentence for the offense of conviction and would justly punish Giles for the seriousness of his conduct. Judge Smith Camp considered all these factors in calculating Giles' appropriate guideline range and conducted a thorough analysis of the Section 3553(a) factors in arriving at sentence of life imprisonment, a sentence within the statutory range of imprisonment. This sentence is supported by the law and the record in this case.

## CONCLUSION

For the reasons stated herein, the Plaintiff respectfully requests this Court affirm the convictions and sentences of the defendants.

Respectfully submitted,

UNITED STATES OF AMERICA

JOE W. STECHER
United States Attorney
District of Nebraska


S/Maria R. Moran

By:   MARIA R. MORAN
Assistant U.S. Attorney
1620 Dodge Street, Suite 1400
Omaha, NE 68102-1506
(402) 661-3700

121

## CERTIFICATION OF DISKETTE

Pursuant to Rule 28A(d) of the Eighth Circuit Rules of Appellate Procedure, I hereby certify that the enclosed computer diskette containing the full text of the Appellee's Brief has been scanned for viruses and is virus-free. The brief was created using Corel WordPerfect X3.

Dated this 29th day of October, 2008.

S/Maria R. Moran

MARIA R. MORAN
Assistant United States Attorney

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that two true and correct copies of the foregoing along with a computer diskette containing a copy of the full text of this brief was served on the following by placing them in the U.S. Mail, properly addressed and postage prepaid, this 29th day of October, 2008.

Mr. Mark A. Weber
Attorney at Law
11240 Davenport Street
Omaha, Nebraska 68154
Attorney for Dale Giles

Ms. Jessica L. Milburn
Attorney at Law
P.O. Box 6668
Lincoln, Nebraska 68506
Attorney for Charmar Brown

Mr. Jerry M. Hug
Attorney at Law
1823 Harney St., Room 1004
Omaha, Nebraska 68102
Attorney for Evereada Kouris

S/Maria R. Moran

MARIA R. MORAN
Assistant United States Attorney

Appellate Case: 08-1385     Page: 139     Date Filed: 11/04/2008 Entry ID: 3487201

## CERTIFICATION OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), I hereby certify that this brief complies with the type-volume limitation provided in Rule 32(a)(7)(B)(i) and pursuant to the Court's Order allowing an increase to 28,000 words, relying on the word processor word count feature, contains 27,845 words.

Dated this 29th day of October, 2008.

S/Maria R. Moran
MARIA R. MORAN
Assistant United States Attorney

123

Appellate Case: 08-1385    Page: 140    Date Filed: 11/04/2008 Entry ID: 3487201

IN THE UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

_____

Case No. 08-1378, 08-1384 and 08-1385
_____

UNITED STATES OF AMERICA,

Plaintiff - Appellee,
v.
DALE GILES, CHARMAR BROWN AND
EVEREADA KOURIS

Defendants - Appellants.
_____

ADDENDUM TO BRIEF OF APPELLEE
_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

HONORABLE LAURIE SMITH CAMP, UNITED STATES DISTRICT JUDGE
_____

UNITED STATES OF AMERICA

JOE E. STECHER
United States Attorney
District of Nebraska
and

MARIA R. MORAN
Assistant U.S. Attorney
1620 Dodge, Suite 1400
Omaha, NE 68102-1506
(402) 661-3700

## <u>ADDENDUM TABLE OF CONTENTS</u>

Grand Jury Testimony. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A1