# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 08-1378

_____

| | |
|---|---|
| United States of America, | * |
| | * |
| Plaintiff–Appellee, | * |
| | * |
| v. | * |
| | * |
| Charmar Brown, | * |
| | * |
| Defendant – Appellant. | * |

_____

No. 08-1384

_____

Appeals from the United States
District Court for the
District of Nebraska.

| | |
|---|---|
| United States of America, | * |
| | * |
| Plaintiff – Appellee, | * |
| | * |
| v. | * |
| | * |
| Evereada Kouris, | * |
| | * |
| Defendant – Appellant. | * |

_____

No. 08-1385

_____

| | |
|---|---|
| United States of America, | * |
| | * |

Plaintiff – Appellee,        *
                                                 *
        v.                                       *
                                                 *
Dale Giles,                                      *
                                                 *
                    Defendant – Appellant.       *
                                    _____

                        Submitted:  January 14, 2009
                            Filed:  March 20, 2009
                                    _____

Before MURPHY and SMITH, Circuit Judges, and LIMBAUGH, District Judge.[1]
                                    _____

MURPHY, Circuit Judge.

        Dale Giles, Charmar Brown, and Evereada Kouris were convicted by a jury of
conspiracy to distribute more than 1,000 kilograms of marijuana.  Giles and Brown
were also convicted of possession with intent to distribute more than 100 kilograms
of marijuana, and three counts of using and carrying a firearm in connection with their
drug trafficking. Giles was convicted on three counts of being a felon in possession
of a firearm.  They appeal, all arguing that the government improperly struck jurors
based on their race.  Giles and Brown contend that one of the firearm charges was
constructively amended and should have been dismissed.  Brown argues that there was
insufficient evidence to support his firearm convictions and that the instructions on
those charges were erroneous, that the district court admitted hearsay, and that it
should have severed his trial and granted his motion to suppress.  Giles claims
ineffective assistance of counsel and sentencing error.  Kouris challenges the

_____

        [1] The Honorable Stephen N. Limbaugh, Jr., United States District Judge for the
Eastern District of Missouri, sitting by designation.

                                    -2-

sufficiency of the evidence, the jury instructions on drug quantity, and an obstruction of justice enhancement. We affirm except on Brown's conviction for Count VII.

I.

Dale Giles and Charmar Brown were in the marijuana trafficking business in Omaha, Nebraska. As a result of meeting Kenrell Boyston in Phoenix, Arizona, they began to buy large quantities of marijuana from his supplier, Ulysses Sanchez. The first sale was for less than 150 pounds, but the amount increased over the next five or six sales to approximately 600 pounds. Richard McGinnis transported several loads of marijuana from Phoenix to Omaha as part of the conspiracy, including loads as large as 800 pounds. McGinnis would pick up the marijuana from Giles and Brown in Phoenix and then deliver it to properties they controlled in Omaha. McGinnis's testimony regarding these trips was corroborated by hotel receipts, car maintenance and cell phone records, and airline tickets for Giles and Brown.

Airline personnel alerted the Nebraska State Patrol that Giles and Brown had been making frequent flights to Phoenix involving short turnarounds on round trips, last minute purchases of tickets, and other behavior consistent with drug distribution. On March 20, 2005, troopers stopped Giles and Brown at the Omaha airport after they missed a flight to Phoenix. Giles and Brown granted permission for their bags to be searched, and the troopers discovered and confiscated $47,430 cash. Giles stated that the money was from his barber shop business and that he was traveling to Phoenix to purchase a car. Neither was arrested.

Giles and Brown traveled to Atlanta in March 2005 where they met at a nightclub with Boyston, Sanchez, and Benigno Dominguez to purchase 1,000 pounds of marijuana. Evereada Kouris, who had a child with Giles and lived with him occasionally, went to Atlanta during the same period with her two children but she claims she was visiting family and was not involved with the drug deal. Subsequently

-3-

Boyston arranged to have Dominguez transport 2,000 pounds of marijuana to Omaha. After that shipment Giles and Brown dealt directly with Sanchez and Dominguez.

On May 3, 2005, Giles called George Moore and asked him to come to a house on North 65th Street in Omaha. When Moore got there, Giles took him inside where he saw Brown, three strangers sitting on a couch in the living room, and a large amount of marijuana. The men on the couch were later determined to be Benigno Dominguez, Frank Wilkinson, and Faustino Garcia. Moore helped weigh the marijuana, which came to approximately 3,000 pounds, and then helped load it into a U-Haul rented by Brown. Giles and Brown drove off in the U-Haul and returned 45 minutes later in Brown's Silverado. Giles sent Moore outside to retrieve a cell phone from the truck, and while Moore was outside he heard three gunshots. He started to run away, but Giles came out the front door and asked him to come back. Moore saw Brown start to leave the house with a gun, but Giles told Brown to go back and "do yours." After Brown went back inside, Moore heard another gunshot.

Giles, Brown, and Moore then drove to another house where they hid two guns belonging to Giles and one belonging to Brown. They stopped at a gas station to fill a gas can before returning to the 65th Street house where they loaded the bodies of Dominguez, Wilkinson, and Garcia into the bed of the Silverado. The men drove to a wooded area and burned the bodies. Giles then sent Moore to ask Johnny Newell for assistance in cleaning up the murder scene. While Newell was cleaning he saw Giles and Brown haul the couch and carpet away in the Silverado. Several days later, Brown and Newell discussed how to prevent detection of the blood on the truck, and had a local body shop operator repaint the truck and replace the existing bed liner. Giles asked McGinnis to melt down two handguns and to transport a third to Phoenix.

Omaha police discovered the bodies on May 4 and identified them based on a hotel receipt in Wilkinson's pocket. Police recovered five bullets from the bodies, all of which had been fired from a .44 caliber revolver, though it was unclear whether a

-4-

single weapon had been used. McGinnis later gave police similar .44 caliber ammunition that Giles had asked him to hide.

In October 2005 Giles and Brown retaliated against two men who had robbed them. On October 3, Giles shot a man named Monte Williams in the leg outside a house where his sister Cyrinthia Williams was visiting a relative. She later testified that Giles had come to the house looking for Monte and identified himself as "Clean." When she told him that Monte was not home, he got in a burgundy Monte Carlo parked across the street where he waited with another man whom Cyrinthia could not identify. It was later ascertained that the Monte Carlo belonged to Brown's girlfriend. When Monte returned to the house, he and Giles got into an altercation, and Giles shot Monte. On October 11, Giles and Brown were involved in a shootout near the home of Clarence Dennis. Dennis had been warned that the two were coming after him so he shot at their car when they approached. Giles, Brown, and two other men in their car returned fire, but no one was injured. Both Monte Williams and Clarence Dennis told police that shortly before the shootings they had robbed Giles and Brown of approximately 25 pounds of marijuana and other valuable items.

Omaha police began to compile information about Giles's and Brown's financial accounts, property they rented for personal and business use, and vehicles they owned or used. Bank records showed deposits of nearly $500,000 within a one year time period. The two men had purchased three houses in Omaha in the several months following the May 3 murders, paying approximately $94,400 in cash. Giles also purchased a house in Arizona in January 2006 and made a $103,000 deposit.

Police obtained search warrants for several of defendants' properties and conducted the searches on April 3 and 4, 2006. At Milt's Mini Storage, they searched two storage units rented by Giles and a unit rented by Daramus Brown, Charmar Brown's cousin. There they found thirteen bags of marijuana and two safes containing $358,030. Three units rented by Giles at Crown Point Storage turned up an additional

-5-

$164,880 and 715 pounds of marijuana. In a unit rented by Evereada Kouris at Crown Point Storage, officers found 35 pounds of marijuana, a semiautomatic .223 caliber rifle, a bullet proof vest, and ammunition.

Other searches were also productive. At Brown's residence police found two bags of marijuana and $22,290. In an apartment shared by Kouris and Giles on North 40th Street, police found marijuana and a scale. A search of Kouris's apartment at 1214 Applewood Drive produced marijuana, a bullet proof vest, and a video camera containing footage of Giles and Brown counting thousands of dollars and bragging about their proceeds, with approximately a pound of marijuana clearly visible. A warehouse leased by Giles and Brown yielded 260 pounds of marijuana, over $80,000, and money counting machines. Police also searched Brown's Silverado that was stored at the warehouse and found a scale, $16,000, a small amount of marijuana, and a .38 Taurus revolver and ammunition. Other properties were searched and produced additional contraband and evidence of a conspiracy to distribute marijuana. In total, police found over 1,000 pounds of marijuana, more than $629,000, fourteen vehicles, and two firearms.

Giles and Brown were arrested on April 4, 2006 and detained pending trial. Giles made numerous phone calls from the jail which were recorded and led police to other conspirators, six of whom were indicted and then entered into plea agreements. In his calls from jail Giles asked McGinnis to deliver approximately 100 pounds of marijuana to his cousin and then asked Kouris to collect payment for the delivery. Giles also asked Kouris to collect money owed him by others, and in later calls she reported to Giles on her progress. In addition Kouris and Giles discussed the rifle found in her storage unit at Crown Point, another firearm in Giles's house in Arizona, and possible alibis for May 3, 2005.

One of Giles's attorneys, Terri Crawford, tried to induce key witnesses to tell police that Brown was responsible for the murders rather than Giles. Newell testified

-6-

that Crawford asked him to tell police that Brown alone had asked for his assistance cleaning up the murder scene. Moore testified that Kouris had asked him to meet Crawford at Giles's house on 40th Avenue. When he arrived, Crawford gave him a note stating "put everything on Charmar" and suggested that he tell police that Brown asked him to move the bodies. In recorded phone calls Giles asked Kouris to help Crawford contact these witnesses.

The grand jury first returned a nine count indictment against Giles and Brown and later four superceding indictments. The fifth and final indictment charged Giles, Brown, and Kouris with conspiracy to distribute more than 1,000 kilograms of marijuana (Count I). 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(vii), 846. Giles and Brown were also charged with possession with intent to distribute more than 100 kilograms of marijuana (Count VI), id. § 841(a)(1), (b)(1)(B)(vii), and with using, carrying, and possessing a firearm in connection with the drug trafficking conspiracy (Counts II, IV, VII). 18 U.S.C. § 924(c)(1)(A). Giles was also charged with being a felon in possession of a firearm (Counts III, V, VIII). Id. § 922(g).

Giles, Brown, and Kouris pled not guilty and were convicted after a sixteen day jury trial. Giles and Brown were sentenced to life on Counts I and VI, and 720 months on Counts II, IV, and VII, to run consecutive to the life sentence. Giles was also sentenced to 120 months for his three felon in possession convictions, to run concurrent to the life sentence. Kouris was sentenced to 135 months. All three forfeited substantial amounts of property associated with the conspiracy.

On appeal, Giles, Brown, and Kouris argue that the government used two peremptory challenges to exclude blacks from the jury. Giles and Brown contend that the district court should have dismissed Count II because the government constructively amended the charge by presenting evidence about the use of a firearm on a date different from the one alleged in the indictment. Separately, Brown alleges insufficiency of the evidence, admission of hearsay, failure to suppress evidence or

-7-

to sever, and incorrect jury instructions.  Giles contends that he was denied effective assistance of counsel and that the district court erred by attributing first degree murder to him at sentencing.  Kouris alleges insufficiency of the evidence, error in the jury instructions on drug quantity, and improper enhancement of her sentence for obstruction of justice.

## II.

### A.  *Batson Issues*

All three appellants argue that the prosecutor struck the only two black members of the jury panel because of their race in violation of <u>Batson v. Kentucky</u>, 476 U.S. 79 (1986).  The prosecutor proffered explanations for each peremptory strike.  The home address provided by one juror indicated that she lived in federally subsidized housing, which caused the prosecutor to "believe [that she ] does not have a stake in the community" and that she might be "sympathetic particularly with Ms. Kouris," who also received public assistance.  The prosecutor explained that she challenged the second juror because she had reported that her son had been "brutalized" by law enforcement.

Defense counsel argued that there was no public record that the first juror lived in public housing and that the government had not inquired during voir dire about the potential bias this created.  Defense counsel also contended that because "more blacks receive public assistance than do whites in Omaha," the prosecutor's challenge suggested racial bias.  The prosecutor responded that an Omaha police officer had reported that the juror's address corresponded to public housing, unlike those of the other jurors.

The factors to judge whether a prosecutor impermissibly challenged a potential juror are "peculiarly within a trial judge's province."  <u>Hernandez v. New York</u>, 500 U.S. 352, 365 (1991).  The prosecutor proffered race neutral explanations which

Appellate Case: 08-1385     Page: 8     Date Filed: 03/20/2009 Entry ID: 3528933

satisfied the district court judge who was conducting the voir dire.  See id. at 360.  She said she had exercised peremptory strikes on other members of the jury panel who had had negative experiences with the police and had challenged the only juror connected with public housing out of concern that she would be sympathetic to defendant Kouris who also received public assistance.  We cannot conclude on this record that the district court clearly erred in finding that the prosecutor had exercised her strikes against the two jurors for race neutral reasons.

## B.  Motion by Giles and Brown to Dismiss Count II

Count II alleged that Giles and Brown had used, carried, possessed, and discharged a firearm on or about October 3, 2005—the date Monte Williams was shot. Giles and Brown claim that the government's evidence focused instead on the shootout with Clarence Dennis on October 11, and that as a result the jury might have convicted them based on the latter incident which was not the offense alleged in Count II.

Giles and Brown moved before trial to dismiss Count II based on their anticipation that Dennis would testify about October 11, and they raised the issue again in a motion for judgment of acquittal.  The district court denied both motions, and our review is de novo.  United States v. Howell, 531 F.3d 621, 622 (8th Cir. 2008) (motion to dismiss indictment); United States v. Garcia-Hernandez, 530 F.3d 657, 661 (8th Cir. 2008) (motion for judgment of acquittal).  In their briefs Giles and Brown allege their convictions on Count II amounted to a variance and a constructive amendment of the grand jury's indictment; at oral argument they focused exclusively on a constructive amendment theory.

A constructive amendment implicates  the defendant's Fifth Amendment right to be charged by a grand jury.  It "occurs when the essential elements of the offense set forth in the indictment are in effect altered by the prosecutor or the court," such as

Appellate Case: 08-1385     Page: 9     Date Filed: 03/20/2009 Entry ID: 3528933

when the jury instructions or evidence presented "allow the jury to convict the defendant of an offense other than the one alleged in the indictment."  United States v. Gill, 513 F.3d 836, 849 (8th Cir. 2008) (citations omitted).

Count II alleged that on or about October 3, 2005, Giles and Brown used, carried, possessed, and discharged a firearm during and in connection with the drug conspiracy.  In her opening statement, the prosecutor said that Count II charged defendants "with the possession, use, carrying, and discharge of a firearm in connection with the Williams and . . . Dennis shootings."  Appellants claim that this implied that the charged offense encompassed both the October 3 and October 11 shootings.  The jury instructions and prosecutor's closing argument referred only to the October 3 shooting, however.  The government presented evidence about the later shooting in order to establish that Monte Williams was shot "during and in relation to" the drug trafficking conspiracy.  The government's eyewitness to the Williams shooting, Cyrinthia Williams, knew nothing about the conspiracy, and Monte Williams died before trial in an unrelated shooting.  The government therefore produced Clarence Dennis to testify that he and Williams had stolen marijuana from Giles and Brown to show that the shootings on October 3 and 11 were in retaliation for that robbery.  Neither defendant objected to this evidence on grounds of relevance or unfair prejudice, and Brown's counsel brought out additional evidence from Dennis about the October 11 shooting.  Neither defendant requested an instruction for the jury to consider the October 11 events only for the purpose of establishing the motive for the October 3 shooting.

After a careful review of the record, we conclude that there is not a substantial likelihood that the jury convicted Giles and Brown of using or carrying a firearm on October 11 instead of October 3 and that there was no constructive amendment.  The evidence of the later shooting was presented to establish the motive for the attack on Monte Williams on October 3 and to tie it to the drug conspiracy.  Moreover, the jury instructions clearly stated that Count II pertained to conduct on October 3.  We

-10-

conclude that the district court did not err by denying the motions to dismiss and for judgment of acquittal.

## C. Evidentiary Rulings

Brown argues that the district court should not have admitted an out of court statement Monte Williams made to Officer Chris Perna during investigation of the October 3 shooting. Williams told Perna that he had been shot by someone that he knew only as "Clean," who had been accompanied by a man named Charmar. Brown argued that admission of the statement violated his confrontation rights and moved for a mistrial, which the district court denied. We review for abuse of discretion. United States v. Hollins, 432 F.3d 809, 812 (8th Cir. 2005).

Perna repeated Williams's statement to explain how he developed suspects for the October 3 shooting. Perna entered "Charmar" into a database to help identify "Clean" and found an incident report linking Giles and Brown. An out of court statement is not hearsay when offered to explain why an officer conducted an investigation in a certain way. See United States v. Johnson, 934 F.2d 936, 942 (8th Cir. 1991). Brown argues that the purported nonhearsay reason was only a "subterfuge to get Williams statement about Brown before the jury," but he did not argue at trial that the prejudicial effect of the evidence outweighed its nonhearsay value. The district court twice told the jury that the evidence was admitted for the limited purpose of understanding why Perna searched the database for "Charmar," and we conclude that there was no abuse of discretion in admitting the evidence.

Because Williams's statement was not admitted for the truth of the matter asserted, it does not implicate the confrontation clause. See Crawford v. Washington, 541 U.S. 36, 59 n.9 (2004); see also United States v. Rodriguez, 484 F.3d 1006, 1013 (8th Cir. 2007) (out of court statement admitted to show the defendant's state of mind

-11-

did not implicate the confrontation clause).  The district court therefore did not abuse its discretion by denying Brown's motion for a mistrial.

Brown also contends that the district court erred by admitting two out of court statements by Giles under the coconspirator exception to the hearsay rule.  Fed. R. Evid. 801(d)(2)(E).  Brown did not object to the evidence at trial, so we will not reverse unless the district court erred, that error was plain, affected Brown's substantial rights, and "seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings."  United States v. Olano, 507 U.S. 725, 736 (1993) (quotation omitted).

One of these statements was a remark made by Giles after Richard McGinnis asked him on the phone whether he had anything to do with the May 3 murders.  McGinnis heard Giles ask someone at his end: "Do you believe what this man's asking me?" Brown argues that Giles's remark was not admissible under the coconspirator exception because it was a question rather than an affirmative statement and was not made in furtherance of the conspiracy.  If Giles's remark was intended to conceal their involvement with the murders related to their marijuana trafficking activities, however, it was in furtherance of the conspiracy.  Cf. United States v. Garcia, 893 F.2d 188, 190 (8th Cir. 1990).  Brown also objects to the introduction of Giles's statement to the police at the airport that the $23,000 he possessed had been earned through his barber shop business and was intended for the purchase of a vehicle.  At trial Brown's objection was hearsay but now he claims violation of his confrontation rights.  Giles's explanation for the money was not introduced for the truth of the matter asserted, but to show that he was lying.  See United States v. Hathaway, 798 F.2d 902, 905 (6th Cir. 1986) (statement offered to prove the falsity of the matter asserted not hearsay).  Such statements are not hearsay and do not implicate the confrontation clause.  Crawford, 541 U.S. at 59 n.9.  The district court did not plainly err by admitting either statement.

-12-

Appellate Case: 08-1385     Page: 12     Date Filed: 03/20/2009 Entry ID: 3528933

*D. Motion to Suppress*

Brown appeals the denial of his motion to suppress evidence obtained from searches of his home and businesses, contending that the supporting affidavits relied heavily on informants and did not establish probable cause. We review for clear error the district court's factual determinations in support of its denial of a motion to suppress, see United States v. Hogan, 539 F.3d 916, 921 (8th Cir. 2008), and give substantial deference to the determination by the issuing judge that probable cause existed. Illinois v. Gates, 462 U.S. 213, 236 (1983). The informants against Brown were not anonymous and provided the basis of their knowledge. See id. at 238. They revealed that they had engaged in criminal activity, and such disclosures against penal interest are presumptively credible. See United States v. Tyler, 238 F.3d 1036, 1039 (8th Cir. 2001). Police were able to corroborate details of the tips, also demonstrating the informants' reliability. See United States v. Edmiston, 46 F.3d 786, 789 (8th Cir. 1995). Based on these factors and our review of the record, we conclude that there was probable cause for the searches and that the district court did not err in denying Brown's motion to suppress.

Brown also argues that the district court erred by denying him a hearing under Franks v. Delaware, 438 U.S. 154 (1978), to challenge the veracity of the affidavit supporting the search warrant for unit 410 at Crown Point Storage. Since the police did not execute this search warrant because they realized that Brown no longer controlled the unit, this argument is moot. See United States v. Aleman, 548 F.3d 1158, 1167 (8th Cir. 2008).

*E. Motion for Severance*

Brown argues that the district court failed to sever his trial from that of Giles when it became clear that Brown was being prejudiced by the joint trial. Brown did not seek relief under Fed. R. Crim. P. 14 before or during trial, however, so our review

Appellate Case: 08-1385    Page: 13    Date Filed: 03/20/2009 Entry ID: 3528933

is for plain error.  Brown must "show not only that there was a Rule 14 violation affecting [his] substantial rights, but also that there is some extraordinary reason for us to reverse for such error despite [his] failure to raise the issue in the trial court." United States v. Thornberg, 844 F.2d 573, 575 (8th Cir. 1988).

Brown argues that he was prejudiced by evidence about Giles's dealings in which Brown was not directly involved, but much of this evidence would have been admissible in a severed trial as proof of the scope of the conspiracy.  A conspirator's liability for the foreseeable actions of other conspirators is one reason a joint trial is favored.  United States v. Payne, 923 F.2d 595, 596 (8th Cir. 1991).  Brown has not shown that he was prejudiced within the meaning of Rule 14 and has not offered any "extraordinary reason" that we should reverse despite his failure to seek severance below.  See United States v. Spotted Elk, 548 F.3d 641, 658 (8th Cir. 2008) (disparity among conspiracy codefendants in extent of culpability is commonplace and does not show the kind of prejudice that would require a district court to sever).

## F.  Jury Instructions

Brown argues that the district court erred in instructing the jury on Counts II, IV, and VII.  These counts charged him with violating 18 U.S.C. § 924(c)(1)(A) on three different dates.  Counts II and IV allege that Brown "used, carried, possessed and discharged a firearm during and in relation to [the crime charged in Count I]" on October 3, 2005 and May 3 and 4, 2005, respectively.  Count VII charges an offense on April 3 and 4, 2006 and omits the term "discharge."  The jury instructions were similar for all three counts except that special interrogatories on whether a firearm was discharged accompanied the charges for Counts II and IV.[2]  Brown did not object to

---

[2]A finding that a firearm was discharged carries an additional sentence of ten years, rather than five.  18 U.S.C. § 924(c)(1)(A)(iii).

-14-

Appellate Case: 08-1385     Page: 14     Date Filed: 03/20/2009 Entry ID: 3528933

the instructions at trial so we review for plain error. United States v. Kent, 531 F.3d 642, 655 (8th Cir. 2008).

Section 924(c)(1)(A) imposes an additional minimum five year sentence for "any person who, during and in relation to any crime of violence or drug trafficking crime . . . , uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm." In this section Congress specified the elements for two distinct crimes connecting guns with either crimes of violence or drug trafficking: (1) *using or carrying* a firearm *during and in relation to* the underlying crime, and (2) *possessing* a firearm *in furtherance of* the underlying crime. United States v. Gamboa, 439 F.3d 796, 810 (8th Cir. 2006); accord United States v. Combs, 369 F.3d 925, 932 (6th Cir. 2004). Contra United States v. Arreola, 467 F.3d 1153, 1161 (9th Cir. 2006). The statute allows a conviction based on possession of a firearm only if the government proves that it was possessed "to advance or promote the commission of the underlying offense." H.R. Rep. No. 105-344, at 12 (1997).

The jury was instructed on all three counts that it could find Brown guilty for "using or carrying a firearm during and in relation to, or possessing a firearm in furtherance of a drug trafficking crime." The instructions incorrectly defined "possessed in furtherance of" to mean that "the firearm must have some purpose or effect with respect to the [drug trafficking crime]; its presence or involvement cannot be the result of accident or coincidence." This definition is nearly identical to the Supreme Court's definition of "in relation to," which is not an element of the possession offense in § 924(c)(1)(A), but of the offense of using or carrying a firearm during and in relation to (drug trafficking). See Smith v. United States, 508 U.S. 223, 238 (1993). In Kent, we held that it was error to give that particular definition for the possession offense because it eliminates the distinction between the two distinct crimes in § 924(c)(1)(A). See Kent, 531 F.3d at 654–55. Here, the jury was instructed that it could convict Brown of Count VII if he possessed a firearm in relation to drug trafficking, but the possession crime requires that the firearm was

-15-

possessed in furtherance of the drug trafficking crime, not just in relation to it. See United States v. Savoires, 430 F.3d 376, 380 (6th Cir. 2005) (holding that an instruction on "possession during and in relation to" created a risk that the defendant was convicted of an offense not described in § 924(c)). Because the indictment and the jury instructions described only the "during and in relation to" standard, the government was required to prove "use or carry" to obtain a conviction.

The government concedes that the instructions were erroneous, and we find that the error is plain under Gamboa, Gill, and Kent. The government argues that the error did not affect Brown's substantial rights on Counts II and IV because for those counts the jury found that the defendants had discharged firearms. Because a firearm that is discharged has necessarily been used or carried, the jury could and did find the evidence sufficient to establish that the defendants had used or carried firearms during and in relation to their drug conspiracy. Thus, the error in the instructions for Counts II and IV did not substantially affect Brown's rights as to those counts. The situation is different in respect to Count VII, however.

Count VII alleged that on April 3 and 4, 2006, Brown used, carried, and possessed two specific firearms during and in relation to drug trafficking. The erroneous instruction could have affected the verdict on Count VII if the evidence could not support a finding of use or carry. There was no evidence (or special interrogatory question) that Brown discharged a weapon on April 3 or 4, and in fact those were simply the dates on which the two firearms were seized. One of the seized firearms was a .38 Taurus revolver[3] found by law enforcement in Brown's Silverado in a warehouse rented by Giles and Brown. The other firearm was a .223 rifle found in Kouris's storage unit. The facts in evidence might support a finding that Brown *possessed* these firearms, see United States v. Sanchez-Garcia, 461 F.3d 939, 946–47

---

[3]A .44 caliber revolver was used in the May 3, 2005 murders, but there was no evidence about the firearm used in either the October 3 or 11, 2005 shootings.

Appellate Case: 08-1385    Page: 16    Date Filed: 03/20/2009 Entry ID: 3528933

(8th Cir. 2006), but they would not support a finding that Brown *used or carried* them on April 3 or 4.

Possession is not coextensive with either use or carry.  See Gamboa, 439 F.3d at 810; United States v. Ramos-Rodriguez, 136 F.3d 465, 468 (5th Cir. 1998).  "Use" does not include concealment of a firearm in a convenient place so as to be "at the ready," but requires "active employment."  Bailey v. United States, 516 U.S. 137, 148–49 (1995).  Even if it could be said that Brown had constructive possession of the two firearms, that would not satisfy the definition of carry.  See id. at 148 ("Storage of a firearm, without its more active employment, is not reasonably distinguishable from possession."); United States v. Canady, 126 F.3d 352, 358 (2d Cir. 1997).  By allowing the jury to convict based on possession of a firearm merely "in relation to" the drug conspiracy, instead of in furtherance of that conspiracy, the instructions likely affected the verdict on Count VII.  We will not reverse, however, unless we find that the error "seriously affect[ed] the fairness, integrity or public reputation of [Brown's] judicial proceedings."  See Olano, 507 U.S. at 736.

We contrast the error here with that in United States v. McGilberry, 480 F.3d 326 (5th Cir. 2007), in which the court found that an indictment mistakenly charging the defendant with possessing a firearm during a drug trafficking crime was plainly erroneous, but did not require reversal because the evidence that McGilberry had used the firearm was "essentially uncontroverted" and the jury was properly instructed that it must find that defendant had used or carried the firearm.  Id. at 329–31.  Here, the jury instructions incorrectly described the charged offense, there was no evidence that Brown used or carried the firearms, and the government's closing argument exacerbated the error in the instructions.  We conclude that the error seriously affected the fairness of Brown's trial on Count VII, and his conviction on that count is therefore reversed.

_____

-17-

Kouris contends that the jury was incorrectly instructed on how to determine the drug quantity for which she was responsible. We review for abuse of discretion and will affirm so long as "the instructions, taken as a whole, fairly and adequately submitted the issues to the jury." Aleman, 548 F.3d at 1166 (quotation omitted). Kouris objected at trial that the coconspirator liability instruction "nullifie[d] reasonable foreseeability as is required under Apprendi," and she now argues that the jury received conflicting direction on how to determine the quantity attributable to her.

The drug quantity instruction explained that the jury should attribute to Kouris all quantities that she possessed for personal use or distribution, and also any amounts that "fellow conspirators distributed or agreed to distribute, if you find that those distributions or agreements to distribute were a necessary or natural consequence of the agreement . . . and were reasonably foreseeable by the defendant." This instruction did not conflict with the coconspirator liability instruction because both directed the jury to determine the defendant's culpability based on the acts of other conspirators done in furtherance of the conspiracy. When the jury asked during deliberations whether the amounts attributable to each defendant could be different, the court referred it to the drug quantity instruction, which clearly instructed the jury to attribute to Kouris amounts distributed by her coconspirators only if she could reasonably foresee those distributions. We conclude that the jury was properly instructed on how to determine the drug quantity attributable to Kouris, and that its finding was a valid basis for her sentence.

## G. Sufficiency of the Evidence

Brown contends that there was insufficient evidence to convict him on Counts II, IV, and VII and that the district court erred by denying his motion for judgment of acquittal. Since his conviction on Count VII has been reversed for other reasons, we limit our discussion to the other counts. We review de novo, and will uphold the

-18-

verdict if "there is any interpretation of the evidence that could lead a reasonable-minded jury to find the defendant guilty beyond a reasonable doubt." Garcia-Hernandez, 530 F.3d at 661 (quotation omitted).

Count II charged the use, carry, possession, and discharge of a firearm during and in relation to a drug trafficking crime on October 3, 2005, the day Monte Williams was shot. Cyrinthia Williams's testimony supports the jury's finding that Giles discharged a firearm on October 3. The jury instructions allowed Brown to be convicted if the discharge of the firearm was reasonably foreseeable to him and was in furtherance of the conspiracy—two elements established by Clarence Dennis's testimony.

Count IV alleged the discharge of a firearm on May 3 and 4, 2005, and refers to the murders of Wilkinson, Dominguez, and Garcia. Brown argues that the government's case was flawed because its forensic examiner concluded that a revolver had been used, but George Moore testified that Brown had carried "the kind [of gun] that spits bullets." Brown claims that meant a semiautomatic weapon. Any dispute about the type of firearm used does not cast doubt on his conviction in light of Moore's highly incriminating testimony about Brown's role in the murders. The district court did not err by concluding that the jury could reasonably find that Brown violated § 924(c) as alleged in Counts II and IV, either directly or by the reasonably foreseeable actions of his coconspirator.

The district court also denied Brown's motion for a new trial, which we review for a clear and manifest abuse of discretion. United States v. Brown, 956 F.2d 782, 786 (8th Cir. 1992). The court may grant a new trial "if the evidence weighs heavily enough against the verdict that a miscarriage of justice may have occurred." Id. Brown contends that the district court failed to weigh the evidence and assess the credibility of "cooperating witnesses influenced by immense incentive to implicate" him in the crimes. Brown does not provide any evidence that their testimony was

-19-

rendered unreliable by the unidentified "immense incentives."  The district court had the opportunity to observe the testimony of these witnesses and assess their credibility, and it did not abuse its discretion in denying Brown's motion for a new trial.

_____

Kouris challenges the sufficiency of the evidence that she intentionally joined the conspiracy charged in Count I.  Separate proof that she engaged in an overt act in furtherance of the conspiracy is not necessary, see United States v. Morales, 445 F.3d 1081, 1084 (8th Cir. 2006), and elements of conspiracy may be established by reasonable inferences from the evidence, see Henderson v. United States, 815 F.2d 1189, 1191–92 (8th Cir. 1987).

Kouris traveled to Atlanta when Giles and Brown went there to negotiate a drug deal.  Kouris's mother testified that she was visiting family, but the jury was entitled to make its own finding.  Kouris also leased a storage unit in which police found 35 pounds of marijuana, a semiautomatic rifle, ammunition, and a bullet proof vest. Although Kouris contends that Giles made all the payments for the unit[4] and that a Crown Point employee could not recall having seen her visit it, as lessee Kouris had constructive possession over the unit's contents.

At 1214 Applewood Drive, Kouris's apartment, the police found marijuana, a bullet proof vest, and a video camera containing footage of Giles and Brown counting large amounts of cash with more than a pound of marijuana visible on the table. The police found six ounces of marijuana and a scale when searching a house that she and Giles shared on 40th Avenue, and another four ounces of marijuana during a second search after Giles's arrest and Kouris's indictment.  Kouris's constructive possession

_____

[4]At oral argument the prosecutor referred to cancelled checks showing that Kouris occasionally paid the rent, but she could not provide an exhibit number.

-20-

of marijuana and trafficking paraphernalia such as a scale, a firearm, ammunition, and bullet proof vests supports the jury's finding that she joined the conspiracy. See United States v. Padilla-Pena, 129 F.3d 457, 465 (8th Cir. 1997) (defendant's control over apartment where heroin and related items were found was "highly suggestive of his role in the heroin business"); United States v. Lopez, 944 F.2d 33, 39 (1st Cir. 1991) (defendant leased apartment where heroin and packaging paraphernalia was found); United States v. Brett, 872 F.2d 1365, 1369 (8th Cir. 1989) (possession of key to a house where cocaine and trafficking paraphernalia were found was sufficient circumstantial evidence linking defendant to conspiracy).

From jail Giles asked Kouris to collect payment for marijuana deliveries, to conceal assets, and to contact prospective witnesses. Kouris argues that there was little corroborating evidence that she performed these tasks, but the jury could reasonably infer from Giles's apparent trust in her that she was involved in the conspiracy. Kouris and Giles talked in code, referring to distribution of "petitions" and soliciting "signatures" on these petitions. The jury could find that Kouris's ability to communicate in code while speaking to Giles in jail shows her previous involvement in the conspiracy. See Padilla-Pena, 129 F.3d at 465 (content of phone conversations with another conspirator revealed the defendant's involvement in a drug distribution scheme).

McGinnis, Moore, and Boyston testified that they had not dealt with Kouris in any drug trafficking and did not think Giles would trust her, but the jury could have found that their testimony was not credible or that they simply did not know about her role. Kouris contends that most of the government's witnesses provided no evidence against her, but "a defendant may be convicted for even a minor role in a conspiracy," so long as that role is proved beyond a reasonable doubt. United States v. Lopez, 443 F.3d 1026, 1030 (8th Cir. 2006) (en banc). After studying the record and viewing the evidence in the light most favorable to the verdict, we conclude that the evidence was

-21-

sufficient to support Kouris's conviction. We also conclude that the district court did not abuse its discretion by denying her motion for a new trial.

## H.    Ineffective Assistance of Counsel

Giles argues that his right to counsel was violated because of the ineffectiveness of his attorney, Terri Crawford, during the early stages of the case. To make out this claim Giles must show that Crawford's performance was deficient and that this deficiency prejudiced his defense. Strickland v. Washington, 466 U.S. 668, 687 (1984). The parties agree that Crawford tried to influence key witnesses to tell police that Brown was responsible for certain acts rather than Giles. Brown's trial attorney questioned witnesses about how their statements to police had changed due to Crawford's influence, and Giles argues that he was unfairly prejudiced by this discussion. Although Crawford's conduct may have been unethical and deficient, it ended six months before trial when she withdrew from representation. Her conduct did not harm Giles directly—it was not until this evidence was introduced and discussed at trial, without objection from Giles's trial attorney, that it had the potential to affect the jury's verdict.

We do not consider ineffective assistance of counsel claims on direct appeal unless "the record has been fully developed or to avoid a plain miscarriage of justice." United States v. Cook, 356 F.3d 913, 919–20 (8th Cir. 2004). There is not a sufficient record of deficient representation or resulting prejudice to permit proper evaluation of Giles's ineffective assistance claim at this time.

## I.    Sentencing

In sentencing Giles on Counts I and VI the district court imposed a life sentence after finding beyond a reasonable doubt that he had committed the first degree murder of Dominguez, Wilkinson, and Garcia. The district court applied U.S.S.G. §

-22-

2D1.1(d)(1), which permits a sentence for first degree murder if the district court finds that "a victim was killed under circumstances that would constitute murder." Giles contends that this sentence violates Apprendi v. New Jersey, 530 U.S. 466, 490 (2000), which held that "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Sentencing facts need not be submitted to a jury, however. See United States v. Garth, 540 F.3d 766, 778 (8th Cir. 2008). Giles's conviction under 21 U.S.C. § 841(b)(1)(A)(vii), based on the jury's finding that he was responsible for the distribution of more than 1,000 kilograms of marijuana, carries a maximum statutory sentence of life, so the district court's finding did not result in a sentence beyond the statutory range authorized by the verdict. Giles argues in the alternative that the district court should have applied a "clear and convincing evidence" standard. Since the district court applied a more rigorous standard—beyond a reasonable doubt, Giles's argument is to no avail.

Giles also challenges his sentences on Counts II and IV, which reflected the jury's findings that he had discharged a weapon during and in relation to a drug trafficking offense. Giles argues the instructions did not remind the jury that it must find discharge beyond a reasonable doubt, but the jury was given a general reasonable doubt instruction which it presumably applied to the issue of discharge. Giles's argument that the evidence was insufficient to support a finding that he discharged a firearm on May 3 and 4, 2005 fails because a reasonable jury could have made this finding based on the testimony of George Moore and the government's forensic evidence.

_____

At sentencing the district court found that Kouris had interfered with the investigation of the case and imposed a two level increase for obstruction of justice under U.S.S.G. § 3C1.1. We review for clear error a district court's factual findings for the purpose of sentencing, which it makes using a preponderance of the evidence

-23-

standard.  <u>Aleman</u>, 548 F.3d at 1163.  The presentence report concluded that Kouris had attempted to destroy or conceal evidence when she tried to recover a video camera seized from her apartment on April 4, 2006.  On May 10, Giles called Kouris from jail and told her that the camera contained incriminating footage.  Kouris contacted police on June 21 to request that the camera be returned, explaining that it contained footage of her family.

Kouris argues that the obstruction finding was in error because she had a legitimate reason to seek the return of the camera and because she did not actually succeed in obtaining it.  Section 3C1.1 clearly states that attempts to obstruct create a basis for enhancement.  That Kouris did not contact police for the five weeks after the camera was seized, until Giles told her it contained evidence, supports the district court's finding that she made the request "for the purpose of eliminating evidence at the trial."  The district court was in a better position to make determinations about Kouris's "motives and veracity."  <u>United States v. Holt</u>, 149 F.3d 760, 762 (8th Cir. 1998).  The incriminating footage was material because it would tend to influence the jury to find that Giles and Brown were engaged in a conspiracy to distribute large quantities of marijuana.  <u>See</u> U.S.S.G. § 3C1.1 cmt. nn. 4(d), 6.  The district court's finding that Kouris obstructed justice was not clearly erroneous.

Kouris also complains that the district court's reliance on information not contained in the presentence report deprived her of fair notice.  The evidence in question had been presented at trial, however, <u>see</u> <u>Padilla-Pena</u>, 129 F.3d at 468, and the district court notified the parties before the sentencing hearing that it would take judicial notice of trial evidence.  We conclude that Kouris's argument that she was denied fair notice is without merit.

-24-

## III.

Accordingly, we affirm the judgment of the district court except for Charmar Brown's conviction on Count VII which we reverse and vacate.  Brown's case is accordingly remanded to the district court for resentencing.

_____

Appellate Case: 08-1385     Page: 25     Date Filed: 03/20/2009 Entry ID: 3528933